**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAAZ QURESHI, individually and on behalf of others similarly situated**, | ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) | Case No. 1:20cv-01141-CRC |
| **AMERICAN UNIVERSITY**, | ) ) ) | |
| *Defendant.* | ) ) ) | |
| **MATTHEW RABINOWITZ, individually and on behalf of others similarly situated**, | ) ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) | Case No. 1:20-cv-01454-CRC |
| **AMERICAN UNIVERSITY**, | ) ) ) | |
| *Defendant.* | ) ) | |
| **DANISH ARIF, individually and on behalf of others similarly situated**, | ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) | Case No. 1:20-cv-01555-CRC |
| **AMERICAN UNIVERSITY**, | ) ) ) | |
| *Defendant.* | ) ) ) | |

**<u>PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION .................................................................................................................. 1

FACTUAL BACKGROUND .................................................................................................. 3

ARGUMENT ......................................................................................................................... 5

I.   THE CONSOLIDATED COMPLAINT ASSERTS A COGNIZABLE CAUSE
     OF ACTION FOR BREACH OF CONTRACT ............................................................. 5

     A.  The Consolidated Complaint Establishes an Enforceable Contract ..................... 5

     B.  The Consolidated Complaint Alleges an Actionable Breach ............................. 10

     C.  Defendant is Not Entitled to Special Deference ............................................... 14

          1.  Educational Malpractice Claims ................................................................ 14

          2.  Claims Involving Student Discipline, Student Assessment, and Other
              Highly Specialized Subjects of a Purely Academic Nature ......................... 15

          3.  All Other Claims ..................................................................................... 16

II.  PLAINTIFFS STATE A CLAIM FOR UNJUST ENRICHMENT ...................................... 22

III. PLAINTIFFS STATE A CLAIM FOR CONVERSION ...................................................... 25

IV. PLAINTIFFS STATE A CLAIM UNDER THE CPPA ...................................................... 30

CONCLUSION ..................................................................................................................... 34

# TABLE OF AUTHORITIES

**Cases**

*ABA, Inc. v. D.C.*,
40 F. Supp. 3d 153 (D.D.C. 2014) ....................................................................... 23

*Alden v. Georgetown Univ.*,
734 A.2d 1103 (D.C. 1999) ................................................................................ 15

*Ansari v. New York University*,
1997 WL 257473 (S.D.N.Y. 1997) ..................................................................... 17

*Baltimore v. District of Columbia*,
10 A.3d 1141 (D.C. 2011) .................................................................................. 25

*Basch v. George Washington, Univ.*,
370 A.2d 1364 (D.C. 1977) ............................................................................. 7, 10

*Beukas v. Bd. Of Trs. Of Farleigh Dickson Univ.*,
605 A.2d 708 (N.J. Super. Ct. 1992) ................................................................... 12

*Bloomgarden v. Coyer*,
479 F.2d 201 (D.C. Cir. 1973) .............................................................................. 7

*Brantley v. D.C.*,
640 A.2d 181 (D.C. 1994) ............................................................................. 14, 17

*Bregman v. Perles*,
747 F.3d 873 (D.C. Cir. 2014) ............................................................................ 23

*Bucheit v. PLO*,
2003 U.S. Dist. LEXIS 26002 (D.D.C. Aug. 15, 2003) ....................................... 26

*Busby v. Capital One, N.A.*,
932 F. Supp. 2d 114 (D.D.C. 2013) ..................................................................... 29

*Campbell v. Nat'l Union Fire Ins. Co.*,
130 F. Supp. 3d 236 (D.D.C. 2013) ..................................................................... 27

*Cannon v. Wells Fargo Bank, N.A.*,
926 F. Supp. 2d 152 (D.D.C. 2013) ........................................................ 26, 32, 33

*Cavaliere v. Duff's Bus. Inst.*,
605 A.2d 397 (1992) .......................................................................................... 15

*CenCor, Inc. v. Tolman,*
868 P.2d 396 (Colo. 1994) ........................................................................................... 17

*Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz,*
82 F. Supp. 3d 344 (D.D.C. 2015) ............................................................................... 23

*Day v. Avery,*
548 F.2d 1018, 179 U.S. App. D.C. 63 (D.C. Cir. 1976) ........................................... 33

*Edwards v. Ocwen Loan Servicing,*
 *LLC*, 24 F. Supp. 3d 21 (D.D.C. 2014) ...................................................................... 26

*Eisele v. Ayers,*
381 N.E.2d 21 (Ill. Ct. App. 1978) .............................................................................. 12

*Falconi-Sachs v. LPF Senate Square, LLC,*
142 A.3d 550 (D.C. 2016) ........................................................................................... 23

*Ford v. Chartone, Inc.,*
908 A.2d 72 (D.C. 2006) .............................................................................................. 32

*G-I Holdings, Inc. v. Baron & Budd,*
238 F. Supp. 2d 521 (S.D.N.Y. 2002) ......................................................................... 28

*Giles v. Howard Univ.,*
428 F. Supp. 603 (D.D.C. 1977) .................................................................................... 7

*Gov't of Rwanda v. Rwanda Working Grp.,*
227 F. Supp. 2d 45 (D.D.C. 2002) ............................................................................... 25

*Greene v. Howard University,*
412 F.2d 1128 (D.C. Cir. 1969) ..................................................................................... 7

*Harris v. Blockbuster Inc.,*
622 F. Supp. 2d 396 (N.D. Tex. 2009) ........................................................................ 13

*Ihebrem v. Capital One, N.A.,*
933 F. Supp. 2d 86 (D.D.C. 2013) ............................................................................... 30

*Johnson v. McCool,*
808 F. Supp. 2d 304 (D.D.C. 2011) ............................................................................. 25

*Johnson v. Schmitz,*
119 F. Supp. 2d 90 (D. Conn. 2000) ............................................................................ 17

*Kashmiri v. Regents of Univ. of Cal.*,
156 Cal. App. 4th 809 (Ct. App. 2007) .................................................................... 17

*Kramer Assoc., Inc. v. Ikam, Ltd.*,
888 A.2d 247 (D.C. 2005) ........................................................................................ 23

*Krukas v. AARP, Inc.*,
376 F. Supp. 3d 1 (D.D.C. 2019) ............................................................................. 26

*MacDonald v. Thomas M. Cooley Law Sch.*,
724 F.3d 654 (6th Cir. 2013) ................................................................................... 32

*Martin v. United Airlines, Inc.*,
727 F. App'x 459 (10th Cir. 2018) ........................................................................... 11

*Mawakana v. Bd. of Trustees of Univ. of D.C.*,
113 F. Supp. 3d 340 (D.D.C. 2015) ........................................................................... 7

*McNamara v. Picken*,
950 F. Supp. 2d 193 (D.D.C. 2013) ............................................................. 26, 27, 28

*Nevius v. Afr. Inland Mission Int'l*,
511 F. Supp. 2d 114 (D.D.C. 2007) ......................................................................... 28

*Olsson v. Board of Higher Ed.*,
49 N.Y.2d 408, 402 N.E.2d 1150 (1980) .................................................................. 15

*Paynter v. New York University*,
319 N.Y.S.2d 893 (N.Y. App. Div. 1971) ................................................................ 21

*Pride v. Howard Univ.*,
384 A.2d 31 (D.C. 1978) ............................................................................................ 7

*Regents of the Univ. of Mich. v. Ewing*,
474 U.S. 214 (1985) .................................................................................................. 15

*Rinck v. Ass'n of Reserve City Bankers*,
676 A.2d 12 (D.C. 1996). .......................................................................................... 12

*Roe v. Loyola Univ. New Orleans*,
2007 WL 4219174 (E.D. La. Nov. 26, 2007) ...................................................... 24, 25

*Ross v. Creighton University*,
957 F.2d 410 (7th Cir. 1992) .................................................................................... 17

*Rwanda v. Rwanda Working Group*,
227 F. Supp. 2d 45 (D.D.C. 2002) .................................................................. 26, 27, 28

*Sabre Int'l Sec. v. Torres Advanced Enter. Solutions, LLC*,
13 F. Supp. 3d 62 (D.D.C. 2014) ................................................................................ 28

*Schulman v. Franklin & Marshall Coll.*,
371 Pa. Super. 345 (1988) ............................................................................................ 6

*Shaw v. Marriott Int'l, Inc.*,
605 F.3d 1039 (D.C. Cir. 2010) ................................................................................. 32

*Shea v. Fridley*,
123 A.2d 358 (D.C. 1956) ........................................................................................... 25

*Shulman v. Voyou, LLC*,
251 F. Supp. 166 (D.D.C. 2003) ................................................................................ 29

*Sisco v. GSA Nat. Capital Fed. Credit Union*,
689 A.2d 52 (D.C. 1997) ............................................................................................. 11

*Sloan v. Urban Title Servs.*,
2011 U.S. Dist. LEXIS 31225 (D.D.C. Mar. 27, 2011) ............................................ 28

*Swartley v. Hoffner*,
734 A.2d 915 (Pa. Super. Ct. 1999) .......................................................................... 15

*Tedeschi v. Wagner Coll.*,
49 N.Y.2d 652 (1980) .................................................................................................. 16

*Zumbrun v. Univ. of S. Cal.*,
23 Cal. App. 3d 1 (Ct. App. 1972) ....................................................................... 17, 21

**Statutes**

D.C. Act No. 17-53, 54 D.C. Reg. 4085 (May 4, 2007) ............................................. 30

D.C. Code § 28-3901 .............................................................................................. 30, 32

D.C. Code § 28-3904 ................................................................................................... 30

D.C. Code. § 28-3905 .................................................................................................. 31

**Rules**

Fed. R. Civ. P. 15 ................................................................................................ 3

Fed. R. Civ. P. 8 ........................................................................................... 22, 28

**Analogous Tuition Refund Orders Nationally**

*Cross v. Univ. of Toledo*,
No. 2020-00274JD, 2020 Ohio Misc. LEXIS 121 (Ct. Cl. July 8, 2020) ..................................... 20

*Garland v. Western Michigan Univ.*,
20-0063-MK (Mi. Ct. Cl. Sept. 15, 2020) ..................................................................... 20

*McDermott v. Ohio State Univ.*,
No. 2020-00286JD, 2020 Ohio Misc. LEXIS 127 (Ct. Cl. Aug. 24, 2020) ................................ 20

*Mellowitz v. Ball State Univ. & Bd. of Trs. of Ball State Univ.*,
2020 Ind. Super. LEXIS 854 (Marion Sup. Ct. Civil Div. 14 Aug. 12, 2020) ............................ 20

*Milanov v. Univ. of Mich.*,
Case No. 20-000056-MK, 2020 Mich. Ct. Cl. LEXIS 1 (Ct. Cl. July 27, 2020) ......................... 20

*Salerno v. Fla. S. Coll.*,
2020 WL 5583522 (M.D. Fla. Sept. 16, 2020) ................................................... 19, 22, 23

*Smith v. The Ohio State Univ.*,
2020-00321JD (Oh. Ct. Cl. Sept. 9, 2020)..................................................................... 20

*Waitt v. Kent State Univ.*,
2020-00392JD (Oh. Ct. Cl. Sept. 28, 2020)................................................................... 20

## INTRODUCTION

Beginning in March 2020, the COVID-19 global pandemic disrupted the daily lives of nearly all Americans.  Students were not spared, like Plaintiffs Maaz Quereshi, Matthew Rabinowitz, and Danish Arif (collectively, "Plaintiffs"), who paid tens of thousands of dollars in tuition and fees to get an in-person educational experience, including all of the services, opportunities, and activities that come therewith, only to have that in-person experience ripped away.  Students, like Plaintiffs, could have enrolled in one of the country's many online learning institutions – at a far cheaper cost – but opted to pay a premium for an in-person educational experience.  Many students undertook significant debt to make these tuition and fee payments.  Nonetheless, although it has an endowment exceeding $676 million, Defendant American University ("Defendant" or "American") has refused to refund a penny of the tuition that students, like Plaintiffs, paid for an in-person educational experience.  As is clear from its Motion to Dismiss, Defendant believes that its students should bear all of the costs of the COVID-19 pandemic.  *See* Defendant's Memorandum of Law (ECF No. 27-1) ("MTD").  The Court should not permit this inequity.

Defendant's attempts to avoid liability fail.  Defendant first argues Plaintiffs have not established the existence of a contract for on-campus education, and even if a contact existed, that Plaintiffs' fail to allege a breach of that contract.  MTD at 5-16.  But Plaintiffs have established both.  D.C. law recognizes that the relationship between a university and its students is contractual, with the terms of the contractual bargain defined by representations made in the school's catalogues, bulletins, and other enrollment or marketing materials.  Here, the Consolidated Complaint alleges all elements of a breach of contract: existence of a contract, Plaintiffs' performance, American's breach, and resulting damages.  *See* Consolidated Class Action Complaint (ECF No. 17) ("CAC") ¶¶ 76-136.  A review of American's Course Catalog,

admissions materials, website, class policies, and long history of prior dealings in totality lead to only one conclusion: that prior to COVID-19, American promised to provide on-campus in-person education, and that Plaintiffs and class members paid handsomely for and expected to receive the same. *See Id.* ¶¶ 126-128.

American next argues its educational judgment should be granted special deference. MTD at 16-20. That is simply not the law with respect to a university's commercial activities, and does not apply to any and all actions that may be brought against an educational institution as Defendant seems to suggest. Universities are not entitled to judicial deference in transactions involving more than pure academic judgment.

Here, Plaintiffs' claims are plainly not academic in nature, but rather commercial, based on fundamental principles of contract law. The Consolidated Class Action Complaint does not take issue with the specific ways that individual professors elected to teach their classes once remote learning was mandated. Plaintiffs do not suggest, for example, that classes should have been taught differently online. Rather, Plaintiffs and the putative class collectively paid millions of dollars to Defendant to purchase an on-campus educational experience with multiple benefits, services, experiences, and opportunities. But once the switch to remote learning occurred, Plaintiffs were denied that experience for which they bargained and paid, including interaction with other students, the use of Defendant's infrastructure, buildings, libraries, labs, computers, etc. in the particular student's chosen discipline. Plaintiffs, like all parties to a contract, are entitled to receive the benefit of their bargain. The denial and deprivation of the rights, privileges, and in-person education that Defendant has afforded students for the past 127 years was a breach of contract between Plaintiffs and Defendant.

Simply put, Defendant did not provide Plaintiffs with the services that it marketed to the public in order to distinguish itself from other competitors, even though Plaintiffs bargained and paid for them.   The law does not permit Defendant to retain the monies Plaintiffs paid. Unsurprisingly, an emerging body of court decisions in other COVID-19 university class actions has led to the rejection of schools' early attempts to dismiss claims similar to those asserted by Plaintiffs.   *See infra* at Section I(C)(3) (collecting cases).   Given the stage of the case and the applicable pleading standards, which require viewing Plaintiffs' well-pled allegations in their favor, Plaintiffs respectfully request that this Court deny Defendant's Motion in its entirety. Should the Court be inclined to dismiss any aspect of Plaintiffs' claims, Plaintiffs request that the dismissal be without prejudice and with leave to amend in accordance with the liberal amendment standards inherent in Fed. R. Civ. P. 15(a).

## FACTUAL BACKGROUND

Defendant's Spring 2020 semester began on or about January 8, 2020 and concluded on or around May 5, 2020.  CAC ¶¶ 42-43.  Effective March 10, 2020, American suspended all classes for the Spring 2020 semester because of the global COVID-19 pandemic.  *Id.* ¶ 46-47.  American did not hold any in-person classes from March 10, 2020 through the end of the Spring 2020 semester.  *Id.*  Classes that continued after March 10, 2020 were only provided in an online format, with no in-person instruction.  *Id.* ¶ 51.  As a result of the closure of Defendant's facilities, Defendant has not delivered the educational services, facilities, access and/or opportunities that Plaintiffs and the putative class contracted and paid for.  *Id.* ¶¶ 52, 59.  Thus, American did not provide in-person education, experiences, or related services for approximately 42% of the Spring Semester 2020.  *Id.* ¶ 50.  Nonetheless, American has refused and continues to refuse to offer any pro-rated discount or refund on Spring 2020 tuition.  *Id.* ¶ 58.

Plaintiffs and American entered into a contractual agreement where Plaintiffs would provide payment in the form of tuition and fees to Defendant, in exchange, would provide in-person educational services, experiences, opportunities, and other related services.  The terms of the contractual agreement, in addition to being implied by a long prior course of conduct, were set forth in publications from American University, including American's Spring Semester 2020 Course Catalog ("Course Catalog"), American's website, student handbook, correspondence, marketing materials, and other circulars, bulletins, and publications.  *Id.* ¶¶ 78-80.  That Course Catalog "provided Plaintiffs and Class Members with information regarding the courses offered, the instructor, the days and times during which the courses would be held, and the location (including the building and room number) in which courses would be held."  *Id.*  ¶ 118.  Indeed, the Course Catalog specifically allowed for students to search for Spring Semester 2020 courses to enroll in based on the location of instruction:



*Id.*  at ¶ 119.

Plaintiffs Qureshi, Rabinowitz, and Arif were enrolled as full-time undergraduate students at American during Spring Semester 2020.  *Id.* ¶ 13.  When Plaintiffs sought to enter into a contractual agreement with Defendant for the provision of educational services for Spring Semester 2020, Plaintiffs viewed Defendant's Course Catalog through the online portal to make specific course selections prior to registering and paying for selected courses.  *Id.* ¶ 117.  Plaintiffs accepted Defendant's offer for live in-person on-campus education and paid valuable consideration in exchange.  *Id.* ¶ 131.

## ARGUMENT

I.    **THE CONSOLIDATED COMPLAINT ASSERTS A COGNIZABLE CAUSE OF ACTION FOR BREACH OF CONTRACT**

Defendant has moved to dismiss Plaintiffs' causes of action for breach of contract, asserting essentially three arguments. First, Defendant contends that the Consolidated Complaint fails to establish the existence of a contract for on-campus education.  Second, Defendant contends that, even if a contract existed, the Consolidated Complaint fails to allege a breach of that contract. Finally, Defendant alleges that even if it breached the contract, it was at liberty to do so without repercussion.  Each of Defendant's arguments is without merit.

### A.  The Consolidated Complaint Establishes an Enforceable Contract

Breach of contract actions can sometimes trade in the minutia.  Parties may disagree as to the meaning of specific terms or the highly technical application of lengthy contracts written by overpriced lawyers containing more Latin phrases than English ones.  This is no such case. Plaintiffs do not seek to enforce some obscure provision buried deep within a university catalog. This action does not seek to overturn a disciplinary decision or poor performance assessment by latching onto a vague procedural statement in the student handbook. Rather, this action contemplates one of the most fundamental and universally understood and accepted relationships

5

ever existing between student and university, and one about which there has been no confusion since the first universities were established in this country dating back to the 1600's. That is that when young adults "go off to college," there is indeed a campus to which they go to complete their studies. The Merriam-Webster dictionary defines "university" as "an institution of higher learning providing facilities for teaching and research and authorized to grant academic degrees."

To be sure, in recent years, the concept of "online colleges" have grown in popularity among certain demographics. Schools such as Strayer University and University of Phoenix have been quite successful in marketing their alternative form of education, which may appeal to certain individuals who, for example, wish to attend school while working full time, or desire to spread their education out over the course of several years. Still, other students crave the true "college experience" – the quintessential game of frisbee on the quad - and traditional schools have spent billions of dollars on campus infrastructure to attract and retain those students. Whatever the reason a particular student chooses a particular school, one thing is certain: when a student applies to university, she knows exactly what type of college experience she is signing up for, and it is exactly the one that university has spent millions of dollars promoting. As the Superior Court of Pennsylvania recognized in 1988, "[a] college is frequently selected by parents and students because of the special aura or quality of life on campus that distinguishes it from other institutions." *Schulman v. Franklin & Marshall Coll.*, 371 Pa. Super. 345, 351 (1988).[1]

Notwithstanding these 400 years of historical context, Defendant argues that it is patently unreasonable for its students to expect an on-campus experience. In the District of Columbia, the

---

[1] Ironically, the Court made this observation in establishing the policy of judicial deference toward student disciplinary decisions (discussed more fully in Section I(C)(2) *infra*): the very deference Defendant erroneously seeks to extend to this case.

relationship between student and university is contractual in nature. *Pride v. Howard Univ.*, 384 A.2d 31, 34 (D.C. 1978) ("[A] contractual relationship exists between a university and its students."). However, there is rarely an express, written, fully integrated contract. Instead, that contractual relationship is in part implied and in part as set forth in the amalgamation of various documents, handbooks, catalogs, agreements, advertisements, and other publications. In construing these writings, "the standard is that of reasonable expectation what meaning the party making the manifestation, the University, should reasonably expect the other party to give it." *Giles v. Howard Univ.*, 428 F. Supp. 603, 605 (D.D.C. 1977). Likewise, the Court may consider the parties' course of dealing for the purposes of identifying the implied contractual terms. *Mawakana v. Bd. of Trustees of Univ. of D.C.*, 113 F. Supp. 3d 340, 347 (D.D.C. 2015) ("'An implied-in-fact contract ... differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt.'") (quoting *Bloomgarden v. Coyer*, 479 F.2d 201, 208 (D.C. Cir. 1973)). Finally, "[i]t has been established that the usual practices surrounding a contractual relationship can themselves be raised to the level of a contractual obligation." *Pride,* 384 A.2d at 35 (citing *Greene v. Howard University*, 412 F.2d 1128, 1133 (D.C. Cir. 1969)).

In short, the two overriding considerations are reasonableness of expectation and intent of the parties. "In ascertaining intent, we consider not only the language used in the contract but also the circumstances surrounding the making of the contract, the motives of the parties and the purposes which they sought to accomplish." *Basch v. George Washington, Univ.*, 370 A.2d 1364, 1367 (D.C. 1977).

Here, Defendant has been providing on-campus education since its inception 127 years ago. Although Defendant has also recently started offering certain online-only degrees, it markets

those programs on a different website, publishes a different catalog for them and, importantly, charges a different (and lower) price for them. Defendant's marketing campaign for its traditional program focuses almost exclusively on the school's location, its campus facilities, and the student experience it offers through its many clubs and events. Among other things alleged throughout the Consolidated Complaint, Defendant promised: "our 90-acre campus gives you the advantages of a traditional college setting combined with unparalleled access to…our nation's capital," CAC ¶ 83; "150+ student clubs and organizations," *id. at* ¶ 93; "[w]e're an intimate community within an urban city, where the stunning sights of our city are never far from view," *id. at* ¶ 98; "[w]hether you're learning in century-old structures or state-of-the-art facilities, experiencing the arts in our museums and theaters, or venturing out into the city, American University offers endless opportunities," *id. at* ¶ 99. Defendant prompts prospective students to take campus visits and tours. *Id.* ¶ 107. Upon admission, students are told, "[a]t AU, you'll make personal connections on campus, as well as in DC and around the world." *Id.* ¶ 110. Once on campus, students register for classes through an online portal that lists each class by physical location. *Id.* ¶¶ 118-19. Plaintiffs showed up for in-person classes, and otherwise had access to campus facilities and services, every day for the weeks and months leading up to the time that they were evicted from campus. *Id.* ¶¶ 122-25. No reasonable person paying tuition prior to COVID-19 could have believed anything other than that they were signing up for an on-campus, in-person education. In fact, it would be disingenuous for Defendant to suggest that, prior to COVID-19, their official response to a student asking if classes were taught in-person would have been "no, don't count on it." Indeed, without these things, what would they have to sell students? Their product would be no more compelling than that of Strayer or University of Phoenix.

Defendant's promises are further highlighted in the Catalog.  Contrary to Defendant's suggestion that "the Catalog makes clear that tuition is tied to credits received, not to the means of instruction" (MTD at 14), the Catalog actually says exactly the opposite.  In the "Tuition and Fee Explanation" section, the Catalog states, "The off-campus tuition rate differs from the rate for on-campus courses."  (Ex. A to MTD, at pg. 2).  This statement not only confirms that Defendant offers "on-campus courses" but also indicates that the rate of tuition is tied to location of instruction.  Likewise, the Catalog specifically calls all non-online courses "standard face-to-face" courses.  *Id.* at pg. 10.

The Catalog's description of fees is equally clear.  The Student Activity Fee is defined as a fee designed to "enhance the general campus environment."  CAC ¶ 160.  Likewise, the in exchange for the Sports Center Fee, students are promised "[a]ny registered student can use the entire sports center complex, including the fitness center."[2]  *Id.* ¶ 161.  The technology fee is paid for access to such on-campus benefits as "classroom instruction…computer labs…and faster internet connectivity."  *Id.* ¶ 162.

Defendant asks the Court to turn a blind eye to all of these things, including 99% of its publications.  Defendant separately argues that no express or implied promise is created by: (1) anything on its website (MTD at 8); (2) any of its admission materials (*Id.* at 9); (3) any of its publications identifying its online degree programs as separate and distinct from its traditional programs (*Id.*); (4) any of the portions of its Course Catalog as cited in the Consolidated Complaint (*Id.* at 10); (5) any of its policies concerning class attendance (*Id* at 11.); or (6) any of the parties'

---

[2] Defendant points out that this fee is explicitly "not a membership fee."  This is true, of course, because membership fees are optional.  This fee is mandatory.  Nonetheless, the fee description still explicitly promises use of the entire sports center complex facilities, including the fitness center.

prior course of dealing. *Id*. The Court need not consider these arguments separately, however, when considering the totality of "the circumstances surrounding the making of the contract, the motives of the parties and the purposes which they sought to accomplish." *Basch*, 370 A.2d at 1367. While any one of these arguments might possibly be true, standing alone, the aggregate of these publications and interactions can lead to only one conclusion: that prior to COVID-19, the University promised and to provide on-campus education, and the students paid handsomely for and expected to receive the same.

**B. The Consolidated Complaint Alleges an Actionable Breach**

Defendant next argues that, even if there was a contract for on-campus education, and even though such benefits were admittedly not provided, it would not have breached that contract by failing to offer fair pro-rated tuition and fee refunds. Ironically, in making this argument, after having asked the Court to ignore nearly every other document and action, Defendant asks the Court to rely upon its half-page "tuition cancellation schedule" found on page 9 of Exhibit A to Defendant's MTD. This refund policy has nothing to do with the case at hand. Instead, the policy sets forth the way that refunds will be handled only "when students withdraw from courses." This policy contemplates a scenario where the student elects to break the contract. It speaks nothing of what happens when the Defendant breaches the contract.

Defendant's argument as to fees fares no better. That the handbook contains a phrase stating "fees are nonrefundable" is of no consequence. Unlike the tuition refund policy, which is arguably part of the contract, albeit an inapplicable part, this policy is not contractual at all. As *Basch* instructs, not every part of a university's bulletin becomes part of the contract. Instead, "[w]hether a given section of the bulletin also becomes part of the contractual obligations between the students and the university … must depend upon general principles of contract construction." *Basch*, 370 A.2d at 1367. Necessarily, to be an enforceable contractual provision, there must exist

10

consideration and mutuality of obligation.  *See, e.g.*, *Sisco v. GSA Nat. Capital Fed. Credit Union*, 689 A.2d 52 (D.C. 1997).  While Defendant might be free to refuse fee refunds in the face of a student's withdrawal (the likely intent of this handbook provision), Defendant cannot apply this policy in the face of its own breach.  A contract that provides no remedies is no contract at all. This is no more binding than a sign stating "all sales are final" on the McDonalds drive through board.  While such a policy might apply where the customer changes her mind after ordering (perhaps she spots a Burger King across the street), the policy would not allow McDonalds to collect full payment at the first window and then deliver only a portion of the order at the second window.  The distinction turns on whether the University is willing and able to provide the service and the student just elects not to accept it, or whether the University does not provide the service at all.  If a party could contractually excuse itself from liability for non-performance, every contract of adhesion in America would do so.

Defendant cites *Martin v. United Airlines, Inc.*, 727 F. App'x 459 (10th Cir. 2018) to support its position.  However, *Martin* actually supports Plaintiffs' position.  In *Martin*, the plaintiffs "were not able to take the trips and cancelled their bookings." *Id.* at 460.  Therefore, the Court held that they were not entitled to refunds pursuant to United's no refund policy.  The case did not involve a situation where the scheduled flights were cancelled by United.  Instead, the flights proceeded as scheduled, and plaintiffs just elected not to board them.  There is no indication from *Martin* that United would have been entitled to cancel the flights altogether and simply keep the monies paid by all the passengers.

Defendant's argument that the services for which the fees were charged are still being provided is equally inappropriate.  Plaintiffs have alleged that they are not.  This must be taken as true for purposes of the Motion to Dismiss and raises a premature factual argument.

Finally, Defendant's reservation of "the right to amend the policies and information contained in the University Catalog from time to time, with or without notice" is a red herring. MTD at 15.  This case involves changes made during *the middle of a semester*, after the contract had already been formed, after students had already pre-paid tuition and fees, and after the deadline had passed for students to withdraw.  It is one thing to make changes from semester to semester, and Plaintiffs do not suggest that Defendant lacks authority to do so.  However, it is an entirely different matter to change the terms of the contract after one party has already fully performed.

Neither of the cases cited by Defendant stand for the proposition that such a reservation of right allows the University to unilaterally alter the contract *in the middle of the semester* after students have already fully performed under the contract by pre-paying tuition and fees.  Defendant relies upon *Beukas v. Bd. Of Trs. Of Farleigh Dickson Univ.*, 605 A.2d 708, 708-09 (N.J. Super. Ct. 1992), a case in which a dental program was discontinued between academic calendar years.  Every student who had pre-paid tuition and fees for the final semester received that full semesters' worth of instruction and credit.  The students were merely required to transfer to a different school before beginning their next semester.  And in fact, the school went above and beyond by helping to arrange the transfers and offering to subsidize any differences in tuition. Defendant's reliance on *Eisele v. Ayers*, 381 N.E.2d 21, 26 (Ill. Ct. App. 1978) is equally misplaced, where the court held students could not sue **for year-over-year increases** of tuition absent allegations of malice or bad faith.  *Id.* (emphasis added).

In essence, these situations do not so much turn on the existence of the reservation clause, but on the doctrine of contract modification.  Parties are permitted to modify contracts where there is mutual assent.  *Rinck v. Ass'n of Reserve City Bankers*, 676 A.2d 12 (D.C. 1996).  In such cases, although the universities reserved the right to modify, they also satisfied the legal obligations for

effecting modification.  Specifically, the students who did not assent to modification were free to transfer without financial penalty.  By remaining enrolled, there was an implication of assent.  By contrast, Plaintiffs in this matter and those similarly situated had no such freedom in the face of Defendant's attempted modification.  They could not transfer or dis-enroll mid-semester because they had already pre-paid for the entire semester and Defendant's policies (as addressed in Section I(B) *supra*) provided for no refund upon withdrawal after the end of the fourth week of classes. The Court cannot infer assent from Plaintiffs' and the classes' continued enrollment because they had literally no other option.

Defendant's reliance on the disclaimer suffers from a fatal flaw: it lacks the consideration or specificity necessary to be considered a binding contractual term.  The disclaimer purports to grant Defendant unfettered discretion to modify the contract without repercussion.  It is black letter law that such a provision is illusory and, therefore, not enforceable.  *See*, *e.g.*, *Harris v. Blockbuster Inc.*, 622 F. Supp. 2d 396 (N.D. Tex. 2009) (holding terms and conditions agreement stating "Blockbuster may at any time, and at its sole discretion, modify these Terms and Conditions of Use, including without limitation the Privacy Policy, with or without notice. Such modifications will be effective immediately upon posting" illusory and unenforceable.). While a party to a contract may contractually reserve the right to modify certain specified terms upon the occurrence of certain specified factors, a provision purporting to give one party the right to unilaterally modify, breach, or cancel the contract for any reason or no reason at all is plainly unenforceable.

Likewise, this provision lacks specificity.   Although Defendant contends that it "necessarily [implies] the right to shift the method of instruction" (MTD at 15-16), the statement itself makes no such reservation, much less the reservation to do so in the middle of the semester while evicting students from campus and retaining their pre-paid tuition and fees.  Any ambiguity

in the reservation of rights must be resolved in the favor of Plaintiffs, not given the "implication" urged by the drafter.  Defendant had the opportunity to explicitly state whatever reading it now asks the Court to infer, and it failed to do so.

In short, the reservation of rights is not an enforceable term of the contract at issue in this case.  Neither does Defendant's attempt to modify the contract mid-semester meet the legal elements required for modification.

### C.  Defendant is Not Entitled to Special Deference

In a final attempt to escape responsibility from this straightforward contract action, Defendant argues that educational institutions are automatically entitled to great deference and/or subject to their own special set of rules.  This is simply not the law with respect to a university's commercial activities; here, selling an in-person, on-campus education to consumers.  While it is true that such deference is due in certain instances, this deference does not apply to any and all actions that may ever be brought against such an institution.  Colleges and universities do not get special treatment with respect to commercial transactions in the marketplace.

There are essentially three scenarios in which educational institutions find themselves defendants in court, and each requires a different analysis.  While Defendant's scattershot citation to various cases does well to highlight these different scenarios, it does little to accurately define them or assist the Court in properly categorizing the instant action.  As discussed below, Defendant's argument fails to acknowledge that the instant case is not subject to the deference it seeks.  Such deference is circumscribed to a narrow set of circumstances.

### 1.  Educational Malpractice Claims

The first type of claim against an academic institution is a type of claim that courts have labeled "educational malpractice."   These claims are generally not allowed.  *See, e.g.*, *Brantley v. D.C.,* 640 A.2d 181 (D.C. 1994).  A claim for educational malpractice is one that sounds in tort

and alleges that a school failed to provide an effective education.  Thus, an educational malpractice claim is one that "amounts to a general allegation of lack of quality education, without more" *Cavaliere v. Duff's Bus. Inst.*, 605 A.2d 397, 404 (1992).  A number of the cases cited by Defendant in support of its plea for discretion involve allegations of pure educational malpractice.  Accordingly, they are inapplicable to the present matter.

### 2. Claims Involving Student Discipline, Student Assessment, and Other Highly Specialized Subjects of a Purely Academic Nature

The second type are claims involving faculty hiring, student discipline, student assessment, and other highly specialized subjects of a purely academic nature.  The plethora of the remaining cases upon which Defendant relies fall into this category.  These claims are not disallowed, but courts do generally afford the type of deference that Defendant's Memorandum requests *ad nauseum*.  The rationale behind this is simple and well-reasoned.

> "When a school issues a diploma to one of its students, it certifies to society that the student is well-versed in all of the knowledge and skills required by his or her chosen profession. Thus, to ensure society's confidence in the qualifications of individuals who have graduated from a particular educational institution, 'it is essential that the decisions surrounding the issuance of these credentials be left to the sound judgment of the professional educators who monitor the progress of their students on a regular basis.'"

*Alden v. Georgetown Univ*., 734 A.2d 1103, 1109 (D.C. 1999)(quoting *Olsson v. Board of Higher Ed.*, 49 N.Y.2d 408, 402 N.E.2d 1150, 1153 (1980)).

As a result, the national consensus is "[w]hen judges are asked to review the substance of a **genuinely academic decision** ... they should show great respect for the faculty's professional judgment." *Swartley v. Hoffner*, 734 A.2d 915, 921 (Pa. Super. Ct. 1999) (quoting *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214 (1985)) (emphasis added).  Generally, courts will not intervene in such cases absent a showing of bad faith or arbitrary and capricious conduct.  This deference, however, is not applicable to situations involving non-academic decisions or decisions

15

not involving determinations requiring the special expertise of educators, such as the present case. This distinction is often confused by litigators, such as Defendant.  As the New York Court of Appeals noted, in describing the distinction between standards of deference, "when urged in academic achievement as distinct from nonacademic matters the contract tends to be limited to the implied in law condition of good faith, i.e., not to act arbitrarily…[there is] ultimate confusion of the rules applicable in the two situations."  *Tedeschi v. Wagner Coll.*, 49 N.Y.2d 652, 659 (1980).

### 3.  All Other Claims

All other claims are subject to the same general contract principles that apply in cases involving non-educational institutions such as the case here.  Not every action by a student against a school is an educational malpractice claim, or a claim involving highly specialized subjects of a purely academic nature.  Where the breach of contract claim does not ask the court to consider highly specialized academic decisions or allege that that the school breached its agreement by failing to provide an effective education, but instead alleges failure to provide specified services, the action may be properly maintained.  The Seventh Circuit succinctly summarized the distinction as follows:

> To state a claim for breach of contract, the plaintiff must do more than simply allege that the education was not good enough.  Instead, he must point to an identifiable contractual promise that the defendant failed to honor.  Thus, as was suggested in [Paladino v. Adelphi Univ., 89 A.D.2d 85, 454 N.Y.S.2d 868 (1982)], if the defendant took tuition money and then provided no education, or alternatively, promised a set number of hours of instruction and then failed to deliver, a breach of contract action may be available.  Similarly, a breach of contract action might exist if a student enrolled in a course explicitly promising instruction that would qualify him as a journeyman, but in which the fundamentals necessary to attain that skill were not even presented.  In these cases, the essence of the plaintiff's complaint would not be that the institution failed to perform adequately a promise of educational service, but rather that it failed to perform the service at all.

16

*Ross v. Creighton University*, 957 F.2d 410, 416-17 (7th Cir. 1992).[3]

Courts across the country have found cognizable breach of contract claims where: an academically challenged student-athlete had been promised academic-assistance services in exchange for attending the university that he claimed were not provided, *Ross*, 957 F.2d at 416-17; a university "raised professional education fees for continuing students after promising on its website and in its catalogues that such fees would not be raised for the duration of the students' enrollment in the professional program," *Kashmiri v. Regents of Univ. of Cal*., 156 Cal. App. 4th 809 (Ct. App. 2007); a university may have "obligated itself to provide modern equipment in good working condition, qualified instructors, and computer training for all students, but did not fulfill those obligations," *CenCor, Inc. v. Tolman,* 868 P.2d 396, 300 (Colo. 1994); a professor ceased teaching classes on May 1 despite the course set to conclude "with a final examination on or before June 2, 1970," the professor did not give a final examination, and the professor provided each student with a score of B for the course due to the professor's engagement in a faculty strike protest of American military involvement in Cambodia, *Zumbrun v. Univ. of S. Cal.,* 23 Cal. App. 3d 1, 7 & 10-11 (Ct. App. 1972); where "Yale failed to deliver on its express and implied contractual duties to safeguard students from academic misconduct, to investigate and deal with charges of academic misconduct, and to address charges of academic misconduct in accordance with its own procedures" that resulted in misappropriation of the plaintiff's idea by faculty, *Johnson v. Schmitz*, 119 F. Supp. 2d 90, 96 (D. Conn. 2000); and where university promised to provide state-of-the-art facilities and hands-on training, but allegedly failed to do so, *Ansari v. New York University*, 1997 WL 257473 (S.D.N.Y. 1997).

---

[3] *Ross* was generally cited with approval by the D.C. Court of Appeals in *Brantley*, *supra.*

Just as in those cases, the Consolidated Complaint in the instant case does not allege a cause of action for educational malpractice, or involve highly specialized subjects of a purely academic nature.  The Consolidated Complaint does not seek to challenge student disciplinary or assessment decisions.  Nor do Plaintiffs take issue with the specific ways that individual professors elected to teach their classes once remote learning was mandated.  Plaintiffs do not suggest, for example, that teachers should have used one video conferencing platform over another, or that the content of lesson plans should have been adjusted.  Rather, Plaintiffs allege that they paid a large sum to Defendant for the purchase of an in-person, on-campus educational experience with multiple benefits, services, access and opportunities, and that Defendant, in breach of contract, did not provide that experience.  Plaintiffs, like all parties to a contract, are entitled to receive the benefit of the bargain. The law does not permit Defendant—a university with hundreds of millions of dollars—to refuse to issue appropriate refunds and insist that Plaintiffs (and other similarly-situated students) bear 100% of the loss resulting from Defendant's breach.

Defendant's opposition seems rooted in Defendant's incorrect understanding of Plaintiffs' claims.  Plaintiffs are not suing because they claim they received a lower quality education, although by all accounts, they did.  Instead, the CAC alleges that when students pay hundreds of thousands of dollars to enroll in schools perhaps hundreds or thousands of miles from their home, they are purchasing an on-campus educational experience with multiple appurtenant benefits, benefits, services, access and opportunities.  It is a bundle of sticks, and the actual quality of educational instruction is but one stick in the bundle.

Once the switch to online learning was mandated, not even the best professor exercising the best academic judgment could have given the students that which they were deprived and that which forms the basis of this lawsuit – the on-campus experience for which they had bargained

18

and paid handsomely.  Even if it could be shown that Plaintiffs received a better quality of education after the online transition, this suit would still lie, because Plaintiffs remained deprived of the other rights and privileges for which they had contracted.

The decision to retain monies paid for products and services that were never delivered is a standard commercial business decision, and one encountered by all market participants who take money in return for the promise to deliver services and/or products.  Defendant's decision to retain such monies in this case was not academic in nature and clearly not a highly specialized academic judgment.  It was, however, illegal and unjust.

While Defendant may dispute these allegations, it is abundantly clear that the Consolidated Complaint alleges a claim that falls into the third category of contract actions against higher education institutions, and does not allege generalized educational malpractice or require any heightened judicial deference.  These allegations must be taken as true for purposes of the instant motion to dismiss, and accordingly, dismissal is not warranted.  Indeed, there are approximately 150 lawsuits currently pending throughout the country related to the failure of colleges and universities to provide appropriate refunds after switching to remote instruction during the spring of 2020.  Although Defendant characterizes these lawsuits as alleging "educational malpractice" and/or necessitating judicial deference, no court has yet to agree.  Instead, of the eight cases where these arguments have been advanced and fully adjudicated, all eight motions have been denied. *See Salerno v. Fla. S. Coll.*, 2020 WL 5583522 at *4 (M.D. Fla. Sept. 16, 2020) (finding complaint sufficiently alleged "that the College's publications clearly implied that courses would be conducted in-person" and "underscore[ing] that this case is not about the quality of the College's education… This case is simply about an alleged promise to provide in-person learning that was allegedly breached.") (Ex. A); *Milanov v. Univ. of Mich.*, Case No. 20-000056-MK, 2020 Mich.

Ct. Cl. LEXIS 1, *8-9 (Ct. Cl. July 27, 2020)("[Plaintiffs] are arguing that the university promised one method of instruction, charged tuition and fees commensurate with that method of instruction, yet provided a different (allegedly lesser) method of instruction. This is a claim potentially sounding in contract or in quasi-contract, not in due process" and "while [case law] describes a number of areas into which a Court should be hesitant to intrude, principles of contract and quasi-contract are not among those areas.") (Ex. B); *McDermott v. Ohio State Univ.*, No. 2020-00286JD, 2020 Ohio Misc. LEXIS 127, *5 (Ct. Cl. Aug. 24, 2020)("Plaintiff's complaint does not merely assert that the education she received was substandard due to the clinic being closed. Rather, plaintiff alleges that defendant charged a fee specifically to support the dental clinic and then closed the clinic. That is sufficient to assert an unjust enrichment claim.") (Ex. C); *Cross v. Univ. of Toledo*, No. 2020-00274JD, 2020 Ohio Misc. LEXIS 121,  *7-8 (Ct. Cl. July 8, 2020) (Ex. D); *Mellowitz v. Ball State Univ. & Bd. of Trs. of Ball State Univ.*, 2020 Ind. Super. LEXIS 854, *1 (Marion Sup. Ct. Civil Div. 14 Aug. 12, 2020) (Ex. E); *Waitt v. Kent State Univ.,* 2020-00392JD (Oh. Ct. Cl. Sept. 28, 2020) at *3 ("Waitt's first amended class action complaint does not present a claim of 'educational malpractice' as KSU suggests.") (Ex. F); *Garland v. Western Michigan Univ.*, 20-0063-MK (Mi. Ct. Cl. Sept. 15, 2020) at *7 ("the Court disagrees that plaintiff's complaint asks the Court to interfere with WMU's academic autonomy…") (Ex. G); *Smith v. The Ohio State Univ.,* 2020-00321JD (Oh. Ct. Cl. Sept. 9, 2020) at *3 ("Plaintiff alleges that when she paid tuition to defendant a contract was created and that by holding classes virtually and not refunding a portion of the previously paid tuition and fees, defendant breached said contract…The mere mention of possible consequences to plaintiff's educational or professional future does not render plaintiff's complaint a claim for educational malpractice.") (Ex. H).

Plaintiffs are not aware of any tuition and fee refund cases across the country that have been dismissed as improper educational malpractice actions or on the grounds of "judicial deference." Finding no support for its position in the above cases (involving nearly identical facts and allegations to the present case), Defendant instead relies upon a 40-year-old case arising out of the small claims court of New York, *Paynter v. New York University*, 319 N.Y.S.2d 893 (N.Y. App. Div. 1971). This reliance is equally misplaced. In *Paynter*, classes were suspended on May 7, 1970 until the examination period after the tragic shooting at Kent State University. The First Department reversed a judgment by the small claims court that held the University was altogether unjustified in cancelling the classes, which is not the issue here. The reversal was a mere two paragraphs and was issued, it seems, in response to a lengthy opinion by the small claims court that could only be described as a misplaced educational manifesto. In denying relief, the court explained that this "***insubstantial change*** made in the schedule of classes does not permit a recovery of tuition." *Id.* at 894 (emphasis added).

However, *Paynter* was a reversal of a judgement awarding a tuition refund, not an order granting a motion to dismiss. As explained by the California appellate court analyzing *Paynter*, "whether the partial failure of consideration was minimal so as to render applicable the maxim 'de minimis non curat lex' or whether it justifies refund of a portion of the tuition and fee allocable to the course is a matter of proof, under the present state of the pleadings, at trial in an appropriate forum." *Zumbrun,* 101 Cal. Rptr. at 505. Thus, *Paynter* supports Plaintiffs' position that this case should be heard on the merits. In any event, it is distinguishable in that it involved a suspension of a few days of courses not a half a semester's worth of courses.

21

## II.     PLAINTIFFS STATE A CLAIM FOR UNJUST ENRICHMENT

Defendant argues that Plaintiffs' unjust enrichment claim should be dismissed because it duplicates their breach of contract claim, and because an unjust enrichment claim may not lie where an express contract exists.  Motion at 21.  Plaintiffs disagree.

First, Defendant ignores the plain reading of Rule 8(d)(3) which allows for pleading in the alternative, including unjust enrichment claims.  *See Salerno,* 2020 WL 5583522, at *1 (rejecting argument that unjust enrichment claim was improper: "Regardless of whether a contract exists, the College disputes the merits of the breach of contract claim.  Even more important, this Court has consistently held that a plaintiff may allege alternative claims in her complaint.").

Second, the existence of a contract alone does not foreclose a recovery under unjust enrichment.  Instead, unjust enrichment claims will fail where there is a valid *and enforceable* contract that *actually governs the issue in dispute*.  An otherwise existing "contract" might be invalid where, for example, there is a lack of consideration.  Likewise, an otherwise valid contract might not address the issue in dispute or might be unenforceable under common law avoidance doctrines.  The merits of any affirmative defenses Defendant may raise are fact intensive and not appropriate for discussion at this stage.  But the possibility that Defendant asserts these defenses in the future remains.  If the finder of fact (or the Court at a later stage) finds that Defendant's performance was excused, Plaintiffs' claims for equitable relief are not only viable but appropriate.  Indeed, in the cases of impossibility, impracticability, and frustration of purpose, *both* parties are excused from performance and the law seeks to restore both parties to their pre-contract position.  In a case such as this, where Plaintiffs have already performed (by paying tuition and fees), equitable disgorgement must accomplish this result.  As the District of Columbia Court of Appeals aptly noted:

> Judicial statements to the effect that "there can be no unjust enrichment in contract cases" can be misleading if taken casually. Restitution claims of great practical significance arise in a contractual context, but they occur at the margins, when a valuable performance has been rendered under a contract that is invalid, or subject to avoidance, or otherwise ineffective to regulate the parties' obligations. Applied to any such circumstance, the statement that there can be no unjust enrichment in contract cases is plainly erroneous.

*Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 556 (D.C. 2016).

In time, this case will resolve as a breach of contract action *or* an unjust enrichment action, and not both. However, that point is not now. Until such evidence is gathered (outside of the four corners of pleadings) to allow the Court or trier of fact to establish the existence and enforceability of a contract, Plaintiffs' claims for unjust enrichment can and must be maintained. *See Salerno*, 2020 WL 5583522, at *5 (denying defendant's motion to dismiss claims of unjust enrichment pled in the alternative to breach of contract in the context of another university's shutdown during the COVID-19 pandemic).

Not only are Plaintiffs permitted to plead unjust enrichment in the alternative to their contract claims, but they have done so plausibly. "'Unjust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust.'" *Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz*, 82 F. Supp. 3d 344, 357 (D.D.C. 2015) (citing *Bregman v. Perles,* 747 F.3d 873, 876 (D.C. Cir. 2014)). In other words, "[a] claim for 'unjust enrichment' may be asserted when one party receives a benefit from another under circumstances that make it inequitable for the defendant to retain the benefit without the payment of its value." *ABA, Inc. v. D.C.*, 40 F. Supp. 3d 153, 172 (D.D.C. 2014) (citing *Kramer Assoc., Inc. v. Ikam, Ltd.,* 888 A.2d 247, 254 (D.C. 2005)).

Here, Plaintiffs have pled that they conferred a benefit on Defendant when they paid tuition and fees for the Spring 2020 semester. CAC ¶¶ 175-177. Plaintiffs have further pled that Defendant retained the benefit. *Id.* at ¶¶ 178-179. Defendant does not appear to contest this. Instead, Defendant argues that its retention was not unjust or inequitable. Mot. at 22. This is a premature factual argument, as the CAC alleges that the retention was unjust. *Id.* at ¶¶ 53-62, 180-183. Furthermore, Defendant itself has essentially acknowledged that the retention of tuition and fees for Spring Semester 2020 is unjust and that the monetary value of online classes is not commensurate with the on-campus experience by providing a 10% discount on tuition for Summer 2020 Semester and Fall 2020 Semester online courses. *Id.* at ¶¶ 54-57.

Defendant's reliance on *Roe v. Loyola Univ. New Orleans*, 2007 WL 4219174 (E.D. La. Nov. 26, 2007) to support its argument on this point is misplaced as *Loyola* is not analogous to the present case. In *Loyola*, the university provided *the option* for its students to attend other accredited law schools as visiting students (in-person and on-campus) during the aftermath of Hurricane Katrina without paying tuition to those schools, so long as they paid tuition to Loyola. *Id.* at *2-3. In dismissing Roe's unjust enrichment claim, the court explained "[p]laintiff has pointed to no provision…that would entitle him to a free semester of law school. Rather, by attending classes during the Fall 2005 semester at SMU, plaintiff received the benefit of the emergency policy made possible by Loyola." *Id.*, at *5-6. The unjust enrichment claim failed because "if he hadn't paid tuition to Loyola, he would have been required to pay SMU's tuition, which was more expensive than that of Loyola." *Id.* at *7. Contrasting to the situation at hand, Plaintiffs were not given an option when Defendant shut down its campus mid-semester—they were forced to either accept a product that was not bargained for (online education) or receive no education at all and forfeit the tuition and fees they had already paid in full. This Hobson's choice

was no option at all.  Moreover, Plaintiffs are not seeking a tuition-free semester as was the Plaintiff in *Loyola*; they only seek a prorated refund based on the difference between tuition for on-campus and online courses, as well as a prorated refund of the fees for access and services for which they did not receive the benefit.

As a result of the closure of campus, Defendant saved significant sums of money in the way of reduced utility costs, reduced maintenance and staffing requirements, reduced or eliminated hours for hourly employees, etc.  At the same time, Defendant received a significant bailout from the Federal Government under the CARES Act.  All the while, Defendant is supported by a multi-million-dollar endowment while its students are incurring debt to pay the very fees and tuition Defendant seeks to retain.  This is a textbook example of an unjust and inequitable arrangement and Plaintiffs' claims for unjust enrichment should not be dismissed.

## III.    PLAINTIFFS STATE A CLAIM FOR CONVERSION

To state a claim for conversion under D.C. law, a plaintiff must allege "'(1) an unlawful exercise, (2) of ownership, dominion, or control, (3) over the personal property of another, (4) in denial or repudiation of that person's rights thereto.'"  *Johnson v. McCool*, 808 F. Supp. 2d 304, 308 (D.D.C. 2011) (quoting *Gov't of Rwanda v. Rwanda Working Grp*., 227 F. Supp. 2d 45, 62 (D.D.C. 2002)); *see also Baltimore v. District of Columbia*, 10 A.3d 1141, 1155 (D.C. 2011).  "[W]here the defendant's initial possession is lawful, the settled rule is that it [sic] the absence of other facts and circumstances independently establishing conversion, a demand for its return is necessary to render his possession unlawful and to show its adverse nature."  *Shea v. Fridley*, 123 A.2d 358, 361 (D.C. 1956) (footnote omitted).  Plaintiffs have pled each of these elements by alleging that Defendant wrongfully retained and refused to refund his tuition and fees.  CAC ¶¶ 58-60, 185-193.

Each of Defendant's four attacks on Plaintiffs' conversion claim are meritless.  First, "'[m]oney can be the subject of a conversion claim if the plaintiff has the right to a specific identifiable fund of money.'" *McNamara v. Picken*, 950 F. Supp. 2d 193, 194 (D.D.C. 2013) (quoting *Cannon v. Wells Fargo Bank, N.A.*, 926 F. Supp. 2d 152, 176 (D.D.C. 2013)).  *See also Bucheit v. PLO,* 2003 U.S. Dist. LEXIS 26002, *18 (D.D.C. Aug. 15, 2003). Plaintiffs have identified the specific sums of money that were converted, namely the tuition and fees they paid for the Spring 2020 semester.  CAC ¶¶ 28-38; *see Krukas v. AARP, Inc.*, 376 F. Supp. 3d 1, 44 (D.D.C. 2019)(holding that where plaintiff alleged that defendant had wrongfully charged and retained an additional 4.95% over and above the premium for her insurance policy, "this rationale sufficiently alleges a right to a specific, identifiable source of money.").  Accordingly, their claim is not one for a "general obligation to pay money" or an "unspecified, unidentified, portion of a larger oil of funds" and is actionable as a conversion claim.  *See* MTD at 24, citing *Edwards v. Ocwen Loan Servicing, LLC*, 24 F. Supp. 3d 21, 31 (D.D.C. 2014).

*Rwanda v. Rwanda Working Group*, 227 F. Supp. 2d 45 (D.D.C. 2002) is directly on point. In that case, a contractual relationship existed between the plaintiff and the defendant, which required the plaintiff to pay the defendant a specific sum of money for work that would then be performed on behalf of the plaintiff.  *Id*. at 50, 63. The plaintiff paid the defendant $28,000 and $55,000 as specified in two separate contracts, however, the defendant failed to use the funds in a manner that would benefit the plaintiff as anticipated by the terms of the contracts.  *Id*.  The plaintiff therefore demanded that the defendant return the money that was paid to him pursuant to the contracts.  *Id*.  Because the defendant had received a specific identifiable sum of money from the plaintiffs, did not perform the services required by the contract, and did not return the money when requested to do so by the plaintiffs, the court held that the defendant unlawfully converted

the plaintiff's money.  *Id.*  Here there was a contract between Plaintiffs and the University under which the University promised to provide in-person education and activities, for which Plaintiffs paid specific sums of money.  CAC ¶ 187.   Defendant failed to use the funds to provide in-person learning and activities as promised in the contract and refused to return the money paid by Plaintiffs.  CAC ¶ 190.  Accordingly, as in *Rwanda*, Plaintiffs have stated a claim for conversion.

The cases relied upon by Defendant are inapposite.  In *McNamara,* 950 F. Supp. 2d 193, plaintiff alleged that money contributed to a partnership was wrongfully used to pay off defendant's personal debts.  *Id*. at 194.  The court determined that plaintiff had not stated a claim for conversion with regard to general partnership funds, which were derived in part from services he provided, because he had not established that a specific amount of funds that he had personally contributed were misdirected.  *Id*. at 195.  However, the court held that plaintiff *had* stated a claim for conversion with regard to a check for a specific amount of money which plaintiff had contributed to the partnership.  *Id*.  Like the check in *McNamara*, Plaintiffs' tuition and fees are a specific, quantifiable amount of money which the University misdirected to online classes rather than the promised and bargained-for in-person learning.

*Campbell v. Nat'l Union Fire Ins. Co.*, 130 F. Supp. 3d 236 (D.D.C. 2013) is similarly unhelpful to Defendant's position.   In *Campbell*, plaintiff alleged that her insurance company had overcharged her on her premiums.  The court held that a conversion claim could not lie because, among other things, overcharges on a credit card did not constitute specific, identifiable sums of money that were segregated for a specific purpose.  *Id*. at 259.  Here by contrast, Plaintiffs' tuition and fees are not merely debts upon which they are owed a refund.  They are specific sums of money which were paid and earmarked for the specific purpose of providing in-person educational opportunities and on-campus activities.  CAC ¶¶ 24-30, 33-37.

Second, Plaintiffs' conversion claim is not predicated merely on their rights under their contract with the University.  While the breach of contract claim is based on Defendant's broken promise to provide in-person teaching and access to certain facilities, the conversion claim is based on an independent harm, namely, Defendant's wrongful retention of the tuition and fees Plaintiffs paid.  Because the conversion claim is not based merely on Defendant's failure to fulfill its contractual obligations it can lie alongside the breach of contract claim.  *See Rwanda*, 227 F. Supp. 2d at 63 (defendant held liable for conversion even though the monies were paid pursuant to contract because defendant did not perform the services as required and failed to return the monies upon demand); *Sloan v. Urban Title Servs.*, 2011 U.S. Dist. LEXIS 31225, *26 (D.D.C. Mar. 27, 2011) (finding that plaintiff's claim for conversion could lie because her allegations extended beyond mere enforcement of a contractual obligation); *Sabre Int'l Sec. v. Torres Advanced Enter. Solutions, LLC*, 13 F. Supp. 3d 62, 72 (D.D.C. 2014) ("[Plaintiff] is not recasting a contract claim as one for conversion; its allegations give rise to a claim for conversion independent of any contract remedies it may also have.").

And, even if the conversion and breach of contract claims were duplicative (which they are not), Plaintiffs are permitted to plead such claims in the alternative.  *See Nevius v. Afr. Inland Mission Int'l,* 511 F. Supp. 2d 114, 122 (D.D.C. 2007) (permitting plaintiff to plead breach of contract and unjust enrichment in the alternative); *McNamara,* 950 F. Supp. 2d at 128 ("a plaintiff 'need not use particular words to plead in the alternative as long as it can be reasonably inferred that this is what [it was] doing.'") (quoting G-*I Holdings, Inc. v. Baron & Budd*, 238 F. Supp. 2d 521, 536-37 (S.D.N.Y. 2002); *see also* Fed. R. Civ. P. 8(e)(2) (permitting pleading in the alternative).  This is especially true where, as here, Defendant denies the very existence of a contractual obligation to Plaintiffs.  *See Busby v. Capital One, N.A.,* 932 F. Supp. 2d 114, 145

(D.D.C. 2013) ("because [defendant] in fact disclaims the existence of any contractual relationship with Capital One, a conversion claim is not unfitting.").

Third, Plaintiffs have adequately alleged that Defendant diverted their funds "in denial or repudiation of [Plaintiff's] right to" the disputed property, namely the tuition and fees they paid for the Spring 2020 semester.  *See* MTD at 24, quoting *Shulman v. Voyou, LLC*, 251 F. Supp. 166, 170 (D.D.C. 2003).  Contrary to Defendant's argument, the University did not use Plaintiffs' tuition or fees for their "intended purpose."  As evidenced by Defendant's website, marketing materials, advertisements, and other literature, the intended purpose of Plaintiffs' tuition was in-person instruction and the on-campus experiences.  *See* CAC ¶¶ 24-30.  Similarly, the mandatory fees paid by Plaintiffs and their classmates were specifically intended to pay for on-campus activities, intra-campus transportation, and access to campus facilities and equipment.  *See* CAC ¶¶ 33-37.  The University diverted Plaintiffs' tuition and fees away from the bargained-for in-person learning and activities to online learning.  Nor is Plaintiffs' choice to continue the semester online rather than simply drop out inconsistent with their claim for conversion.  Defendants failure to provide a refund of Plaintiffs' tuition and fees forced Plaintiffs to choose between an online education at full price or no education at all.  By taking online classes, Plaintiffs received an education, but not the one that they were promised and paid for.  Plaintiffs have thus stated a claim for the difference between the value of the in-person education they and the University agreed to and the online education they received.

Finally, for the reasons set forth in Section I.C., *supra*, Plaintiffs' conversion claim, like its claims for breach of contract and unjust enrichment, are not claims of educational malpractice.  Plaintiffs have not asked the Court to sit in review of the day-to-day implementation of the educational policies, but to remedy that Defendant's refusal to refund Plaintiffs tuition and fees

which they were induced to pay based on the University's unfulfilled promise of in-person educational services, opportunities, and experiences.

## IV.    PLAINTIFFS STATE A CLAIM UNDER THE CPPA

Plaintiffs bring claims under D.C. Consumer Procedures Act (CCPA) on the grounds that the University's failure to provide an in-person education and complete transition to online- only education, was in direct contradiction to the representations made in its marketing, advertisements, and other public representations.   CAC ¶¶ 195-211.   The purpose of the CPPA is to protect consumers from a broad spectrum of unscrupulous trade practices by merchants. *Ihebrem v. Capital One, N.A.*, 933 F. Supp. 2d 86, 106-07 (D.D.C. 2013).   Due to the CPPA's remedial nature, the CPPA is "construed and applied liberally to promote its purpose" of "assur[ing] that a just mechanism exists to remedy all improper trade practices and deter the continuing use of such practices. D.C. Code § 28-3901(b)(1),(c).   Pursuant to D.C. Code § 28-3904, merchants are prohibited from "misrepresent[ing] as to a material fact which has a tendency to mislead."

In the face of the broad purpose and liberal pleading standards of the CPPA, the Court should reject Defendant's attempt to dismiss this claim.   First, Defendant erroneously asserts that it is excepted from the CPPA as a nonprofit educational institution.   MTD at 25-26.   But Nonprofits were explicitly added to § 28-3901 per the Nonprofit Organizations Oversight Improvement Amendment of 2007, D.C. Act No. 17-53, 54 D.C. Reg. 4085 (May 4, 2007) (the "Nonprofit Amendment") in order "to eliminate the judicially-created exemption to the Consumer Protection Procedures Act for nonprofit organizations" and to "address[] the regulatory vacuum that now jeopardizes the integrity of our nonprofit sector and the public's trust of nonprofit organizations."[4]

---

[4] *See* Council of the District of Columbia, Committee on Public Safety and Judiciary, Report on Bill 17-53, at 2, 5 (Feb. 28, 2007) ("By eliminating the judicially-created exemption for

There is only a limited carve out exempting actions against nonprofits based on: "membership in such organization, membership services, training or credentialing activities, sale of publications of the nonprofit organization, medical or legal malpractice, or any other transaction, interaction, or dispute not arising from the purchase or sale of consumer goods or services in the ordinary course of business." D.C. Code. § 28-3905(k).

Defendant provides little support for its assertion that its failure to provide in-person educational opportunities for its students falls under this narrow exception as a "training or credentialing activity." Indeed, the only case cited by the University is a District of Columbia Court of Appeals case which explicitly declined to address the issue. MTD at 26. Lack of supporting caselaw aside, Plaintiffs do not contest that they and their fellow students received instruction and will obtain a degree from the University. Accordingly, their claims do not concern "training or credentialing," but rather, are based on the misrepresentations and material omissions made by Defendant about the form of its education and access to on-campus resources and activities. Moreover, the statute makes it clear that the nonprofit exception applies only to a "transaction, interaction, or dispute *not arising from the purchase or sale of consumer goods or services in the ordinary course of business*." D.C. Code. § 28-3905(k) (emphasis added). Defendant makes no argument that its educational services are not provided to its students "in the ordinary course of business,"[5] and, as set forth below the educational opportunities it promises fit

---

nonprofits, we can provide consumers who purchase from nonprofit businesses with the same legal protection as consumers who purchase from for-profit business.").

[5] Indeed, Defendant charges tuition and fees for its in-person learning and experiences to directly to thousands of students each year. *See* https://www.american.edu/about/academic-profile.cfm (last accessed October 12, 2020) (stating that Defendant's enrollment is over 14,000).

comfortably within the statute's definition of "consumer services."  Accordingly, the nonprofit exception to the CPPA does not apply to Defendant's deceptive and misleading representations.

Defendant's assertion that the in-person education it promised is not a "consumer good" is similarly meritless.  The statute defines consumer goods and services broadly as "any and all parts of the economic output of society, at any stage or related or necessary point in the economic process ....". D.C. Code § 28-3901(a)(7).  It is true that the CPPA excludes "transactions intended primarily to promote businesses or professional interests." *Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039, 1043, (D.C. Cir. 2010).  But the circumstances under which courts in this circuit have applied this exclusion are very different from those at issue here and typically involve purchases of goods on behalf of an employer.  *See Ford v. Chartone, Inc.*, 908 A.2d 72, 84, n.12 (D.C. 2006)(cab driver's purchase of gasoline while on the job was not subject to the CPPA); *Cannon,* 926 F. Supp. 2d at 173 (insurance policy purchased for business was not a consumer good);  *Shaw*, 605 F.3d at 1043 (overcharges for hotel stays during business trips were not actionable under CPPA).  Here, Plaintiffs are not paying tuition and fees as part of their employment.  Moreover, nowhere in the Complaint do Plaintiffs allege that their primary goal in pursuing an education with Defendant is to increase their earning power or boost their job prospects.  In fact, the Complaint makes it clear that Plaintiffs paid their tuition and fees based on the form and quality of education that they were promised, not simply for a degree that would enhance their professional prospects.  This stands in stark contrast to *MacDonald v. Thomas M. Cooley Law Sch*., 724 F.3d 654 (6th Cir. 2013), cited by Defendant, where "the complaint averred that each of the graduates intended to use his or her law degree *to prospectively better themselves and their personal circumstances through the attainment of full-time employment in the legal sector*."  *Id*. at 661 (internal quotation marks omitted) (emphasis in original).  Defendant cannot seek dismissal of Plaintiffs' CPPA claim based

on an assumption regarding their motives for seeking an education, especially when that assumption is belied by the allegations in the Complaint.

Defendant further argues that Plaintiffs' CPPA claim must be dismissed because the University's promises of in-person education were "statement[s] of future expectations" that did not have a "tendency to deceive" because the University could not have predicted the pandemic and the need to transition to online-only instruction. MTD at 27. But Defendant did not say that it would *attempt* to provide an in-person education or that it would provide an in-person education *barring unforeseen circumstances*. In *Cannon,* 926 F. Supp. 2d 152, cited by Defendant, the court held that the representation that the plaintiff "*may* be eligible for [i]mproved coverage compared to your current homeowners or property insurance" was not actionable. *Id*. at 174 (emphasis in original). Here, by contrast, Defendant's promise of in-person learning was unequivocal and noncontingent. And even if the University's promises of an in-person education were properly characterized as "statements of future expectation" such statements are still actionable where, as here "the parties did not stand in a position of parity and normal wariness with respect to the subject of the representation." *Day v. Avery*, 548 F.2d 1018, 1026, 179 U.S. App. D.C. 63 (D.C. Cir. 1976). Defendant was in a far better position than Plaintiffs and their fellow students to know the University's policies and contingencies with regard to cancelling in-person classes. Contrary to Defendant's characterization, Plaintiffs do not fault the University for failing to foresee the pandemic, but rather for promising an in-person education while failing to disclose the possibility that the University could unilaterally and fundamentally alter the method and means of instruction for its students.

Finally, for the reasons set forth at length above, Plaintiffs' CCPA claim does not challenge academic decision-making and should not be dismissed as a mere educational malpractice claim.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion in full.  To the extent the Court identifies any deficiencies in Plaintiffs' pleadings, Plaintiffs respectfully request leave to amend.

Date:  October 14, 2020

**DOUGLAS & BOYKIN PLLC**

_____/s/ Curtis A. Boykin_____
Curtis A. Boykin, Esq., Bar No. 444120
Tram T. Pham, Esq., Bar No. 1034963
1850 M Street, NW, Ste. 640
Washington, DC 20036-5836
Phone: (202) 776-0370
Fax: (202) 776-0975
Email: caboykin@douglasboykin.com
tpham@douglasboykin.co

**ANASTOPOULO LAW FIRM, LLC**
Eric M. Poulin (admitted *pro hac vice*)
Roy T. Willey, IV (admitted *pro hac vice*)
32 Ann Street
Charleston, SC 29403
Telephone: (843) 614-8888
eric@akimlawfirm.com
roy@akinlawfirm.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (*pro hac vice* app. forthcoming)
Sarah N. Westcot (*pro hac vice* app. forthcoming)
2665 S. Bayshore Drive, Suite 220
Miami, FL 33133
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
Email: scott@bursor.com
swestcot@bursor.com

**THE SULTZER LAW GROUP P.C.**
Jason P. Sultzer, Esq. (admitted *pro hac vice*)
Jeremy Francis, Esq. (admitted *pro hac vice*)
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
Telephone: (845) 483-7100

sultzerj@thesultzerlawgroup.com
francisj@thesultzerlawgroup.com

*Co-Lead Interim Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

    I, Curtis A. Boykin, hereby certify that on October 14, 2020 a true and correct copy of Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss Plaintiffs' Consolidated Complaint was served via the Court's electronic filing system to all counsel of record.

                        */s/ Curtis A. Boykin*
                        Curtis A. Boykin

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAAZ QURESHI, individually and on behalf of others similarly situated,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 1:20cv-01141-CRC |
| | ) | |
| **AMERICAN UNIVERSITY,** | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |
| **MATTHEW RABINOWITZ, individually and on behalf of others similarly situated,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-01454-CRC |
| | ) | |
| **AMERICAN UNIVERSITY,** | ) | |
| | ) | |
| *Defendant.* | ) | |
| **DANISH ARIF, individually and on behalf of others similarly situated,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-01555-CRC |
| | ) | |
| **AMERICAN UNIVERSITY,** | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

**[PROPOSED] ORDER**

1

UPON CONSIDERATION of Defendant's Motion to Dismiss, any opposition thereto, and the entire record herein, it is on this ___ day of October, 2020 hereby

ORDERED that Defendant's motion is DENIED.

SO ORDERED.

_____
Honorable Christopher R. Cooper
Judge for the United States District
Court for the District of Columbia