## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MAAZ QURESHI, individually and on behalf of others similarly situated**, | ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) | Case No. 1:20-cv-01141 |
| **AMERICAN UNIVERSITY**, | ) ) | |
| *Defendant.* | ) ) ) | |
| **MATTHEW RABINOWITZ, individually and on behalf of others similarly situated**, | ) ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) | Case No. 1:20-cv-01454 |
| **AMERICAN UNIVERSITY**, | ) ) | |
| *Defendant.* | ) ) | |
| **DANISH ARIF, individually and on behalf of others similarly situated**, | ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) | Case No. 1:20-cv-01555 |
| **AMERICAN UNIVERSITY**, | ) ) | |
| *Defendant.* | ) ) ) | |

## CONSOLIDATED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Maaz Qureshi, Matthew Rabinowitz, and Danish Arif (collectively, "Plaintiffs")

by and through undersigned counsel, bring this action against Defendant American University

("Defendant" or the "University") on behalf of themselves and all others similarly situated, and

make the following allegations based upon information, attorney investigation and belief, and upon Plaintiffs' own knowledge:

## PRELIMINARY STATEMENT

1.   Plaintiffs bring this case as a result of Defendant's decision not to issue appropriate refunds for the Spring 2020 semester after canceling in-person classes and changing all classes to an online/remote format, closing most campus buildings, and requiring all students who could leave campus to do so as a result of the Novel Coronavirus Disease ("COVID-19").

2.   This decision deprived Plaintiffs and other members of the Classes from recognizing the benefits of on-campus enrollment, access to campus facilities, student activities, and other benefits and services in exchange for which they had already paid fees and tuition.

3.   Defendant has either refused to provide reimbursement for the tuition, meals, fees, and other costs that Defendant failed to provide during the Spring 2020 semester or has provided inadequate and/or arbitrary reimbursement that does not fully compensate Plaintiffs and members of the Classes.

4.   This action seeks refunds of the amount Plaintiffs and other members of the Classes are owed on a *pro-rata* basis, together with other damages as pled herein.

## PARTIES

5.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

6.   Defendant American University is a private institution of higher learning located at 4400 Massachusetts Avenue, NW, Washington, DC 20016.

7.   Upon information and belief, Defendant's endowment exceeds $676 Million.[1]

8.   Moreover, Defendant received federal aid in the amount of approximately $6.3 million

---

[1] https://www.usnews.com/best-colleges/american-university-1434

under the CARES Act.[2]

9.  From this bailout, Defendant has apparently set aside only $3.16 million (the bare minimum required by law) to be distributed to students, presumably intending to retain the remaining $3.14 million for themselves.[3]

10. Plaintiff Qureshi is an individual and resident and citizen of the state of New Jersey.

11. Plaintiff Rabinowitz is an individual and resident and citizen of the state of Minnesota.

12. Plaintiff Arif is an individual and resident and citizen of the state of Florida.

13. Plaintiffs are currently enrolled as full-time students in Defendant's undergraduate program and were enrolled as full-time students during the Spring 2020 semester.

## JURISDICTION AND VENUE

14. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

15. This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs.

16. This court has personal jurisdiction over Defendant because Defendant conducts business in the District of Columbia and has sufficient minimum contacts with the District of Columbia.

17. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## BACKGROUND FACTS

18. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

---

[2] https://www2.ed.gov/about/offices/list/ope/allocationsforsection18004a1ofcaresact.pdf
[3] https://www.american.edu/financialaid/heerf.cfm

19.   Plaintiffs were each enrolled as full-time students for the Spring 2020 semester at
      Defendant's University.

20.   As a precondition for enrollment, Plaintiffs were required to and did pay substantial tuition
      for the Spring 2020 semester either out of pocket of by utilizing student loan financing, as
      did all members of the putative Tuition Class.

21.   There are hundreds, if not thousands, of higher learning institutions in this country.

22.   Many schools nationwide offer and highlight remote learning capabilities as a primary
      component of their efforts to deliver educational value, such as, Western Governors
      University, Southern New Hampshire University, and University of Phoenix-Arizona.
      Defendant is not such a school.

23.   In fact, as Defendant acknowledges, "[a]lthough we do offer undergraduate online
      courses, **we do not offer undergraduate online degrees**."[4] (**emphasis in original**).

24.   Accordingly, a significant focus of Defendant's efforts to obtain and recruit students relate
      to the campus experience Defendant has to offer, along with face-to-face, personal
      interaction with skilled and renowned faculty and staff.  Through its website, marketing
      material, advertisements, and other literature, the University sells on-campus instruction
      and the on-campus experience as key reasons that a student should choose to attend
      American.  This is true across Defendant's schools, the degrees it offers, and its disciplines.

25.   For example, an entire page on Defendant's website is dedicated to "University Life" and
      touts such things as Greek life, athletics, and student organizations.[5]

26.   Defendant also markets the benefits of their physical campus location, stating, "DC serves

---

[4] https://www.american.edu/onlinelearning/
[5] https://www.american.edu/universitylife/

as a laboratory of learning for students."[6]

27.     Plaintiffs and members of the proposed Tuition Class did not choose to attend another institution of higher learning, or to seek an online degree, but instead chose to attend Defendant's University and specifically chose to enroll in the on-campus program.

28.     Defendant priced the tuition and mandatory fees based on the in person educational services, opportunities and experiences it was providing on campus.

29.     Plaintiffs made payments to the Defendant based on promises made by Defendant in in lieu of receiving education at other universities or academic institutions.

30.     Accordingly, when students pay tuition in exchange for enrollment in the on-campus program, such students expect to receive, and Defendant has promised to provide, benefits and services above and beyond basic academic instruction, which include but are not limited to:

- Face-to-face interaction with professors, mentors, and peers;

- Access to facilities such as computer labs, study rooms, laboratories, libraries, etc.;

- Student governance and student unions;

- Exposure to community members of diverse backgrounds, cultures, and schools of thought;

- Social development and independence;

- Hands-on learning and experimentation; and

- Networking and mentorship opportunities.

31.     Plaintiffs' education was changed from in-person, hands-on learning to online instruction

---

[6] Id.

during the Spring 2020 term.

32.  When this happened, Plaintiffs were forced from campus and deprived of the benefit of the bargain for which they had paid, and in exchange for which Defendant had accepted, tuition as set forth more fully above.

33.  In addition to tuition, Defendant charges certain mandatory fees, including but not limited to a(n):

- Activity Fee;

- Sports Center Fee;

- Technology Fee; and

- Metro U-Pass Fee.

34.  According to Defendant, the mandatory activity fee is intended to provide for student sponsored programs that "contribute significantly to the intellectual and social development of the student body, serve the university academic goals, encourage student participation and leadership, and enhance the general campus environment."[7]

35.  Defendant's mandatory sports center fee provides registered students with "use [of] the entire sports center complex facilities, including the fitness center."[8]

36.  Defendant's mandatory technology fee is intended to provide students with a number of physical, on-campus technological services such as "expanded computer lab…wireless connectivity…and faster internet connectivity."[9]

37.  Defendant's Metro U-Pass fee is a mandatory fee charged to full time students enrolled in an on-campus program, which provides such students unlimited access to the Metrorail and

---

[7] https://www.american.edu/finance/studentaccounts/tuition-and-fees-information.cfm
[8] Id.
[9] Id.

Metrobus transportation network.[10]

38.     Plaintiffs were required to, and did pay, all fees associated with their Spring 2020 enrollment.

39.     However, at Defendant's request and direction, Plaintiffs and members of the Classes lost access to campus facilities and services thereon from approximately March 8 throughout the remainder of the Spring 2020 term.

40.     As a result of being prohibited from campus, Plaintiffs and members of the Fees Class no longer had the benefit of the services, access, and activities for which the fees had been paid.  For example, Plaintiffs could not participate in on-campus student activities; had no access to the sports complex facilities or fitness center; had no access to campus computer labs or internet services; and had no need or ability to utilize the U-Pass transportation system.

**FACTUAL ALLEGATIONS**

41.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

42.     Upon information and belief, Defendant's Spring semester began on or about January 8, 2020.[11]

43.     Upon information and belief, Defendant's Spring term was scheduled to conclude with the last day of examinations on or about May 5, 2020 and commencement ceremonies on May 8-10, 2020.[12]

44.     Accordingly, Defendant's Spring semester was scheduled and contracted to consisted of approximately 118 days.

---

[10] Id.
[11] https://www.american.edu/provost/registrar/academiccalendar/academic-calendar-2019-2020.cfm
[12] Id.

45.     Defendant's Spring break began on or about March 8, 2020 and was supposed to end on or about March 15, 2020, with students resuming in person classes on March 16, 2020.[13]

46.     However, as a result of the COVID-19 pandemic, Defendant announced major changes to this schedule in an announcement from the University's President on March 10, 2020.  The University announced that Spring break would be extended for 2 days through March 16 and 17, and that classes would resume on March 18, 2020 in a fully online format.[14]

47.     Originally, classes were only scheduled to move online through April 3, 2020,[15]  but on March 12, 2020, the University announced that the transition to online instruction would remain through the end of the Spring semester.[16]

48.     In this same announcement, students were "strongly encouraged" to "depart campus as soon as possible" and all University sponsored events (both on and off campus) were suspended.[17]

49.     In a separate announcement of the same day (March 12, 2020), the University Provost further encouraged students (both those living on and off campus) to return to their permanent homes, stating "there will not be campus activities."[18]

50.     Accordingly, Plaintiffs and Members of the proposed Classes were deprived of approximately 42% of the in-person instruction, activities, and on-campus services for which they had bargained and already paid.

51.     Although Defendant continued offering some level of academic instruction via online classes, Plaintiffs and members of the proposed Classes were deprived of the full benefits

---

[13] Id.
[14] Id.
[15] Id.
[16] https://www.american.edu/president/announcements/march-12-2020.cfm
[17] Id.
[18] https://www.american.edu/ocl/3-12-covid.cfm

and experiences of on-campus enrollment as set forth more fully above.

52.     The online learning options being offered to Defendant's students are sub-par in practically every aspect as compared to what the educational experience afforded Plaintiffs and the members of the Class once was.

53.     The University Provost acknowledged to students that off-campus, online instruction was not an adequate substitute for the on-campus experience[19]

> First, though, let me acknowledge what this transition means to all of us. I'm heartbroken that you will not be able to be on campus to finish the year (and, for many, your AU careers) in the cherished company of your friends and classmates. All of you have had so much going on and planned this semester that would have made being together in person so important and special – events, internships, activities, shared projects, personal plans.

54.     Likewise, the University acknowledged that the monetary value of online classes is not commensurate with the on-campus enrollment experience in setting tuition rates for the Summer 2020 and Fall 2020 terms.

55.     Although Defendant refuses to reduce or refund tuition for Spring semester students, the University announced that students expecting to take Summer classes in person (who would be forced to take them online) would be given a 10% discount on tuition.[20]



**Stay Home, Learn Together This Summer.**
New Payment Plan Available
To safeguard the well-being of our community, our 2020 summer programs will be conducted online. We're introducing a new payment plan, offering a 10 percent discount, and expanding our course catalog to help you make the most of your summer.

56.     Subsequently, Defendant announced that they would offer a similar 10% discount for

---

[19] https://www.american.edu/ocl/3-12-covid.cfm
[20] https://www.american.edu/

students forced to take online classes during the upcoming Fall semester.[21]

57.   Upon information and belief, the only difference between Defendant's decision to discount online classes for the Summer/upcoming Fall and not discount online classes for the previous Spring is that Defendant has already collected tuition for the Spring Semester and believe that the Spring Semester students have no recourse, whereas Defendant had not yet collected tuition for the Summer or Fall terms and Defendant knew many students would not agree to pay full price tuition for online classes during those terms because online courses are in no way commensurate with in-person courses and the on-campus experience otherwise offered.

58.   These realities notwithstanding, Defendant has refused and continues to refuse to offer any pro-rated discount or refund on Spring 2020 tuition.

59.   Likewise, Plaintiffs and members of the proposed Fees Class were deprived of utilizing services for which they had already paid, such as access to campus facilities, and other opportunities as described above.

[space intentionally left blank]

---

[21] https://www.american.edu/coronavirus/faq-finances-and-student-services.cfm#finaid1

60.    Nonetheless, Defendant has refused and continues to refuse to pro-rate or refund any portion of the mandatory fees set forth in Paragraph 33:[22]



Which fees are not eligible for prorated refunds?
ENROLLMENT/REGISTRATION CHARGES:
Students will not receive any refunds for the enrollment/registration fees listed below.

These charges remain nonrefundable, as AU continues to offer courses via virtual course delivery until the end of the spring 2020 term.

- Tuition
- Health Insurance Fee
- Metro UPass Fee
- Technology Fee
- Activity Fee
- Sports Center Fee
- Course Fees

61.    Again, this refusal to fairly treat students from whom money has already been collected stands in stark contrast to Defendant's efforts to retain students who have not already paid.

62.    For example, in a recent announcement, Defendant stated that it would be reducing activity fees and waiving other fees for the upcoming Fall 2020 semester.[23]

## CLASS ACTION ALLEGATIONS

63.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

64.    Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Classes:

**The Tuition Class:**

All people who paid tuition for or on behalf of students enrolled in classes at the

---

[22] https://www.american.edu/coronavirus/faq-finances-and-student-services.cfm#proratedfees
[23] https://www.american.edu/coronavirus/faq-finances-and-student-services.cfm#finaid1

University for the Spring 2020 semester who were denied live in-person instruction and forced to use online distance learning platforms for the latter portion of that semester.

**The Fees Class:**

All people who paid fees for or on behalf of students enrolled in classes at the University for the Spring 2020 semester.

65.    Excluded from the Classes are The Board of Trustees of American University and any of their respective members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; and the judicial officers, and their immediate family members, and Court staff assigned to this case.  Plaintiffs reserve the right to modify or amend the Class definitions, as appropriate, during the course of this litigation.

66.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

67.    This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

**Numerosity: Fed. R. Civ. P. 23(a)(1)**

68.    The members of the Classes are so numerous and geographically dispersed that individual joinder of all members is impracticable.  Plaintiffs are informed and believes there are thousands of members of the Classes, the precise number being unknown to Plaintiffs, but such number being ascertainable from Defendant's records.  Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

**Commonality and Predominance: Fed. R. Civ. P. 23(a)(2)**

69.    This action involves common questions of law and fact, which predominate over any

questions affecting individual members of the classes, including, without limitation:

     a.   Whether Defendant engaged in the conduct alleged herein;

     b.   Whether there is a difference in value between online distance learning and live in-person instruction;

     c.   Whether Defendant breached its contracts with Plaintiffs and the other members of the Tuition Class by retaining the portion of their tuition representing the difference between the value of online distance learning and live in-person instruction;

     d.   Whether Defendant was unjustly enriched by retaining tuition payments of Plaintiffs and the Tuition Class representing the difference between the value of online distance learning and live in-person instruction;

     e.   Whether Defendant breached its contracts with Plaintiffs and the other members of the Fees Class by retaining fees without providing the services the fees were intended to cover;

     f.   Whether Defendant was unjustly enriched by retaining fees of Plaintiffs and the other members of the Fees Class without providing the services the fees were intended to cover;

     g.   Whether Defendant converted monies entrusted to them by Plaintiffs and members of the classes;

     h.   Whether Defendant violated the CPPA with respect to Plaintiffs and members of the classes;

     i.   Whether certification of any or all of the classes proposed herein is appropriate under Fed. R. Civ. P. 23;

      j.   Whether Class members are entitled to declaratory, equitable, or injunctive relief, and/or other relief; and

      k.   The amount and nature of relief to be awarded to Plaintiffs and the other Class members.

**Typicality: Fed. R. Civ. P. 23(a)(3)**

70.    Plaintiffs' claims are typical of the claims of other members of the Classes because, among other things, all such members were similarly situated and were comparably injured through Defendant's wrongful conduct as set forth herein.

**Adequacy: Fed. R. Civ. P. 23(a)(4)**

71.    Plaintiffs are adequate representatives of the Classes because their interests do not conflict with the interests of other members of the Classes they seek to represent.  Plaintiffs have retained counsel competent and experienced in complex litigation; and Plaintiffs intend to prosecute the action vigorously.  The interests of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

**Superiority: Fed. R. Civ. P. 23(b)(3)**

72.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and other members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Classes to individually seek redress for Defendant's wrongful conduct.

73.    Even if members of the Classes could afford individual litigation, the Court system likely

could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, comprehensive supervision by a single court, and finality of the litigation.

**Certification of Specific Issues: Fed. R. Civ. P. 23(c)(4)**

74.    To the extent that a Class does not meet the requirements of Rules 23(b)(2) or (b)(3), Plaintiffs seek the certification of issues that will drive the litigation toward resolution.

**Declaratory and Injunctive Relief: Fed. R. Civ. P. (23)(b)(2)**

75.    The University has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described herein, with respect to the members of the Classes as a whole.

**COUNT I**

**BREACH OF CONTRACT**
**(Plaintiffs and Other Members of the Tuition Class)**

76.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

77.    Plaintiffs bring this count on behalf of themselves and other members of the Tuition Class.

78.    Plaintiffs and the other members of the Tuition Class entered into contracts with Defendant which provided that Plaintiffs and other members of the Tuition Class would pay tuition for or on behalf of students and, in exchange, Defendant would enroll such students and admit them to campus; granting them the full rights and privileges of student status, including but not limited to access to campus facilities, access to campus activities, and live, in-person instruction in a physical classroom.

79.    The rights and privileges of student status that comprise the contractual terms are set forth by Defendant through its website, academic catalogs, student handbooks, correspondence, marketing materials and other circulars, bulletins, and publications.

80.    These rights and privileges form the basis of the bargain on which prospective students agree to accept Defendant's offer of enrollment in exchange for the payment of tuition and fees.

81.    One such right is the ability to be physically present on campus, and fully enjoy the facilities, services, and opportunities provided thereon, including the campus' location and surrounding opportunities within Washington, DC.

82.     Defendant does not deny that the physical location of its campus is a main benefit of enrollment, as it refers to its campus as the "Epicenter of Impact."[24]

83.    Further, Defendant touts the benefits of its location as follows, "[n]estled in a residential district of Washington, DC, our 90-acre campus gives you the advantages of a traditional college setting combined with unparalleled access to the energy, culture, and opportunities of our nation's capital."[25]

84.    Defendant's website and recruitment brochures are the primary means through which Defendant targets prospective new students and attempts to influence such students to apply for enrollment at the University as opposed to other institutions of higher learning.

85.    Through these publications, Defendant markets to and enrolls students seeking a comprehensive on-campus educational experience.

---

[24] https://www.american.edu/about/campus.cfm
[25] Id.

86.    Indeed, as noted above, Defendant affirmatively declares that it does not offer online degrees.[26]

87.    Instead, Defendant promises that an American University education has "a focus on experiential learning."[27]

88.    Defendant's publications are full of references to the on-campus experience, including numerous references to student activities; campus amenities; class size and student/teacher ratios; campus diversity, campus location, and the like.

89.    When visitors enter the "About" page on Defendant's main website, they are greeted with a short promotional video, which begins by welcoming the viewer to, "Our sleepy little college town."[28]

90.    The narration is transposed over dramatic music and visual depictions of campus buildings, campus activities, and the surrounding city.

91.    Students seeking further information about the University are directed to click the links below titled, "Our Story," "Our Leaders," "Our Campus," "Our Organization," "Working @AU," and "Get Involved."

92.    Prospective students seeking additional information can find the Prospective First-Year Students page, which also includes another short video.[29]

93.    In this video, Defendant markets the following statistics, among others:

- 23-person average class size;

- 8 schools and colleges;

- 150+ student clubs and organizations;

---

[26] https://www.american.edu/onlinelearning/
[27] https://www.american.edu/about/history.cfm
[28] https://www.american.edu/about/
[29] https://www.american.edu/admissions/first-year/index.cfm

- 16 NCAA teams;

94.    In every frame throughout the video, viewers are shown students physically on campus or participating in on-campus activities.

95.    On Defendant's Admissions page, Defendant states, "American University is a diverse body of students who represent all 50 states and 123 countries. Many of our students join us from other institutions, and bring a unique perspective to our community of changemakers. If you're looking for a school that will challenge you intellectually and provide you with access to one of the most international cities in the world, look no further."[30]

96.    Defendant's Admissions page also maintains a number of official social media accounts, including but not limited to a YouTube channel, an app, a Twitter page, and an Instagram page.

97.    Further, on the bottom of the Office of Admissions page, there is a "See Our Campus" section with 30 pictures and captions of the University.

98.    Here, Defendant promises, "[w]e're an intimate community within an urban city, where the stunning sights of our city are never far from view. Relax with your friends on our beautiful grounds (a designated arboretum) one moment; take an impromptu trip to the National Mall the next."[31]

99.    Defendant states further, "[w]hether you're learning in our century-old structures and state-of-the-art facilities, experiencing the arts in our museums and theatres, or venturing out into the city, American University offers endless opportunities."[32]

100.    Upon information and belief, there were no references or disclaimers in any of

---

[30] Id.
[31] https://www.american.edu/about/campus.cfm
[32] Id.

Defendant's websites, circulars, bulletins, publications, brochures, or other advertisements that even referenced the possibility of in-person classes being changed to fully online classes for any reason whatsoever after the start of a given term.

101.     In fact, it is clear that, prior to COVID-19 interruption, Defendant had no plans whatsoever to offer its in-person classes via an online delivery model. This is evident from the fact that the University had to cancel classes while its professors hurriedly and ineffectively scrambled to make the switch.

102.     Those prospective students who were interested in enrolling at the University after consuming the marketing materials described above were invited to complete applications, and some were selected for and offered admission.

103.     When a student is offered admission to the University, that student receives a number of further communications and has a number of additional interactions with Defendant.

104.     Initially, the student will receive an official offer letter. For example, students selected for the American University class of 2021 received a letter from the Acting Director for Undergraduate Admissions, Jeremy Lowe.

105.     In this letter, Lowe stated, "The Admissions Committee feels strongly that you will not only benefit from—but also add value to—American University's hard-working and intellectually curious community.

106.     The letter goes on to state, "To accept this offer of admission, you must complete the enrollment process. Your admission packet contains important conditions and terms related to your admission to the university."

107.     Admitted students are also invited to attend an "Admitted Student Overnight" (which is hosted on Defendant's campus) where students get the opportunity to experience the

University firsthand. Defendant further states that the benefit of this program is to:

- Learn more about AU;

- Hear from faculty about programs that interest you;

- Learn more about academic programs, campus life, housing, and dining;

- Tour the campus with a current AU student; and

- Stay overnight with a student host.[33]

108.    This is just another way Defendant attempts to convince such students to accept their offers of admission by highlighting the University's location and the many benefits of being on campus.

109.    In a 6:19 video on the Campus Life section of Defendant's website titled, "Explore, Connect, Grow: Welcome to American University," Defendant states that, "As students year, and some their college careers, we want them to come to American University and Explore, Connect, and Grow into Global Citizens in the laboratory know as Washington, DC.[34]

110.    In the video, the narrator states that, "At AU, you'll make personal connections on campus, as well as in DC and around the world."[35]

111.    Once students accept Defendant's offer of admission, they are directed to set up a student account at "MyAu" using the student login credentials that were given in their acceptance letter.

112.    Once students create their account, they are to pay required deposits, submit any official transcripts, and finally, register for classes.

113.    Returning students also must register for classes.

---

[33] https://www.american.edu/admissions/aso.cfm
[34] https://www.american.edu/ocl/families/
[35] Id.

114.    This is another area where Defendant specifically emphasizes the distinction between its in-person and online class offerings through the academic catalogs and course listings on the website.

115.    Defendant's programs are listed separately on the University's Tuition & Fees Information page with the specific tuition and fees charged for specific programs.[36]

116.    Defendant's list of Online Learning programs, however, is listed independently on a separate web page, where separate policies and cost information depends on the individual online program.[37]

117.    When Plaintiffs and Class Members sought to enter into a contractual agreement with Defendant for the provision of educational services for the Spring Semester 2020, Plaintiffs and Class Members viewed the academic course catalog through the online portal to make specific course selections prior to registering and paying for selected courses.

118.    The course catalog provided Plaintiffs and Class Members with information regarding the courses offered, the instructor, the days and times during which the courses would be held, and the location (including the building and room number) in which courses would be held.

119.    The course catalog specifically allows for students to search for courses to enroll in based on location of the instruction:

---

[36] https://www.american.edu/finance/studentaccounts/tuition-and-fees-information.cfm
[37] https://www.american.edu/onlinelearning/registration.cfm



120.    Upon registration, students in many of Defendant's on-campus schools and programs are subject to strict personal attendance requirements as set forth in various departmental policies and handbooks, evidencing Defendant's requirement and the students' acceptance of the requirement that such students physically attend such classes on campus.

121.    That Defendant offered to provide, and members of the Tuition Class expected to receive, instruction on the physical campus is further evidenced by the parties' prior course of conduct.

122.    Those classes for which students expected to receive in-person instruction began the Spring 2020 semester by offering in-person instruction.

123.    Each day for the weeks and months leading up to the announced closures, students attended physical classrooms to receive in-person instruction, and Defendant provided such in-person instruction.

124.    Likewise, upon information and belief, students were provided with syllabi and other documents that referenced class meeting schedules, locations, and physical attendance requirements.

125.    Each day for the weeks and months prior to announced closures, students had access to the full campus.

126.    Accordingly, it is clear that Defendant offered to provide live, in-person education, together with a full on-campus experience and that members of the Tuition Class accepted that offer by paying tuition and attending classes during the beginning of the Spring 2020 semester.

127.    Based on this mutual assent, Plaintiffs and other members of the Tuition Class fulfilled their end of the bargain when they paid tuition for the Spring 2020 semester, either by paying out of pocket or by using student loan financing, or otherwise.

128.    However, the University breached the contract with Plaintiffs and other members of the Tuition Class by moving all classes for the Spring 2020 semester to online distance learning platforms, and restricting the on-campus experience without reducing or refunding tuition accordingly.

129.    This cause of action does not seek to allege "academic malpractice."

130.    Rather, it is clear from the facts and circumstances that Defendant offered a cognizable and distinct product, that being live, in-person, on-campus education, with its featured ancillary and related services.

131.    Plaintiffs and members of the Tuition Class accepted Defendant's offer for live in-person on-campus education and paid valuable consideration in exchange.

132.    However, after accepting such consideration from Plaintiffs and other members of the Tuition Class, Defendant provided a materially different product, which deprived Plaintiffs

and other members of the Tuition Class of the benefit of the bargain for which they had already paid.

133.    The University retained tuition monies paid by Plaintiffs and other members of the Tuition Class, without providing them the full benefit of their bargain.

134.    Plaintiffs and other members of the Tuition Class have suffered damage as a direct and proximate result of Defendant's breach, including but not limited to being deprived of the value of the services the tuition was intended to cover, namely live in-person instruction in a physical classroom.

135.    Defendant's refusal to offer refunds is in bad faith.

136.    As a direct and proximate result of Defendant's breach, Plaintiffs and the Tuition Class are legally and equitably entitled to damages, to be decided by the trier of fact in this action, to include but not be limited to disgorgement of the difference between the value of the online learning which is being provided versus the value of the live in-person instruction in a physical classroom that was contracted for.

### COUNT II

### UNJUST ENRICHMENT
### (Plaintiffs and Other Members of the Tuition Class)

137.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

138.    This claim is pled in the alternative to, and to the extent it is determined a contract does not exist or otherwise apply, the contract-based claim set forth in Count I above.

139.    Plaintiffs bring this count on behalf of themselves and other members of the Tuition Class.

140.    This claim is pled in the alternative to, and to the extent it is determined a contract does not exist or otherwise apply, the contract-based claim set forth in Count I above.

141.    The University has received a benefit at the expense of Plaintiffs and other members of the

Tuition Class to which it is not entitled.

142.  Plaintiffs and other members of the Tuition Class paid substantial tuition for live in-person instruction in physical classrooms and did not receive the full benefit of the bargain.

143.  Instead, Plaintiffs and other members of the Tuition Class conferred this benefit on Defendant in expectation of receiving one product, *i.e.*, live in-person instruction in a physical classroom along with the on-campus experience of campus life as described more fully above, but they were provided with a materially different product carrying a different fair market value, *i.e.*, online instruction devoid of the on-campus experience, access, and services.

144.  Plaintiffs and other members of the Tuition Class conferred this benefit on Defendant when they paid the tuition.

145.  Defendant has realized this benefit by accepting such payment.

146.  Defendant has retained this benefit, even though Defendant has failed to provide the services for which the tuition was collected, making Defendant's retention unjust under the circumstances.

147.  As a result of closing campus and moving classes online, Defendant saved significant sums of money in the way of reduced utility costs, reduced maintenance and staffing requirements, reduced or eliminated hours for hourly employees, reduced or eliminated hours for paid work study students, and otherwise.

148.  Simply put, it is significantly cheaper to operate a remote, on-line campus than a fully open physical campus. But even if it was not, it is not the product that students were offered and not the product the students expected to receive.

149.  Equity and good conscience require that the University return a portion of the monies paid

in tuition to Plaintiffs and other members of the Tuition Class.

150.    This is particularly true where, as here, Defendant is supported by a $676 million endowment, while its students, on information and belief, do not have access to such immense financial resources, and further where, on information and belief, a substantial portion of its students have incurred substantial debt to finance an educational experience that they did not receive.

151.    At the same time, Defendant received significant aid from the federal government, of which Defendant has indicated that it intends to retain roughly $3.14 million for itself, as opposed to passing it along to students.

152.    Defendant should be required to disgorge this unjust enrichment.

**COUNT III**

**BREACH OF CONTRACT**
**(Plaintiffs and Other Members of the Fees Class)**

153.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

154.    Plaintiffs bring this count on behalf of themselves and other members of the Fees Class.

155.    In addition to tuition, Defendant charges a number of mandatory fees.

156.    In its publications and particularly on its website, Defendant specifically describes the nature and purpose of each fee.

157.    Some fees apply broadly to all certain groups of students, while other fees are program or course based.

158.    Such fees are set forth not only in amount but also in description and purpose through the various academic catalogs and on the website.

159.    As such, it is axiomatic that the monies Plaintiffs and other members of the Fees Class paid towards these fees were intended by both the students and Defendant to cover the services,

access, benefits and programs for which the fees were described and billed.

160.   By way of example, Defendant describes its "Activity Fee" as follows:

> The University Board of Trustees approves and encourages strong and viable student-sponsored programs that contribute significantly to the intellectual and social development of the student body, serve the university academic goals, encourage student participation and leadership, and enhance the general campus environment. To finance these student-run organizations and programs (over 160), the Board directs the assessment of a mandatory non-refundable student activity/program fee. Depending on your student status, those fees will be labeled on your student account statement as Undergraduate Activity Fee, Graduate Activity Fee, or WCL General Fee.[38]

161.   Defendant describes its "Sports Center Fee" as follows:

> Our sports center fee is charged to all registered students, and is used to help pay for building maintenance and service costs associated with the sports center complex. The fee is not a membership fee for use the fitness center. Any registered student can use the entire sports center complex facilities, including the fitness center.[39]

162.   Defendant describes its "Technology Fee" as follows:

> This mandatory fee is charged to all registered students. The fee is assessed to help pay a small portion of the university's overall technology costs. It helps to fund technology priorities, ranging from classroom instruction, faculty research, expanded computer labs, student portals, wireless connectivity, on-line registrations, faster internet connectivity, server upgrades, computer security, and administrative systems. Whether a student lives on-campus, off-campus, or abroad, the technology services are available to them.[40]

163.   Defendant describes its "Metro University Pass (U-Pass) Fee" as follows:

> The Metro U-Pass fee is a mandatory fee charged to full time students enrolled in an on-campus program. The Metro U-Pass is valid for unlimited Metrorail and Metrobus transportation for the duration of the semester (Fall/Spring).[41]

---

[38] https://www.american.edu/finance/studentaccounts/tuition-and-fees-information.cfm
[39] Id.
[40] Id.
[41] Id.

164.    As such, in accepting these terms and paying these fees, a contract was formed between Plaintiffs, including the Fees Class, and Defendant, which provided that Plaintiffs and other members of the Fees Class would pay these fees for or on behalf of themselves, and, in exchange, Defendant would provide or make available the services, access, benefits and/or programs related to those fees, as promised.

165.    It is undisputed that Defendant did not provide student activities, on-campus printing facilities, access to recreational facilities, access to campus-based information technology resources, or access to metrobus transportation for a portion of the Spring 2020 semester.

166.    Plaintiffs and other members of the Fees Class fulfilled their end of the bargain when they paid these fees for the Spring 2020 semester, either by paying out of pocket or by using student loan financing, or otherwise.

167.    However, Defendant breached the contract with Plaintiffs and other members of the Fees Class by moving all classes for the Spring 2020 semester to online distance learning platforms, constructively evicting students from campus, closing most campus buildings and facilities, and cancelling most student activities.

168.    Defendant has acknowledged that it does not and cannot provide the benefits and services for which fees are charged to students who physically prohibited from campus by way of waiving or reducing such fees for the Summer 2020 and Fall 2020 terms.

169.    By retaining fees paid by Plaintiffs and other members of the Fees Class, without providing them the full benefit of their bargain, Defendant has failed to perform its contractual obligations.

170.    Plaintiffs and other members of the Fees Class have suffered damage as a direct and proximate result of Defendant's breach, namely being deprived of the value of the services,

access, benefits and/or programs the fees were intended to cover.

171. As a direct and proximate result of Defendant's breach, Plaintiffs and other members of the Fees Class are legally and equitably entitled to damages, to be decided by the trier of fact in this action, to include disgorgement of the pro-rata amount of fees that were collected but for which services were not provided.

## COUNT IV

### UNJUST ENRICHMENT
**(Plaintiffs and Other Members of the Fees Class)**

172. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

173. This claim is pled in the alternative to, and to the extent it is determined a contract does not exist or otherwise apply, the contract-based claim set forth in Count III above.

174. Plaintiffs bring this count on behalf of themselves and other members of the Fees Class.

175. The University has received a benefit at the expense of Plaintiffs and other members of the Fees Class to which it is not entitled.

176. Plaintiffs and other members of the Fees Class paid substantial student fees for on campus benefits and services and did not receive the full benefit of the bargain.

177. Plaintiffs and other members of the Fees Class conferred this benefit on Defendant when they paid the fees.

178. Defendant has realized this benefit by accepting such payment.

179. Defendant has retained this benefit, even though Defendant has failed to provide the services for which the fees were collected, making Defendant's retention unjust under the circumstances.

180. Equity and good conscience require that the University return a pro-rata portion of the monies paid in fees to Plaintiffs and other members of the Fees Class.

181.   This is particularly true where, as here, Defendant is supported by a $676 million endowment, while its students on information and belief, do not have access to such immense financial resources, and further where, on information and belief, a substantial portion of its students have incurred substantial debt to finance an educational experience that they did not receive.

182.   At the same time, Defendant received significant aid from the federal government, of which Defendant has indicated that it intends to retain roughly $3.14 million for itself, as opposed to passing it along to students.

183.   Defendant should be required to disgorge this unjust enrichment.

## COUNT V

## CONVERSION
### (Plaintiffs and All Class Members)

184.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

185.   Plaintiffs bring this count on behalf of themselves and all members of the other Classes.

186.   The two key elements of conversion are (1) Plaintiff's legal ownership or an immediate superior right of possession to a specific identifiable thing, and (2) Defendant's unauthorized dominion over the thing in question or interference with it, to the exclusion of Plaintiff's right.

187.   When Plaintiffs and Class members paid tuition fees, and other charges, such payments were made to a specific fund for specific, identifiable services.

188.   Such monies were paid to Defendant only for the particular purpose for which the tuition and fees were charged.

189.   Plaintiff and members of the Classes have an identifiable legal ownership to the right to such access and services.

190. As set forth above, Defendant has not provided those services or access to the exclusion of Plaintiffs' and other members of the Class' rights.

191. Such retention was unauthorized and illegal because Defendant failed to apply the retained funds to the particular purpose for which they were paid.

192. Defendant's continued possession of the full payments for the 2020 Spring semester is adverse and in derogation of Plaintiffs' and the other Class members' entitlement to such funds.

193. Defendant refuses to remit Plaintiffs' and the other Class members' reimbursement for tuition and fees paid for the 2020 Spring semester.

194. Defendant has therefore converted and continues to convert Plaintiffs' and the other Class members' 2020 Spring semester tuition and fees.

## COUNT VI

### UNLAWFUL AND DECEPTIVE TRADE PRACTICES
### IN VIOLATION OF THE CPPA
**(On Behalf of Plaintiffs, All Class Members,
and on behalf of the General Public of the District of Columbia)**

195. Plaintiffs, on behalf of themselves, other Class Members, and the general public of the District of Columbia, files this action pursuant to D.C. Code § 28-3905(k).

196. When the CPPA was enacted in 1976, it gave the Department of Consumer and Regulatory Affairs ("DCRA") the role of "principal consumer protection agency of the District of Columbia government." Section 28-3902(a). The statute contemplated that DCRA would have broad authority to investigate unlawful trade practices and adjudicate consumer complaints.

197.    However, beginning in 1994, because of budget shortfalls, the City Council indefinitely suspended the DCRA's enforcement authority. In April 1999, the Antitrust, Trade Regulation and Consumer Affair Section of the D.C. Bar published a report that recommended changes in the consumer protection enforcement mechanism.

198.    That report cited "critical shortfalls" in the District's consumer protection system and noted that "[s]uspension of DCRA's authority removed the primary mechanism for halting unlawful trade practices, and prohibited D.C's consumer protection agency from enforcing the law," and that "public interest organizations, and the bar do not have an enumerated authority to halt illegal practices through injunctive relief and disgorgement of ill-gotten gain in the public interest." The report recommended that public interest organizations and the private bar "be statutorily enabled to seek injunctive relief and disgorgement of illegal proceeds."

199.    Following the issuance of the Bar Report, the City Council amended the CPPA in late 2000 (effective 2001). The changes included permitting a "person" (as opposed to a "consumer") to bring a case in court and eliminating the requirement that such a lawsuit be filed by someone who "suffers any damage as a result of the use or employment by any person of a trade practice in violation of a law of the District of Columbia within the jurisdiction of the Department." The District's 2000 budget act continued "defunding" DCRA consumer protection, demonstrating intent to place enforcement in private hands.

200.    On January 25, 2013, the D.C. Council enacted the Consumer Protection Amendment Act of 2011, which became effective on April 23, 2013. Among other things, the amendments added provisions allowing "testers" to bring claims on behalf of the general public. The

amendments also added a provision specifying that the CPPA establishes an enforceable right to truthful information from merchants.

201.  Plaintiffs, on behalf of themselves, other Class Members, and the general public of the District of Columbia, files this action pursuant to D.C. Code § 28-3905(k) for Defendants' unfair and deceptive practices.

202.  Defendant's provision online education, paid for by Plaintiffs and Class Members, contradicted representations made about their educational services, including that Plaintiffs and the Class Members would receive in-person educational services, experiences, and opportunities, constituting an unfair and deceptive trade practice pursuant to DC Code § 28-3904 in that Defendant:

   a.  Represented that goods or services have characteristics, uses, and benefits that they do not have;

   b.  Represented that its services are of a particular standard, quality, and style when, in fact, they are of another;

   c.  Misrepresented as to a material fact that has a tendency to mislead;

   d.  Failed to state a material fact that tended to mislead;

   e.  Used innuendo or ambiguity as to a material fact, which has a tendency to mislead;

   f.  Made unconscionable terms or provisions of a sale as demonstrated by, among other factors, the gross disparity between the price of the services and the value of the services measured by the price at which similar services are readily obtainable in transactions by like buyers;

   g.  Otherwise misleads.

33

203. The above-mentioned material misrepresentations and omissions affect the general public's ability to comparison shop for higher education programs by materially misleading about the contents and quality of the educational services, experiences, and opportunities offered at American University.

204. Defendant's cancellation of in-person education and complete transition to online- only education, was in direct contradiction to the representations made in Defendant's marketing, advertisements, and other public representations. Defendant's misrepresentations and omissions regarding the availability of in-person educational services is an unfair and deceptive trade practice pursuant to D.C. Code § 28-3904.

205. Defendant now takes the position that it never promised an in-person on-campus educational experience, nor access to programs, services and facilities that the same entails.

206. Defendant's misrepresentations and omissions regarding the nature of its educational services constitute an unfair trade practice. This is so because Defendant's marketing (1) offends public policy, and (2) is immoral, unethical, oppressive, and unscrupulous, based on Defendant's current position that it did not promise anything of the things that its marketing, in fact promotes and promises.

207. Defendant's misrepresentations and omissions are also unfair in that they resulted in economic harm of a nature that could not have been reasonably avoided by consumers such as Plaintiffs and Class Members.

208. As a result of these material misrepresentations, Plaintiffs suffered financial loss in that they would not have paid the tuition and fees for the Spring 2020 Semester to Defendant or would have paid a much lower amount in tuition and fees.

209. D.C. Code § 28-3901(c) establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia.

210. As a result of Defendant's unfair and deceptive trade practices detailed herein, Plaintiffs and consumers in the District of Columbia were deprived of truthful information regarding American University's educational services, experiences, access, programs and opportunities offered.

211. Plaintiffs and the Class Members seek actual damages, statutory damages, punitive damages, injunctive relief, and reasonable attorney's fees for themselves and Class Members.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of members of the Class(es), pray for judgment in their favor and against Defendant as follows:

a. Certifying the Classes as proposed herein, designating Plaintiffs as Class representatives, and appointing undersigned counsel as Class Counsel;

b. Declaring that Defendant is financially responsible for notifying the Class members of the pendency of this action;

c. Declaring that Defendant has wrongfully kept monies paid for tuition and fees;

d. Requiring that Defendant disgorge amounts wrongfully obtained for tuition and fees;

e. Awarding injunctive relief as permitted by law or equity, including enjoining Defendant from retaining the pro-rated, unused monies paid for tuition and

fees;

f.    Scheduling a trial by jury in this action;

g.    Awarding Plaintiffs' reasonable attorney's fees, costs and expenses, as permitted by law;

h.    Awarding pre and post judgment interest on any amounts awarded, as permitted by law; and

i.    Awarding such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

This 28th day of August, 2020        Respectfully submitted,


**Douglas & Boykin PLLC**

BY:   /s/ Curtis A. Boykin
1850 M Street, NW, Suite 640
Washington, District of Columbia 20036
(202) 776-0370
caboykin@douglasboykin.com

-and-

**ANASTOPOULO LAW FIRM, LLC**

Eric M. Poulin (admitted *pro hac vice*)
Roy T. Willey, IV (admitted *pro hac vice*)
32 Ann Street
Charleston, SC 29403
(843) 614-8888
eric@akimlawfirm.com
roy@akimlawfirm.com

Scott A. Bursor (*pro hac vice* app. forthcoming)
Sarah N. Westcot (*pro hac vice* app. forthcoming*)*
**BURSOR & FISHER, P.A.**
2665 S. Bayshore Drive, Suite 220
Miami, FL 33133
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
Email: scott@bursor.com
             swestcot@bursor.com

Jeffrey K. Brown

Michael Tompkins, Esq.
Brett R. Cohen, Esq.
**LEEDS BROWN LAW, P.C.**
One Old Country Road, Suite 347
Carle Place, NY 11514
(516) 873-9550
jbrown@leedsbrownlaw.com
mtompkins@leedsbrownlaw.com
bcohen@leedsbrownlaw.com

Jason P. Sultzer, Esq.
Jeremy Francis, Esq.
**THE SULTZER LAW GROUP P.C.**
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
Telephone: (845) 483-7100
sultzerj@thesultzerlawgroup.com
francisj@thesultzerlawgroup.com

*Counsel for Plaintiff and Proposed Class*

## CERTIFICATE OF SERVICE

I, Curtis A. Boykin, hereby certify that on August 28, 2020 a true and correct copy of the foregoing Consolidated Amended Complaint was served *via* the Court's electronic filing system to all counsel of record.

____/s/_____
Curtis A. Boykin