# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASHA SMITH, Individually and On | : | CIVIL ACTION |
| Behalf of All Others Similarly Situated | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF PENNSYLVANIA | : | NO. 20-2086 |

## MEMORANDUM OPINION

Savage, J.                                                                                        April 20, 2021

Like many students at colleges and universities across the country, plaintiffs Asha Smith and Emma Nedley were forced to leave their dormitories and continue coursework online in March 2020 due to the COVID-19 pandemic. They and other students at the University of Pennsylvania ("Penn") demanded partial refunds for the second half of the spring 2020 semester, claiming they received a materially different educational experience of lesser value than what they had been promised. Penn refused.

The plaintiffs then brought this putative class action asserting claims for breach of contract. They contend that Penn breached its promise of in-person classes and an on-campus experience when it moved classes online, ordered students to leave campus, canceled events and activities, and closed most campus facilities. Penn has moved to dismiss, arguing that the plaintiffs have not and cannot identify an express promise that Penn breached.

We conclude that the alleged facts do not establish that Penn breached its contract with the plaintiffs regarding tuition payments. However, the plaintiffs have stated a breach of contract claim regarding the fee payments. Therefore, we shall grant Penn's motion to dismiss in part and deny it in part.[1]

---

[1] The plaintiffs also bring claims for unjust enrichment and conversion. They claim that Penn has been unjustly enriched or converted the *pro rata* tuition and fees by retaining the money the plaintiffs paid

**Plaintiffs' Allegations**

Plaintiffs Asha Smith and Emma Nedley were enrolled as full-time undergraduate students at the University of Pennsylvania during the spring 2020 semester.[2] They paid tuition and mandatory fees to enroll in classes for the spring semester.[3] The mandatory fees included a technology fee, a clinical fee and a "general fee," which totaled approximately $3,307.[4] Penn describes what it provides students for these fees on its website as follows:

> A General Fee is assessed to all undergraduate, graduate, and professional students, and directly funds Penn's non-instructional student support services. The General Fee for full-time students provides them with full access to a wide variety of services and resources, including counseling and wellness, multicultural resource centers, student activities, recreation and fitness, career services, learning support, and much more.
>
> The Technology Fee is used to cover a broad group of technology-driven services, including online learning resources, data and network security, technology support, email services and support, technology-enabled spaces, provided software, electronic research tools, and other related costs.
>
> [The Clinical Fee] is assessed to all students and supports Penn Wellness services, including Campus Health, Counseling and Psychological Services, the Student Health Service, and the Office of Alcohol and Other Drug Programs.[5]

---

for services that were not rendered. We conclude that the existence of a contract between the parties bars the unjust enrichment claims and the gist of the action doctrine bars the conversion claim. Therefore, we shall dismiss these claims.

[2] Pls.' Am. Compl. at ¶ 17 (ECF No. 18).

[3] *Id.* at ¶ 18.

[4] *Id.* at ¶¶ 26-28.

[5] *Id.* at ¶¶ 147-149.

The spring 2020 semester began on January 15 and was scheduled to conclude on May 12.[6] In March, Penn moved all programs from in-person to online instruction in response to the coronavirus ("COVID-19") pandemic and government shutdown orders.[7] Penn ordered all students living on campus to vacate their dormitories by March 17.[8] All non-life-sustaining buildings, which constitute a majority of buildings and facilities on campus, were closed.[9]

Shortly after Penn announced the switch to online instruction, students began demanding refunds for tuition and fees.[10] Though it provided pro-rated credits for housing and dining costs for the rest of the spring semester, Penn refused to refund any part of tuition or fees.[11]

The plaintiffs then filed this action. They assert claims for breach of contract, unjust enrichment and conversion on behalf of themselves and members of two classes: (1) the Tuition Class, consisting of all persons who paid tuition for or on behalf of students enrolled in classes for the spring 2020 semester; and (2) the Fees Class, consisting of all persons who paid fees for or on behalf of students enrolled in classes for the spring 2020

---

[6] *Id.* at ¶¶ 38-39.

[7] *Id.* at ¶¶ 1, 24, 41.

[8] *Id.* at ¶ 41.

[9] *Id.* at ¶ 30.

[10] *Id.* at ¶ 42.

[11] *Id.* at ¶¶ 48, 51; Def.'s Mot. to Dism. at 4, Ex. 8 (ECF No. 26).

semester.[12] They seek a pro-rated refund of the tuition and fees for the second half of the spring 2020 semester.[13]

According to the plaintiffs, although the students paid tuition for an on-campus, in-person education with all its appurtenant benefits, Penn provided them with a "materially deficient and insufficient" experience for the second half of the spring semester.[14] Similarly, they allege that Penn deprived them and the other members of the Fees Class of certain services, amenities and activities for which they had paid.[15] The plaintiffs contend that as a result of its cutting back or cancelling activities, Penn was able to drastically reduce its costs, including those for maintenance and staffing.[16] Yet, the students' costs were not cut, even as they lost housing, on-campus jobs and internships.[17] In short, the students complain they did not receive the full academic and extra-curricular benefits of an on-campus experience.[18]

The essence of the plaintiffs' claims is that Penn did not deliver the educational experience it had promised. Penn recruits students to its undergraduate program by advertising an on-campus, immersive experience through its website and other promotional materials.[19] According to the plaintiffs, Penn "sells on-campus instruction"

---

[12] Pls.' Am. Compl. at ¶ 56.

[13] *Id.* at ¶¶ 3-4.

[14] *Id.* at ¶¶ 34, 45.

[15] *Id.* at ¶ 35.

[16] *Id.* at ¶ 46.

[17] *Id.* at ¶ 47.

[18] *Id.*

[19] *Id.* at ¶¶ 21, 79.

and "the City of Philadelphia as key reasons that a student should choose to attend Penn."[20] Unlike other higher education institutions that primarily offer programs online, Penn structures its undergraduate program around on-campus, in-person instruction, with only limited online courses.[21]

The plaintiffs allege they paid Penn tuition and fees in exchange for enrolling them in classes and granting them the full rights and privileges of students which includes access to campus facilities, activities and live, in-person instruction.[22] Specifically, the plaintiffs allege they paid for and expected to receive, and Penn promised to provide: (1) "[f]ace-to-face interaction with professors, mentors, and peers"; (2) "[a]ccess to facilities such as computer labs, study rooms, laboratories, libraries, etc."; (3) "[s]tudent governance and student unions"; (4) "[e]xtra-curricular activities, groups, intramural sports, etc."; (5) "[s]tudent art, cultures, and other activities"; (6) "[e]xposure to community members of diverse backgrounds, cultures, and schools of thought"; (7) "[s]ocial development and independence"; (8) "[h]ands-on learning and experimentation"; and (9) "[n]etworking and mentorship opportunities."[23]

The plaintiffs claim the contract is "implied or set forth" in Penn's website, academic catalogs, student handbooks, marketing materials and other circulars, bulletins, and publications.[24] They allege the students' right and ability to be physically present on

---

[20] *Id.*

[21] *Id.* at ¶¶ 20-21, 104, 116.

[22] *Id.* at ¶ 70.

[23] *Id.* at ¶ 23.

[24] *Id.* at ¶ 71.

campus and enjoy all campus facilities, services and opportunities is deeply engrained in the culture of higher education and specifically enshrined in Penn's mission and vision statements.[25] According to the plaintiffs, Penn's publications emphasize the on-campus experience, including its location, diversity and amenities. Penn makes various "'campus life' promises," vis-à-vis housing, dining, student clubs and organizations, arts and cultural centers, athletics and recreation.[26] It also encourages prospective students to visit campus to "get a feel for the college experience [Penn] intends to provide its students."[27]

The plaintiffs contend Penn emphasizes the in-person features of its educational experience during class registration.[28] The University Catalog provides information for all degree programs, course offerings and other academic policies and resources.[29] Course descriptions include meeting times and physical classroom locations.[30] Students are subject to strict personal attendance requirements.[31] Limited options for online courses are listed in a separate course catalog and offered at a lower price.[32]

The plaintiffs claim that there is nothing in any of Penn's materials reserving the right to change in-person classes to fully online classes after the start of a term.[33]

---

[25] *Id.* at ¶ 74.

[26] *Id.* at ¶ 83.

[27] *Id.* at ¶¶ 88, 99.

[28] *Id.* at ¶ 102.

[29] *Id.* at ¶ 103.

[30] *Id.* at ¶ 107.

[31] *Id.* at ¶ 108.

[32] *Id.* at ¶¶ 104-106, 116.

[33] *Id.* at ¶ 91.

According to the plaintiffs, Penn's prior course of conduct evidences its promise of in-person, on-campus instruction.[34] For the first two months of the spring 2020 semester, Penn's courses were taught through in-person instruction and students had full access to campus.[35] Then, in mid-March came the COVID-19 pandemic and the governmental shutdown orders.

## Legal Standard

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when the plaintiffs plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

A conclusory recitation of the elements of a cause of action is not sufficient. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). The plaintiffs must allege facts necessary to make out each element. *Id.* (quoting *Twombly*, 550 U.S. at 563 n.8). In other words, the complaint must contain facts which, if proven later, support a conclusion that a cause of action can be established.

In considering a motion to dismiss under Rule 12(b)(6), we first separate the factual and legal elements of a claim, accepting the well-pleaded facts as true and disregarding legal conclusions. Then, we determine whether the alleged facts make out a plausible claim for relief. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (quoting

---

[34] *Id.* at ¶ 109.

[35] *Id.* at ¶¶ 110-113.

*Iqbal*, 556 U.S. at 679). All well-pleaded allegations in the complaint must be accepted as true and interpreted in the light most favorable to the plaintiffs, and all inferences must be drawn in the plaintiffs' favor. *See McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009).

In deciding a motion to dismiss, courts generally consider only the allegations of the complaint, exhibits attached to the complaint and matters of public record. *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir. 1993), *cert. denied,* 114 S. Ct. 687 (1994). Courts may consider documents incorporated by reference in the complaint. *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 134 (3d Cir. 2004). However, courts may also consider "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp.,* 998 F.2d at 1196. Courts may do so because "the primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff—is dissipated where the plaintiff has actual notice . . . and has relied upon [those] documents in framing the complaint." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (internal quotation marks, alteration, and citation omitted). "Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied." *Pension Benefit Guar. Corp.*, 998 F.2d at 1196 (citing *Goodwin v. Elkins & Co.,* 730 F.2d 99, 113 (3d Cir. 1984)). Courts may consider these documents without having to convert the motion to one for summary judgment. *Id.*

## Analysis

### *Breach of Contract*

The relationship between a student and a private educational institution is contractual in nature under Pennsylvania law.[36] *Reardon v. Allegheny Coll.*, 926 A.2d 477, 480 (Pa. Super. 2007) (citing *Barker v. Trustees of Bryn Mawr Coll.,* 122 A. 220, 221 (Pa. 1923)). A student may bring an action for breach of contract against a college or university where it violates the terms of the written contract. *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. 1999) (citations omitted). To assert a claim for breach of contract, the student must allege "a specific contractual undertaking which was breached, clearly and directly resulting in at least some demonstrable damages." *Cavaliere v. Duff's Bus. Inst.*, 605 A.2d 397, 401 (Pa. Super. 1992). *See also Vurimindi v. Fuqua Sch. of Bus.*, 435 F. App'x 129, 133 (3d Cir. 2011) (citing *Swartley,* 734 A.2d at 919) ("The allegations must relate to a specific and identifiable promise that the school failed to honor").

Pennsylvania courts distinguish between an action for breach of a specific contractual obligation and one for educational malpractice. The former may be maintained; the latter may not. *Cavaliere v. Duff's Bus. Inst.*, 605 A.2d 397, 403 (Pa. Super. 1992). Here, the plaintiffs emphasize they are not asserting a claim for educational malpractice.[37] They do not challenge Penn's decision to switch to online instruction. Rather, they characterize their claim as a commercial business dispute. They complain that Penn retained payments for products and services that were not delivered.[38]

---

[36] A federal court exercising diversity jurisdiction applies the substantive law of the forum state. *Glenn Distribs. Corp. v. Carlisle Plastics, Inc.*, 297 F.3d 294, 300 n.3 (3d Cir. 2002). Neither party disputes that Pennsylvania substantive law governs the plaintiffs' state law claims.

[37] Pls.' Resp. at 6, 16-18 (ECF No. 31).

[38] *Id.* at 14-18.

This is not a claim for educational malpractice. It is simply an action for breach of contract.

The contract is comprised of the "written guidelines, policies, and procedures as contained in the written materials distributed to the student over the course of their enrollment in the institution." *Swartley*, 734 A.2d at 919. These materials include the course catalog, registration materials, student handbook, school policies and procedures, bulletins, circulars and regulations. *Id.*

The only implied contract Pennsylvania recognizes in the educational context is a private educational institution's obligation to confer a degree upon a student's successful completion of the degree requirements. *See Gati v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 91 A.3d 723, 731 (Pa. Super. 2014). In *Gati*, the court defined the "essence of the bargain between student and university" as the student's "reasonable expectation based on statements of policy by [the university] and the experience of former students that if he performs the required work in a satisfactory manner and pays his fees he will receive the degree he seeks." *Id.* (internal quotation marks and citations omitted). Pennsylvania does not recognize an action for breach of an implied contract in other educational contexts, such as evaluating academic performance and disciplining for violations of school policies. *Swartley*, 734 A.2d at 919-920; *Cavaliere,* 605 A.2d at 404. *See also Hart v. Univ. of Scranton*, No. 11-1576, 2012 WL 1057383, at *3 (M.D. Pa. Mar. 28, 2012) (rejecting breach of contract claim against university based on implied contract theory) (citations omitted).

Similarly, the plaintiffs cannot base their claim for breach of contract on Penn's prior course of conduct. Courts in other jurisdictions have held that a university's "usual

or customary practice" of providing in-person instruction cannot replace express, written terms. *See Lindner v. Occidental Coll.*, No. 20-8481, 2020 WL 7350212, at *9 (C.D. Cal. Dec. 11, 2020) ("[T]he fact that Occidental provides in-person instruction 'under ordinary circumstances' . . . does not prevent Occidental from exercising its rights under the 2019-2020 Catalog to modify its programs, including during a national emergency, such as the Covid-19 global pandemic."); *see also Zagoria v. New York Univ.*, No. 20-3610, 2021 WL 1026511, at *5 (S.D.N.Y. Mar. 17, 2021) ("Breach of contract actions between a student and a university 'must be grounded in a text' and may not be inferred from the conduct of the parties.") (citations omitted).

Penn argues the plaintiffs have not and cannot allege an identifiable written contractual promise that Penn violated.[39] It contends that Pennsylvania law requires a plaintiff to allege the breach of a specific, written provision.[40] Otherwise, so it argues, educational institutions could not protect academic freedom and prevent courts from second-guessing their educational decisions.[41] Penn contends the promotional materials cited in the amended complaint are not part of its contract with its students.[42] According to Penn, the Financial Responsibility Statement the students sign as part of the enrollment process governs the parties' relationship, and nothing in that contract and the policies to which it refers entitles students to refunds because the method of instruction changed.[43]

---

[39] Def.'s Mot. to Dism. at 6-9; Def.'s Reply at 2-3 (ECF No. 33).

[40] Def.'s Mot. to Dism. at 7-9; Def.'s Reply at 3-4.

[41] Def.'s Mot. to Dism. at 7-9; Def.'s Reply at 3-4.

[42] Def.'s Mot. to Dism. at 10-16.

[43] *Id.* at 9-10; Def.'s Reply at 5-8.

In short, it argues there is no express promise to provide an in-person, on-campus experience regardless of the circumstances.[44]

The plaintiffs counter that the Financial Responsibility Statement is not a contract, and even if it was, it does not control the entire scope of the parties' relationship.[45] They contend the contract is comprised of numerous express, written documents, including Penn's handbook, course catalog, policies and procedures, and other published materials, which give rise to an implied contract to provide an in-person, on-campus education.[46]

As part of the enrollment process, students sign the Financial Responsibility Statement, agreeing as follows:

> **Financial Obligation:** By registering for class(es) offered by the University of Pennsylvania, I am agreeing to pay tuition, fees and other charges associated with my enrollment in these classes on or before the scheduled due dates. This constitutes a legal financial obligation.
>
> **Tuition & Fees:** I understand that my school publishes tuition and fee schedules. The PennBook (https://catalog.upenn.edu/pennbook/) documents policies and procedures regarding changes or cancellation of my registration. I am aware that non-attendance does not relieve me of my financial responsibility for the class(es) I signed up for.[47]

The PennBook, which the Financial Responsibility Statement specifically incorporates, lays out Penn's financial policies regarding tuition, fees and other charges.[48]

---

[44] Def.'s Mot. to Dism. at 9-10; Def.'s Reply at 5-8.

[45] Pls.' Resp. at 6-10.

[46] *Id.* at 18-25.

[47] Pepe Decl. in Supp. of Def.'s Mot. to Dism. Ex. A at 1 ("Financial Responsibility Statement").

[48] Kidney Decl. in Supp. of Def.'s Mot. to Dism. Ex. 11 at 6.

The only refund the PennBook addresses is for students who withdraw under certain circumstances within the first four weeks of a new term.[49]

Contrary to Penn's argument, the contract is comprised of more than the Financial Responsibility Statement and related financial policies contained in the PennBook. The contract consists of the Financial Responsibility Statement, Penn's University Catalog, registration materials, online fee descriptions, PennBook and any other pages of Penn's website providing information and resources for enrolled students. *See Swartley*, 734 A.2d at 919.

Having identified what constitutes the contract, we examine whether it contains an express, written promise to provide in-person instruction. The Financial Responsibility Statement includes no such promise. Nor do the excerpts of the PennBook's policies and procedures provided in support of Penn's motion to dismiss.

The plaintiffs have not identified a specific, written promise in any of the contract documents. They allege that a promise of an in-person, on-campus experience derives from promotional materials, which include statements made on the admissions pages of Penn's website.[50] These are the mission statement, photos, videos and testimonials from students on the "Life at Penn" and admissions pages of Penn's website, invitations for prospective students to visit campus and attend new student orientation, and Penn's admission letter to accepted students.

---

[49] *Id.*

[50] *See* Pls.' Am. Compl. at ¶¶ 78, 82, 83, 84, 85, 88, 89, 94, 95, 98, 101; Oral Arg. Tr. at 3:18-4:7, 11:25-12:20.

Informational materials, such as a university's website and brochures distributed to prospective applicants, are not part of a student's contract. Nor are they statements of school policies or procedures. Under Pennsylvania law, "advertisements generally do not constitute offers." *Bourke v. Kazaras*, 746 A.2d 642, 644 (Pa. Super. 2000) (citing *Touraine Partners v. Kelly*, 482 A.2d 240 (Pa. Super. 1984) and Restatement (Second) of Contracts § 26 cmt. b (1981)). Advertisements and promotional materials become part of the contract only "if they contain 'some language of commitment or some invitation to take action without further communication.'" *Id.* at 644-45 (quoting Restatement (Second) of Contracts § 26 cmt. b).[51] Without language of commitment to provide the advertised programs and resources to students under all circumstances, these promotional materials are not offers.

The *Swartley* court defined the contractual relationship as one between a university and an *enrolled* student. *Swartley*, 734 A.2d at 919. The contract is formed when the student enrolls. Promotional and recruitment materials precede enrollment and the making of the contract. Thus, they are not part of the contract.

---

[51] Other courts have reached similar conclusions about promotional materials in the COVID-19 tuition refund context. As one court recently stated:

> [T]hese statements, without more, seem informative rather than promissory. They appear on their face to be intended to inform students of the resources and amenities available to them. . . . [not] a contractually-enforceable *promise* to provide them irrespective of changing or unanticipated circumstances. . . .
>
> [M]arketing materials "are not among the terms of the contract between universities and their students." Even if that weren't true, the statements the plaintiffs proffer as specific promises are actually "expression[s] of intention, hope or desire."

*Oyoque v. Depaul Univ.*, No. 20-3431, 2021 WL 679231, at *4-5 (N.D. Ill. Feb. 21, 2021) (internal citations omitted). *See also Doe v. Emory Univ.*, No. 20-2002, 2021 WL 358391, at *5 (N.D. Ga. Jan. 22, 2021) ("While these statements might conjure images of the typical academic, residential, and social opportunities enjoyed by college students, these statements cannot be deemed a legal offer. Instead, these promotional statements are essentially advertising materials, which do not constitute offers to form express contracts under longstanding Georgia law.") (citations omitted).

An admission letter is an offer of enrollment. It is not part of the agreement. At Penn, the contract is not formed until the student registers for classes, triggering the obligation to pay tuition and fees in exchange for enrollment.[52]

The plaintiffs also contend the course descriptions, classroom locations, attendance policy and other information in the PennBook create an implied promise of in-person instruction.[53] A cause of action for breach of an implied promise is not cognizable under Pennsylvania law in the higher education context.

It is not surprising there is no specific, written promise to provide in-person instruction. Institutions of higher education retain flexibility to respond to emergencies that may require them to close campus, such as for inclement weather, natural disasters or terrorist attacks. *See, e.g., Roe v. Loyola Univ. New Orleans*, No. 07-1828, 2007 WL 4219174, at *1-2 (E.D. La. Nov. 26, 2007) (dismissing breach of contract claim where law school transferred students to a nearby law school for one semester while campus was closed following Hurricane Katrina); *Paynter v. New York Univ.*, 319 N.Y.S.2d 893, 893 (App. Div. 1971) (dismissing breach of contract claim where defendant suspended classes following anti-war student protests and shooting at Kent State University).

Penn reserved the right to suspend operations in the event of an emergency. Contemplating emergency situations, the PennBook provides in a section entitled "Suspension of Normal Operations":

---

[52] Financial Responsibility Statement at 1. The FRS states: "[b]y registering for class(es) offered by the University of Pennsylvania . . . [students] agree to pay tuition, fees and other charges" and that registration "constitutes a legal financial obligation." *Id.* The contract is formed when students register for classes.

[53] *See* Pls.' Am. Compl. at ¶¶ 103-107; Oral Arg. Tr. at 12:21-13:5. These include information on degree programs, academic policies, course offerings and other resources, online courses and programs, and registration materials containing course descriptions, meeting times, and locations.

> Although Penn normally never stops operating, emergencies such as severe weather conditions may sometimes result in the cancellation of classes and/or the full or partial closure of certain areas of the University. Decisions affecting work schedules and class cancellation are made by the Executive Vice President in consultation with the Provost.[54]

This provision and the related policies and procedures it references[55] warn students and staff that Penn may cancel or suspend operations, totally or partially, in response to emergencies. It does not promise a refund or credit for time lost. Thus, Penn retained the right to modify and cancel classes if the circumstances called for it, further underscoring the lack of a guarantee of in-person instruction.

Some courts have denied motions to dismiss COVID-19 tuition refund cases, finding there was an implied contract to provide in-person classes. But, those decisions were grounded on state law that differed from Pennsylvania law. *See*, *e.g.*, *Salerno v. Fl. Southern Coll.*, No. 20-1494, 2020 WL 5583522, at *5 (M.D. Fla. Sep. 16, 2020) (noting that Florida law "recognizes that the college/student contract is typically implied in the College's publications" and "is more nebulous . . . [than] a typical contract situation where there is an express document with delineated terms that a plaintiff can reference."); *Zahn v. Ohio Univ.*, No. 2020-00371, 2020 WL 6163919, at *3 (Oh. Ct. Cl. Oct. 19, 2020) (denying motion to dismiss where plaintiff adequately alleged "an implied contract exists for an in-person education as opposed to an online education" under Ohio law); *Spiegel v. Trs. of Ind. Univ.*, No. 53C06-2005-CT-000771, 2020 Ind. Cir. LEXIS 388, at *7 (Monroe

---

[54] "2020-21 Catalog: Suspension of Normal Operations," University of Pennsylvania, https://catalog.upenn.edu/pennbook/suspension-normal-operations/.

[55] "Policy Manual: Suspension of Normal Operations (Formerly Emergency Closing policy)," Penn Human Resources (Dec. 21, 2010), https://www.hr.upenn.edu/policies-and-procedures/policy-manual/other-policies/suspension-of-normal-operations.

Cir. Ct. Nov. 19, 2020) (denying motion to dismiss under Indiana law where the plaintiff's allegations "are sufficient to establish, at minimum, an implied contract").

In jurisdictions where the state law is similar, courts have required, as we do, the plaintiffs to identify an express contractual promise to provide in-person classes, no matter the circumstances. In *Zagoria*, the court dismissed the plaintiff's tuition reimbursement claim because he failed to "point to any express language promising the 'certain specified service' of in-person classes . . . [or] demonstrate[ing] NYU 'relinquished its authority' to alter the method of academic instruction." 2021 WL 1026511, at *4. Significantly, the court found NYU's "'marketing and recruitment materials' . . . do not rise to the level of a specific promise to provide in-person educational services." *Id.* Similarly, in *Shaffer v. George Washington Univ.*, the court dismissed the plaintiffs' tuition reimbursement claim because "broad descriptions of GW's campus and common student experiences, as well as customary practice . . . do not create enforceable obligations on the part of GW." No. 20-1145, 2021 WL 1124607, at *2 (D.D.C. Mar. 24, 2021). According to the court, promotional materials "certainly create an expectancy for on-campus education," but they do not "definitively promise" that experience. *Id.*

Because the plaintiffs have not specifically alleged that Penn violated an express, written contractual provision to provide in-person instruction and an on-campus experience in exchange for tuition, they have not stated a claim for breach of contract on behalf of the Tuition Class. Thus, we shall dismiss the tuition claim.

The breach of contract claim on behalf of the Fees Class is another matter. Unlike the Tuition Class that was unable to identify a specific promise to provide in-person

instruction, the Fees Class has identified a promise to provide specific services and resources.

According to the descriptions on Penn's website, the General Fee, Technology Fee and Clinical Fee support a wide range of services and resources, many of which are only available and accessible on-campus. The General Fee provides students "with full access to . . . multicultural resource centers, student activities, [and] recreation and fitness." The Technology Fee covers technology-driven services, including "technology-enabled spaces." The Clinical Fee supports "the Student Health Service." These descriptions amount to a specific promise to provide the services, resources and facilities to students. The absence of language entitling students to fee refunds in the event of a suspension of operations or closure does not relieve Penn of its obligation to provide what it specifically promised.

The plaintiffs have alleged they were deprived of some of these services and resources when Penn shut its campus. According to the amended complaint, Penn did not provide "on-campus computer or lab facilities, access to recreational facilities, access to campus events, any student activities, or any student health and treatment services for a portion of the Spring 2020 semester."[56] Students were barred from accessing the Morris Arboretum, the Penn Bookstore, the University Ice Rink, the Penn's Children Center, all on-campus libraries and all student centers, among other buildings and facilities.[57]

---

[56] Pls.' Am. Compl. at ¶ 151.

[57] *Id.* at ¶ 30.

Based on the plaintiffs' allegations and the fee descriptions themselves, the students were charged fees for certain resources and services that were later cancelled or unavailable. *See Chong v. Ne. Univ.*, No. 20-10844, 2020 WL 5847626, at *4 (D. Mass. Oct. 1, 2020) (allowing breach of contract claim for campus recreation fee that granted students access to campus athletic events and fitness centers, which were subsequently closed). At the pleading stage, the plaintiffs have alleged a claim for breach of contract on behalf of the Fees Class.

### *Unjust Enrichment*

Under Pennsylvania law, a plaintiff may not recover under a theory of unjust enrichment if the parties' relationship is governed by a written contract. *Shafer Elec. & Const. v. Mantia*, 67 A.3d 8, 13 (Pa. Super. 2013), a*ff'd on other grounds*, 96 A.3d 989 (Pa. 2014) (citing *Wilson Area Sch. Dist. v. Skepton,* 895 A.2d 1250, 1254 (Pa. 2006)). Where the existence of a contract is in dispute, a plaintiff may plead an unjust enrichment claim in the alternative. FED. R. CIV. P. 8(d)(3). *See also W.V. Realty, Inc. v. N. Ins. Co.*, 334 F.3d 306, 316 (3d Cir. 2003).

The parties agree there is an express, written contract. Although the contract does not give rise to the promise plaintiffs argue Penn breached, the contract still exists. Because the parties' relationship is governed by a contract, the plaintiffs cannot plead an unjust enrichment claim as an alternative cause of action. *Khawaja v. RE/MAX Cent.*, 151 A.3d 626, 633 (Pa. Super. 2016) (citations omitted). Therefore, we shall dismiss the unjust enrichment claims.

*Conversion*

Penn also argues the contract bars the plaintiffs' conversion claim under the gist of the action and economic loss doctrines.[58] The plaintiffs respond that the conversion claim is based on Penn's retention of the tuition and fee payments, not on the contractual breach itself.[59] According to the plaintiffs, the contract is merely the vehicle establishing the relationship within which the tort was committed.[60]

Pennsylvania's gist of the action doctrine precludes a plaintiff from bringing what is actually a breach of contract claim as a tort claim. *Erie Ins. Exch. v. Abbott Furnace Co.*, 972 A.2d 1232, 1238 (Pa. Super. 2009). *See also Jones v. ABN Amro Mortg. Grp., Inc.*, 606 F.3d 119, 123 (3d Cir. 2010). The doctrine maintains the distinction between causes of action founded on the breach of a contractual duty created by the parties' relationship and those based on the breach of a social duty imposed by society on all individuals. *Bash v. Bell Tel. Co. of Penn.*, 601 A.2d 825, 829 (Pa. 1992).

When the parties' obligations are defined by the terms of a contract and not by duties imposed by social policies, a plaintiff may assert only a contract claim. *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014); *Erie Ins. Exch.*, 972 A.2d at 1239 (citing *eToll, Inc. v. Elias/Savion Adver.*, 811 A.2d 10, 14 (Pa. Super. 2002)). In order to state a tort claim where there is a contract, the wrong complained of must be the gist of the action with the contract only incidental. *Bruno*, 106 A.3d at 66 (quoting *Bash*, 601 A.2d at 829).

---

[58] Def.'s Mot. to Dism. at 24-26; Def.'s Reply at 14-15.

[59] Pls.' Resp. at 31-32.

[60] *Id.*

In determining whether the gist of the action is based on a contract or a tort, we look to the nature of the duty breached as alleged in the complaint. *Id.* at 63. If the claim arises directly from a breach of a contractual duty created by the parties, it is a contract action. If the claim arises from the violation of a broader social duty imposed by society and not by the parties to the action, it is a tort action. *Id.* Thus, the substance of the allegations in the complaint is of "paramount importance." *Id.* at 68.

The fact that there is a contract between the parties does not mean that a party's claim for injury or loss resulting from the other party's conduct in performing the contract is necessarily a claim for breach of contract. A breach of contract cause of action is based on the breach of a specific executory promise in the contract. *Id.* at 70. Where it is alleged that the defendant breached a duty that exists "independently and regardless of the contract" and was not created by the parties, it is a tort action. *Id.*

The gist of this action is a breach of contract claim. The plaintiffs allege that despite Penn's promise to provide an in-person, on-campus education with its appurtenant benefits and services, it delivered a materially different product. The plaintiffs themselves characterize Penn's decision "to retain monies paid for products and services that were never delivered [as] a standard commercial business decision."[61] Although the plaintiffs contend that allowing Penn to retain these payments violates a "broader social duty," they have not identified that social duty. *See McKesson Corp. v. Campbell*, No. 2579-2014, 2015 WL 7571502, at \*9 (Pa. Super. Nov. 24, 2015) (citing *Pittsburgh Const. Co. v. Griffith*, 834 A.2d 572, 584 (Pa. Super. 2003)) ("Claims for conversion have been consistently disallowed where such claims are based on the same facts as the contract

---

[61] *Id.* at 16.

claim."). Nor can we discern any. Thus, the gist of the action doctrine bars the plaintiffs' conversion claim.[62]

## Conclusion

The plaintiffs have not stated a claim for breach of contract against Penn for tuition refunds. They have stated a cause of action for breach of contract for refunds of the fee payments. The unjust enrichment claim is barred by the parties' contract. The conversion claim is barred by the gist of the action doctrine. Therefore, we shall dismiss only Counts I, II, IV and V.

---

[62] Because we conclude that the gist of the action doctrine bars the plaintiffs' conversion claim, we do not address whether the claim is barred by the economic loss doctrine.