## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DARIA CRAWFORD** and **AHMED ABDELHAMID**, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| v. | Case Nos. 20-cv-1539 (CRC), 20-cv-1886 (CRC) |
| **THE PRESIDENTS AND DIRECTORS OF GEORGETOWN COLLEGE,** | |
| Defendant. | |
| **MAAZ QURESHI**, **MATTHEW RABINOWITZ**, and **DANISH ARIF**, individually and on behalf of others similarly situated, | |
| Plaintiffs, | |
| v. | Case Nos. 20-cv-1141 (CRC), 20-cv-1454 (CRC), 20-cv-1555 (CRC) |
| **AMERICAN UNIVERSITY**, | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

As the COVID-19 pandemic upended daily life in spring 2020, countless institutions of higher education suspended in-person classes and activities and temporarily moved them online. Two of those institutions were Georgetown University and American University.  In these putative class actions, Georgetown and American students seek a partial refund of tuition and fees they paid for the spring 2020 semester.  The students do not dispute that it was reasonable under the circumstances to pause on-campus education, but they claim that the universities owe them compensation for failing to deliver a full semester of the traditional college experience that

the students reasonably expected when they enrolled.  The universities have moved to dismiss those claims.

Georgetown and American are not alone in facing litigation over the interruption of in-person learning due to COVID-19.  Many similar cases have been filed across the country, and courts have divided on whether these complaints raise plausible claims for breach of contract and other causes of action.  As these mixed results suggest, these cases raise difficult legal issues and require close attention to the facts alleged against each individual university.

After careful consideration, the Court concludes that the Georgetown and American students have failed to state valid claims.  The Court has no trouble accepting that the students expected a campus-based semester.  Under normal conditions, the universities might be obligated to fulfill that expectation.  Yet, the students' allegations do not support a plausible inference that the universities promised away their discretion to make reasonable modifications in response to radically changed circumstances, such as moving classes online to keep students and faculty safe during the deadly and uncertain early months of a once-in-a-century pandemic.  The Court will therefore dismiss the claims against both universities.

## I.    Background

### A.    Factual Allegations as to Georgetown

The following facts are alleged in the Amended Complaint in Crawford v. Presidents and Directors of Georgetown College, No. 20-cv-1539 ("Georgetown Am. Compl."), or drawn from other documents that the Court may consider at the pleading stage.[1]  Georgetown University is a

---

[1] On a motion to dismiss, the Court may consider "documents attached as exhibits or incorporated by reference in the complaint" and "documents attached to a motion to dismiss if their authenticity is not disputed, they are referred to in the complaint, and they are integral to the plaintiff's claims."  Int'l Brotherhood of Teamsters v. Atlas Air, Inc., 435 F. Supp. 3d 128, 135

private research university in Washington D.C., with approximately 19,000 students enrolled

across its undergraduate and graduate programs.  Georgetown Am. Compl. ¶ 2.  For the spring

2020 semester, plaintiff Daria Crawford was enrolled as an undergraduate at Georgetown, and

plaintiff Ahmed Abdelhamid was enrolled as a law student.  Both plaintiffs paid tuition for the

semester.  Id. ¶¶ 19–20.  They also paid certain fees.  Specifically, Ms. Crawford paid a

mandatory "Student Activities Fee" that "fund[s] various activities throughout the year,

including concerts, lectures, performances, discussion groups, recreational opportunities, and

other co-curricular programs," while Mr. Abdelhamid paid a "Graduate Student Activity Fee."

Id. ¶ 21.

--------

(D.D.C. 2020) (Cooper, J.) (cleaned up).  "The prototypical incorporation by reference occurs
where a complaint claims breach of contract, and either party attaches to its pleading an authentic
copy of the contract itself."  Banneker Ventures, LLC v. Graham, 798 F.3d 1119, 1133 (D.C.
Cir. 2015); see also Whiting v. AARP, 637 F.3d 355, 363 (D.C. Cir. 2011) (in dispute over
meaning of insurance contract, court could consider promotional materials extrinsic to the
contract itself, as the materials were "referred to and relied on in the complaint" and were
attached to defendant's motion to dismiss).
      Here, the universities have attached several documents to their motions to dismiss, including
Georgetown's Student Handbook of Academic Policies for law students,
Georgetown's Undergraduate Bulletin, and excerpts from American's 2019-2020 Catalog.  The
students have not disputed the authenticity of any of these documents.  Moreover, these
university publications are integral to the students' claims.  The American students' Amended
Complaint specifically refers to American's "academic catalogs" and alleges that "contractual
terms are set forth" in those and other university documents.  Am. Compl., No. 20-cv-1141
("American Am. Compl.") ¶ 79.  Similarly, the Georgetown students' Amended Complaint
explicitly refers to and relies on Georgetown Law's Student Handbook.  Georgetown Am.
Compl. ¶¶ 7, 54.  And while the operative pleadings do not cite Georgetown's Undergraduate
Bulletin by name, the Georgetown students concede that the terms of their contract with the
university depend in part on the language of the Bulletin.  See Georgetown Opp'n at 10, No. 20-
cv-1539, ECF No. 21 ("[I]t is well-accepted in D.C. that the terms set down in a university's
bulletin become part of the contract between students and the University." (internal quotation
marks omitted)); see also Georgetown Am. Compl. ¶ 3 (alleging generally that "[t]he terms of
the contractual agreement were set forth in publications from Georgetown University").
Therefore, the Court will consider the American Catalog, the Georgetown Law Handbook, and
the Georgetown Undergraduate Bulletin in deciding the motions to dismiss.

When they agreed to enroll at Georgetown, plaintiffs allege that they understood themselves to have purchased a contractual right to an on-campus education, including in-person instruction.  Id. ¶¶ 3, 21.  In plaintiffs' telling, "[t]he terms of the contractual agreement were set forth in publications from Georgetown University, including Georgetown University's Spring Semester 2020 Course Catalog . . ., the [school's] marketing materials, and Plaintiffs' acceptance letter."  Id. ¶ 3.  For example, Georgetown's electronic course catalog indicated "the location (including the building and room number) in which courses would be held" and allowed users to filter course selections for "In Person" classes, id. ¶¶ 5–6; Georgetown course syllabi specified that the courses would be taught in person and that student attendance was required, id. ¶ 23; and the school's website "market[ed] the Georgetown on-campus experience as a benefit of enrollment," id. ¶ 37.

Elsewhere in its official publications, Georgetown reserved certain rights to itself.  Its Undergraduate Bulletin states that the university "reserves the right to change without notice the Undergraduate Bulletin, including all rules, policies, fees, curricula, courses, graduation requirements, or other matters contained therein," Georgetown Undergraduate Bulletin at 2, No. 20-cv-1539, ECF No. 19-1, as well as "the right to increase tuition and other fees without prior notice should conditions be such that an increase is warranted," id. at 21.  The Georgetown Law Center Handbook similarly notes that "[t]he Law Center reserves the right to change academic requirements and policies," Georgetown Law Handbook at iii, No. 20-cv-1539, ECF No. 19-2, and that "[t]uition and fees are subject to change without prior notice," id. at 140.

On March 11, 2020, Georgetown announced that because of the COVID-19 pandemic, it would suspend all in-person classes and transition to online learning for the rest of the semester.  Georgetown Am. Compl. ¶ 12.  Accordingly, "Georgetown did not provide in-person education,

experiences, or related services for approximately 50% of the Spring Semester 2020." Id. ¶ 15.
Georgetown has not issued any refund of tuition or mandatory student fees as a result of this
temporary shift to online education.  Id. ¶ 16.

     B.  Factual Allegations as to American

The facts alleged against American University are largely similar to those in the
Georgetown complaint.  Like Georgetown, American is a private university located in D.C.
American Am. Compl. ¶ 6.  Plaintiffs Maaz Qureshi, Matthew Rabinowitz, and Danish Arif were
enrolled as full-time undergraduate students at American for the spring 2020 semester.  Id. ¶ 13.
They paid tuition for the semester, id. ¶ 127, plus mandatory fees including an "activity fee," a
"sports center fee," a "technology fee," and a "Metro U-Pass fee," id. ¶¶ 33, 164.

The American students allege that "[t]hrough its website, marketing material,
advertisements, and other literature, the University sells on-campus instruction and the on-
campus experience as key reasons that a student should choose to attend American."  Id. ¶ 24.
They cite examples including American's online course catalog, which lists the location of
courses and allows students to filter courses by location, id. ¶¶ 118–19; "syllabi and other
documents that referenced class meeting schedules, locations, and physical attendance
requirements," id. ¶ 124; the university's publicly stated policy against offering "online degrees,"
id. ¶ 86; the fact that American's non-degree-granting online programs are discussed on a
separate page of its website, id. ¶¶ 115–16; the "University Life" page on American's website,
which "touts such things as Greek life, athletics, and student organizations," id. ¶ 25; the
university's representation that "DC serves as a laboratory of learning for students," id. ¶ 26; a
promotional video "welcoming the viewer to, 'Our sleepy little college town,'" id. ¶ 89; and a

program offering overnight campus visits to prospective students as part of American's recruiting pitch, id. ¶¶ 107–08.

The American University Catalog contains a reservation of rights similar to the ones in Georgetown's publications: "American University reserves the right to amend the policies and information contained in the University Catalog from time to time, with or without notice." American Catalog at 1, No. 20-cv-1141, ECF No. 27-2.  Separately, the American Catalog discusses the basis for calculating students' tuition.  According to the Catalog, "[u]ndergraduate students who register for fewer than 12 credit hours are charged tuition per credit hour based on the number of credit hours taken."  Id. at 2.  By contrast, "[u]ndergraduate students who register for 12 to 17.5 credit hours are charged for tuition at a flat full-time rate of $24,535."  Id.  The Catalog then explains: "The off-campus tuition rate differs from the rate for on-campus courses. However, full-time undergraduate students who register for courses both on and off campus are assessed tuition at the on-campus full-time rate."  Id.

In response to the COVID-19 pandemic, American shifted its instruction to a fully online format starting March 18, 2020 and continuing through the end of the spring 2020 semester. American Am. Compl. ¶¶ 46–47.  The university encouraged students to leave campus and advised them that there would be no activities there.  Id. ¶ 48.  According to the plaintiffs, the online learning experience was "sub-par in practically every aspect" compared to the in-person education they had been receiving before the pandemic.  Id. ¶ 52.  They note that the University Provost has expressed sympathy to students who lost the benefits of on-campus education, id. ¶ 53, and that American has offered discounts on tuition to students who were unable to take their summer 2020 and fall 2020 courses in person, id. ¶¶ 55–57.

C.  <u>Procedural Background</u>

Ms. Crawford filed a putative class action against Georgetown in June 2020, seeking partial refunds of tuition and fees on behalf of herself and all similarly situated students.  Mr. Abdelhamid filed a similar complaint in the District of New Jersey, which transferred the case to this district.  Meanwhile, the three named American plaintiffs filed their putative class actions in quick succession.  Mr. Qureshi filed a complaint in this Court in May 2020, followed by Mr. Rabinowitz in June.  Mr. Arif filed his complaint in the Southern District of Florida in May 2020, and the case was transferred to this Court.

In July 2020, this Court consolidated the two cases against Georgetown and separately consolidated the three cases against American.  The following month, both sets of plaintiffs filed consolidated Amended Complaints against their respective schools.  The universities then moved to dismiss the Amended Complaints.  Both motions to dismiss are now fully briefed.  In addition to their motion papers, both sides have filed—and the Court has reviewed—numerous notices of supplemental authority regarding decisions in similar lawsuits against other universities that suspended in-person classes due to COVID-19.

In February 2021, the Court held a combined hearing by videoconference on both universities' motions to dismiss.  The motions are now ripe for decision.

**II.   Legal Standard**

Federal Rule of Civil Procedure 12(b)(6) requires the Court to dismiss a complaint that fails "to state a claim upon which relief can be granted."  In analyzing a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).

"The Court takes all of the factual allegations in the complaint as true and construes those facts 'liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the facts alleged.'"   Johnson v. United States, No. 17-cv-2411 (CRC), 2019 WL 2424039, at *3 (D.D.C. June 10, 2019) (quoting Stewart v. Nat'l Educ. Ass'n, 471 F.3d 169, 173 (D.C. Cir. 2006)).

### III.  Analysis

Both Amended Complaints seek a partial refund of (1) tuition and (2) student fees based on claims for breach of contract, unjust enrichment, and conversion.  In addition, the Georgetown plaintiffs include a claim for money had and received, and the American plaintiffs accuse their university of unlawful and deceptive trade practices in violation of the D.C. Consumer Protection Procedures Act.  The Court will first consider whether to dismiss each claim as it relates to tuition, then repeat the analysis as to fees.  Because the issues are largely common to both Georgetown and American, the Court will address them together, except where necessary to distinguish between the universities.

A.  Tuition Claims

1.  *Breach of Contract*

The universities first argue that the students' breach-of-contract claims seeking a partial refund of tuition should be dismissed.  The Court agrees.

The District of Columbia's substantive law governs the dispute.[2]  "To prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an

_____

[2] "A federal court must apply the choice-of-law rules of the jurisdiction in which it sits to determine the body of law that should govern substantive matters."  Turkmani v. Republic of Bolivia, 273 F. Supp. 2d 45, 51 (D.D.C. 2002).  "D.C. law employs 'a modified governmental interests analysis which seeks to identify the jurisdiction with the most significant relationship to

obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." Tsintolas Realty Co. v. Mendez, 984 A.2d 181, 187 (D.C. 2009). A valid contract requires "both (1) agreement as to all material terms and (2) intention of the parties to be bound." Jack Baker, Inc. v. Office Space Dev. Corp., 664 A.2d 1236, 1238 (D.C. 1995) (quoting Georgetown Entertainment Corp. v. District of Columbia, 496 A.2d 587, 590 (D.C. 1985)). Agreement, in turn, requires a valid offer, which "must be so definite in its terms, or require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain." Basch v. George Washington Univ., 370 A.2d 1364, 1367 (D.C. 1977) (quoting Restatement of Contracts § 32 (1932)).

A contractually binding promise may be either "express" or "implied-in-fact." Emerine v. Yancey, 680 A.2d 1380, 1383 (D.C. 1996). The existence of an express contract between the parties does not necessarily rule out the existence of additional, implied terms. See id. at 1384 (holding that an express contract for accounting services impliedly incorporated the accountant's usual hourly rate). "[A]n implied-in-fact contract is a true contract, containing all the necessary elements of a binding agreement; it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt." Id. at 1383 (quoting Vereen v. Clayborne, 623 A.3d 1190, 1193 (D.C. 1993)). A party's conduct can serve as an effective "manifestation of his assent" to a contract only if "he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." Camara v. Mastro's

_____

the dispute.'" In re APA Assessment Fee Litig., 766 F.3d 39, 51 (D.C. Cir. 2014) (quoting Washkoviak v. Student Loan Mktg. Ass'n, 900 A.2d 168, 180 (D.C. 2006)). Given that both universities are located in D.C. and plaintiffs allege they bargained for an on-campus education, D.C. is the jurisdiction with the most significant relationship to the parties' dispute.

Restaurants LLC, 952 F.3d 372, 375 (D.C. Cir. 2020) (quoting Restatement (Second) of

Contracts § 19(2) (1981)).  The mere fact that a party's conduct induces reasonable *expectations*

does not necessarily show that the party has manifested assent to a contractual *obligation* to

fulfill those expectations.  See E.M. v. Shady Grove Reproductive Science Ctr. P.C., No. 19-cv-

657 (RC), 2020 WL 6158575, at \*27 n.19 (D.D.C. Oct. 21, 2020) ("[T]he 'mere expectancy of a

continued course of conduct is not enough' to establish a contract by implication." (quoting

Patriot, Inc. v. U.S. Dep't of Housing & Urban Dev., 963 F. Supp. 1, 6 (D.D.C. 1997))); Basch,

370 A.2d at 1368 (words that "expressed an expectancy by the University regarding future

increases" in tuition did not constitute "a promise susceptible of enforcement").

"[T]he relationship between a university and its students is contractual in nature.  It is

also accepted that the terms set down in a university's bulletin become a part of that contract."

Basch, 370 A.2d at 1366.  However, some language may appear in a university bulletin without

becoming a contractual term.  See id. at 1367 ("University bulletins customarily contain a great

deal of information concerning what the prospective student may expect," which may not be

binding under "general principles of contract construction").  Conversely, contractual terms in a

university context can arise without being written in a bulletin, or indeed, without being

expressly stated at all.  See Pride v. Howard Univ., 384 A.2d 31, 35 (D.C. 1978) ("[T]he usual

practices surrounding a contractual relationship can themselves be raised to the level of a

contractual obligation."); Dantley v. Howard Univ., 801 A.2d 962, 964–66 (D.C. 2002)

(appellant might have "had an implied contract by virtue of language in the [Howard University]

Handbook"); McConnell v. Howard Univ., 818 F.2d 58, 65–66 (D.C. Cir. 1987) (former faculty

member could proceed to trial on theory that university had an implied contractual duty to help

resolve certain conflicts between faculty and students); Greene v. Howard Univ., 412 F.2d 1128,

1133–35 (D.C. Cir. 1969) (finding implied contractual obligation and explaining that "[c]ontracts are written, and are to be read, by reference to the norms of conduct and expectations founded upon them . . . especially" in the university context).

"[I]n determining whether a university has complied with its own rules or contract, a court must be careful not to substitute its judgment improperly for the academic judgment of the school." Allworth v. Howard Univ., 890 A.2d 194, 202 (D.C. 2006) (internal quotation marks omitted). However, this deferential posture toward academic judgment does not prevent courts from enforcing contractual promises "to provide *specifically promised educational services*." Roe v. St. Louis Univ., No. 4:08CV1474, 2012 WL 6757558, at *10 (E.D. Mo. Dec. 31, 2012) (quoting Alsides v. Brown Inst., Ltd., 592 N.W.2d 468, 472 (Minn. Ct. App. 1999)) (emphasis original), aff'd, 746 F.3d 874 (8th Cir. 2014); Doe v. George Washington Univ., 321 F. Supp. 3d 118, 124 (D.D.C. 2018) (finding that sections of university's Code of Student Conduct "are binding on the University, and failure to follow them, as alleged, would constitute a breach of contract").

Here, all parties agree that both universities entered a contract of some kind with their students for the spring 2020 semester. The universities concede that under the contract, they were obligated to provide each student "instruction resulting in credits" toward a degree. Georgetown Mem. at 13, No. 20-cv-1539, ECF No. 18-1; American Mem. at 16, No. 20-cv-1141, ECF No. 27-1. However, they insist that none of their alleged words or actions manifested a promise to provide *in-person* education, and they hold up their express reservations of rights as affirmative proof that students have no contractual right to any specific format of instruction.

The students, by contrast, contend that their schools promised an on-campus educational experience. To support this contention, the Georgetown plaintiffs allege that Georgetown's

electronic course catalog indicated "the location (including the building and room number) in which courses would be held" and allowed users to filter for "In Person" courses, Georgetown Am. Compl. ¶¶ 5–6; that Georgetown course syllabi specified that the courses would be taught in person and that student attendance was required, id. ¶ 23; that Georgetown's website "markets the Georgetown on-campus experience as a benefit of enrollment," id. ¶ 37; that this emphasis on "in-person educational opportunities, experiences, and services" is echoed in other Georgetown "marketing materials" and "advertisements," id. ¶ 8; that Georgetown's acceptance letters to prospective students also set forth "[t]he terms of the contractual agreement" to provide an on-campus experience, id. ¶ 3; and that Georgetown law students, in particular, were promised an opportunity to "build[] your resume in the city where laws are made," id. ¶ 37 (quoting Georgetown's website).

Similarly, the American plaintiffs allege that American's course catalog and syllabi identify on-campus locations for courses, American Am. Compl. ¶¶ 118–19, 124; that various marketing materials emphasize the benefits of American's on-campus experience, id. ¶¶ 24–26, 82-110; and that American's website specifically distinguishes between its campus-based, degree-granting programs and its online, non-degree programs, id. ¶¶ 86, 115–16.

The universities have the better argument.  To begin, the students have practically conceded that they did not enter *express* contracts for in-person education.  See Hearing Tr. at 37, No. 20-cv-1539, ECF No. 34 (statement by students' counsel that "I think what we're dealing with here is an implied-in-fact contract that incorporated express written terms").  The Court agrees.  While the pleadings indicate that both universities made references to on-campus instruction in their written materials, these references do not include promissory language, and no individual statement rises to the level of specificity required to communicate a definite

promise.  See In re Columbia Tuition Refund Action, No. 20-CV-3208 (JMF), 2021 WL 790638, at *3–5 (S.D.N.Y. Feb. 26, 2021) (dismissing claim against Columbia University based on similar allegations, while contrasting Columbia's statements with another university's express representation that certain courses would be "taught with only traditional in-person, on-campus class meetings").  Indeed, the Amended Complaints fail to identify even an ambiguous statement that *could* be interpreted as a freestanding, verbal promise of on-campus instruction.

Whether the students have plausibly alleged *implied* contracts for in-person education is a more difficult issue.  Answering that question requires a careful examination of "the conduct of the parties in the milieu in which they dealt."  Emerine, 680 A.2d at 1383.  In particular, the Court must determine whether the universities' alleged words and actions, taken in context, support a plausible inference that the universities made a binding promise to educate students on campus throughout the semester.

On one hand, the Amended Complaints contain well-pleaded allegations that the universities vigorously marketed their on-campus educational experiences, and that their course catalogs indicated an intent to hold certain classes in person.  See Georgetown Am. Compl. ¶¶ 5–8, 37; American Am. Compl. ¶¶ 82–119.  In the same vein, American allegedly represented that students enrolled as full-time undergraduates would not be pursuing "online degrees" and maintained a separate web page, with separate cost information, for its non-degree-granting "Online Learning" programs.  American Am. Compl. ¶¶ 23, 116.[3]  As already noted, none of the

---

[3] American's Catalog also contains relevant language not quoted in the American students' Amended Complaint.  This language, on careful inspection, is unhelpful to the students:

> Undergraduate students who register for fewer than 12 credit hours are charged tuition per credit hour based on the number of credit hours taken. Undergraduate

universities' alleged representations can be singled out and read as a specific promise to provide

in-person education throughout the semester, even resolving all ambiguities in the students'

favor.  Nevertheless, the fact that the universities routinely touted their campus experiences

provides some evidence of a shared understanding that part of what the universities intended to

sell—and the students intended to buy—was an educational model in which campus-based

instruction and activities would be the norm.[4]

On the other hand, the absence of anything approaching an express promise of in-person

instruction is glaring.  As the lengthy university documents referenced in the Amended

Complaints show, "the milieu in which [the parties] dealt," Emerine, 680 A.2d at 1383, was one

---

students who register for 12 to 17.5 credit hours are charged for tuition at a flat
full-time rate of $24,535. . . . The off-campus tuition rate differs from the rate for
on-campus courses.  However, full-time undergraduate students who register for
courses both on and off campus are assessed tuition at the on-campus full-time
rate.

American Catalog at 2.  In their opposition brief, the American plaintiffs seize on the statement
that "[t]he off-campus tuition rate differs from the rate for on-campus courses."  American
Opp'n at 9, No. 20-cv-1141, ECF No. 28.  But in context, it is reasonably clear that this
statement refers only to the rates American charges per credit hour *for part-time students*—i.e.,
those who take fewer than 12 credit hours.  Full-time undergraduate students like the plaintiffs,
by contrast, "are charged for tuition at a flat full-time rate of $24,535," regardless of whether
they register exclusively for on-campus courses or choose a mix of course formats.  American
Catalog at 2.  Thus, the Catalog's discussion of tuition undermines the theory that American tied
its tuition rates for full-time undergraduates to the location of instruction.  At the same time, this
language leaves unanswered the distinct question of whether American's full-time
undergraduates, having paid their tuition, had a contractual right to attend in-person classes
throughout the semester if they so chose.

[4] Other facts highlighted in the Amended Complaints and the students' motion papers
contribute little, if anything, to the plausibility of the students' implied-contract theory.  For
example, both Amended Complaints allege that the universities have academic policies requiring
class attendance.  Georgetown Am. Compl. ¶ 7; American Am. Compl. ¶ 120.  But merely
requiring attendance does not imply that classes will meet on campus.  It is perfectly coherent to
say that students must "attend" their online classes as well as their in-person classes.

in which key contractual terms were routinely committed to writing.  Of course, it is possible for universities to make binding promises without stating them expressly, in official documents or otherwise.  But when courts applying D.C. law have found such implied promises by universities, they have generally done so because the written contract contained some ambiguous language that, in light of the relevant circumstances, could reasonably be interpreted as making a promise.  Compare Dantley, 801 A.2d at 964–66 (finding genuine dispute as to whether appellant "had an implied contract by virtue of language in the [Howard University] Handbook") and Greene, 412 F.2d at 1135 (finding a contractual obligation to provide a hearing on alleged faculty misconduct and relying on provisions in the faculty handbook that "seem . . . to contemplate a hearing") with Pride, 384 A.2d at 34-36 (declining to read a quorum rule for Howard's Judiciary Board into the Code of Conduct, which was "silent" on the matter).  Given the lack of a textual hook for the purported agreement to educate students on campus, it stretches the bounds of plausibility to infer that a reasonable student would believe the universities had made an unequivocal promise to do so.

The universities' broadly worded reservations of rights further undermine the plausibility of any such inference.  See Georgetown Undergraduate Bulletin at 2 ("Georgetown University reserves the right to change without notice the Undergraduate Bulletin, including all rules, policies, fees, curricula, courses, graduation requirements, or other matters contained therein."); Georgetown Law Handbook at iii ("The Law Center reserves the right to change academic requirements and policies"); American Catalog at 2 ("American University reserves the right to amend the policies and information contained in the University Catalog from time to time, with or without notice.").  These provisions fall somewhat short of expressly granting the universities an unambiguous, absolute right to cancel in-person instruction.  Nevertheless, they put students

on notice that their expectations regarding the format of instruction—even *reasonable* expectations—might go unfulfilled.[5]  As another court recently explained in a similar case, "[o]ne can reasonably infer that the universities reserved their rights *for situations just like what occurred in 2020*–unexpected events, in this case a global pandemic."  Burt v. Bd. of Trs. of Univ. of R.I., No. 20-cv-465-JJM-LDA, 2021 WL 825398, at *5 (D.R.I. Mar. 4, 2021) (emphasis added).

When the students' factual allegations are considered together with the universities' reservations of rights and the absence of express contractual language, and all reasonable inferences are drawn in the students' favor, a picture emerges of an implied contract with terms more nuanced than either side now acknowledges.  It is plausible that both universities impliedly promised, at most, to make a good-faith effort to provide on-campus education, while retaining the right to deviate from the traditional model if they reasonably deemed it necessary to do so.

By way of illustration, suppose there were no pandemic, but Georgetown and American decided to close their campuses, move their students to an apartment complex in Virginia, and convert all in-person courses to online formats as an efficiency measure.  Presented with this hypothetical at oral argument, the universities' counsel argued that there would be no breach of

_____

[5] The students argue that these reservations of rights, by their terms, merely permit the universities to "make changes from semester to semester," not changes "during *the middle of a semester*, after the contract had already been formed, after students had already pre-paid tuition and fees, and after the deadline had passed for students to withdraw."  American Opp'n at 12; Georgetown Opp'n at 12.  The Court is not persuaded.  On their face, the rights-reserving provisions are not limited to changes made between semesters.  And it is easy to imagine mid-semester changes that would seem clearly authorized by the reservations of rights.  For example, if a pipe burst or a fire broke out in an academic building during the semester, the university surely could move the location of classes that formerly met in that building for the rest of the semester to allow time for repairs.

contract.  Hearing Tr. at 6–7, 9.  The Court is not so sure.  Plausibly, the universities knew or should have known that their representations about their on-campus experiences would lead reasonable students to understand that the universities had contractually forfeited any right to abandon in-person instruction on a mere whim.  Insofar as the universities made a specific, implied promise to treat in-person education as the default instructional format, the doctrine of deference to universities' academic judgments likely would not shield them from liability for violating that promise.  See Roe, 2012 WL 6757558, at *10 (courts will enforce contracts "to provide *specifically promised educational services*"); McCarthy v. Loyola Marymount Univ., No. 2:20-cv-04668-SB, 2021 WL 268242, at *3 n.2 (C.D. Cal. Jan. 8, 2021) (noting that, in cases where students are found to have plausibly alleged a promise of in-person education, "[t]he vast majority of federal courts" hold that enforcing the promise would "not implicate the educational malpractice doctrine").

Nor would the universities' express reservations of rights necessarily require the opposite conclusion.  "[A]ll contracts contain an implied duty of good faith and fair dealing, which means that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Paul v. Howard Univ., 754 A.2d 297, 310 (D.C. 2000) (internal quotation marks omitted); see also Allworth, 890 A.2d at 202 (bad faith includes "evasion of the spirit of the bargain," and fair dealing "involves reasonable rather than arbitrary or capricious action").  This doctrine does not prevent contractual parties from validly reserving rights, Obelisk Corp. v. Riggs Nat'l Bank of Wash., D.C., 668 A.2d 847, 854 n.4 (D.C. 1995), but it does require them to exercise their reserved rights reasonably, so as to avoid rendering other terms of the contract illusory.  See Eisenberg v. Eisenberg, 357 A.2d 396, 400 (D.C. 1976).  If the universities had cancelled all in-person instruction simply to save money and

effort, that might be precisely the type of unreasonable, bad-faith action that D.C. contract law prohibits.

However, that hypothetical scenario is quite different from what the students allege in these cases.  The students concede that the universities did not simply change their minds about in-person instruction, but acted in response to the COVID-19 pandemic.  Georgetown Am. Compl. ¶ 1; American Am. Compl. ¶ 1.  The Amended Complaints do not allege that this decision was unreasonable or made in bad faith, as the students' counsel conceded at oral argument.  Hearing Tr. at 39–40 ("We are not saying in the circumstance that what they did was necessarily bad or was wrong[.]").  Whatever else the universities may have impliedly promised, it is not objectively plausible that they intended to surrender their discretion to take such undisputedly reasonable steps to adapt to sudden changes in the public health environment.[6]

This analysis represents something of a middle ground between the two poles that have emerged in similar tuition-refund cases over universities' responses to COVID-19.  Numerous courts have held that allegations similar to the ones in these cases were sufficient to survive a motion to dismiss.  See, e.g., Ford v. Rensselaer Polytech. Inst., No. 1:20-CV-470, 2020 WL 7389155, at *7 (N.D.N.Y. Dec. 16, 2020) ("It does not matter whether defendant's decisions were prudent or necessary. What matters at this moment is that plaintiffs have plausibly alleged

---

[6] The Court should not be misunderstood as holding that COVID-19 rendered in-person instruction impossible and thus excused the universities from any obligation to teach on campus. Jumping to such a factual conclusion would be premature on a motion to dismiss.  See Hiatt v. Brigham Young Univ., No. 1:20-CV-00100-TS, 2021 WL 66298, at *4 (D. Utah Jan. 7, 2021) (validity of university's impracticability defense was "not clear on the face of the Complaint"). Rather, the Court's analysis focuses on the scope of the contract that existed in the first place. Taking the students' allegations as true and drawing all reasonable inferences in their favor, the universities never promised to continue in-person education at all times, regardless of whether a change in format was reasonable.

that defendant specifically promised in its circulars a bevy of in-person academic programs that it did not provide."); <u>Doe v. Bradley Univ.</u>, No. 20-cv-1264, 2020 WL 7634159, at *2 (C.D. Ill. Dec. 22, 2020) (collecting cases reaching similar conclusions).  Others have granted motions to dismiss because they found no plausible allegation that the universities made any definite promise of in-person education.  <u>See, e.g.</u>, <u>Shaffer v. George Washington Univ.</u>, No. 20-cv-1145 (RJL), 2021 WL 1124607, at *2 (D.D.C. Mar. 24, 2021); <u>Smith v. Univ. of Pa.</u>, No. 20-cv-2086, 2021 WL 1539493, at *5–8 (E.D. Pa. Apr. 20, 2021); <u>Hassan v. Fordham Univ.</u>, No. 20-CV-3265 (KMW), 2021 WL 293255, at *7 (S.D.N.Y. Jan. 28, 2021).  The Court has given due consideration to both lines of authority but must keep in mind that most of these cases were decided under other states' laws[7] and none is factually identical to the present litigation.  On the facts presented here, the answer to whether the universities promised in-person education cannot be neatly reduced to "yes" or "no."  Rather, it appears that the parties bargained for a presumption of in-person education but preserved the universities' right to suspend campus-based instruction if they had a good-faith reason to do so.

Accordingly, the Court will dismiss the breach-of-contract claims seeking a partial refund of tuition.

### 2.  *Unjust Enrichment*

The universities next seek dismissal of plaintiffs' unjust enrichment claims regarding tuition.  These claims, too, must be dismissed.

---

[7] For example, the court in <u>Smith</u> explained that "[t]he only implied contract Pennsylvania recognizes in the educational context is a private educational institution's obligation to confer a degree upon a student's successful completion of the degree requirements."  2021 WL 1539493, at *4.  D.C. law, by comparison, recognizes a broader range of possible implied contracts involving universities.  <u>See, e.g.</u>, <u>Greene</u>, 412 F.2d at 1133–35; <u>McConnell.</u>, 818 F.2d at 65–66.

"The elements of an unjust enrichment claim are (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust."  Falconi-Sachs v. LPF Senate Square, LLC, 142 A.3d 550, 556 (D.C. 2016) (internal quotation marks omitted).  A plaintiff cannot recover on an unjust enrichment theory if the parties have a valid contract covering the same subject matter. Id.; see also Vila v. Inter-Am. Inv. Corp., 570 F.3d 274, 280 (D.C. Cir. 2009) ("Underscoring the nature of promissory estoppel and unjust enrichment as remedies for failed agreements, courts tend not to allow either action to proceed in the presence of an actual contract between the parties.").  However, if "there is a basis to set aside a contract as unenforceable," the existence of that contract will not bar an unjust enrichment claim.  Falconi-Sachs, 142 A.3d at 556 (quoting Harrington v. Trotman, 983 A.2d 342, 347 (D.C. 2009)).  Thus, at the pleading stage, a plaintiff may state a claim for unjust enrichment as an alternative to breach of contract, but only if there is some "allegation that the contract is invalid or unenforceable."  He Depu v. Yahoo! Inc., 306 F. Supp. 3d 181, 193 (D.D.C. 2018) (collecting cases).

Here, all parties agree that the universities had a contractual relationship with their students.  Moreover, the Court—taking the Amended Complaints' allegations as true and construing them liberally—has accepted the students' premise that the contracts address the matter of instructional format.  Although the Court rejects the breach-of-contract claims as to tuition, it arrives at that conclusion by interpreting the terms of the contracts as plausibly alleged; it does not "set aside [the] contract[s] as unenforceable."  Falconi-Sachs, 142 A.3d at 556.  Nor does either Amended Complaint include any "allegation that the contract is invalid or

unenforceable." He Depu, 306 F. Supp. 3d at 193.[8]  The students therefore may not claim unjust

enrichment as an alternative to their breach-of-contract claim for a partial tuition refund.  See

Shaffer, 2021 WL 1124607, at *3 (dismissing unjust enrichment claim for the same reason in

similar case against George Washington University).

Even if the students' contract claims did not preclude their unjust enrichment claims

regarding tuition, the latter claims would fail on the merits.  As already noted, one element of

unjust enrichment is that "under the circumstances, the defendant's retention of the benefit is

unjust." Falconi-Sachs, 142 A.3d at 556.  The students fail to allege facts that, if proven, would

make it unjust under the circumstances for the universities to retain their full tuition payments for

the spring 2020 semester.  The Court is not unsympathetic to students who spent a great deal of

money to attend universities where they reasonably expected in-person instruction, only to find

their classes moved online amid the pandemic.  But as discussed at length above, it is not

plausible that this result was inconsistent with the terms of the contracts the students knowingly

entered.  As part of those bargains, the universities retained (at least) the right to make

reasonable changes in response to evolving circumstances, and there is no allegation that the

move to online learning in 2020 was anything but reasonable in the face of the pandemic.  In

retrospect, the students may understandably wish they had secured a money-back guarantee of

in-person instruction, but viewed *ex ante*, there was nothing inherently unconscionable about an

---

[8] At most, the Amended Complaints contain conclusory allegations that *if* the contracts
are unenforceable, *then* the universities are liable for unjust enrichment.  Georgetown Am.
Compl. ¶ 60 ("Even if performance was excused or impossible, Defendant would nevertheless be
required to return the funds received for services it will not provide."); American Am. Compl. ¶
138 ("This claim is pled in the alternative to, and to the extent it is determined a contract does
not exist or otherwise apply, the contract-based claim set forth in Count I above.").  The Court
disregards these legal conclusions in deciding the universities' motions to dismiss.  Iqbal, 556
U.S. at 678.

arrangement that lacked this feature.  The students may not proceed on an unjust enrichment

theory that would "displace the terms of [the] contract and impose some other duties not chosen

by the parties."  Emerine, 680 A.2d at 1384.[9]

### 3. Conversion

The universities also move to dismiss the students' claims of conversion as to their tuition

dollars.  Again, the Court sides with the universities.

Under D.C. law, "[a] defendant will be liable for conversion if the plaintiff shows that the

defendant participated in (1) an unlawful exercise, (2) of ownership, dominion, or control, (3)

over the personal property of another, (4) in denial or repudiation of that person's rights thereto."

Johnson v. McCool, 808 F. Supp. 2d 304, 308 (D.D.C. 2011).  "Although this tort typically

applies to chattels, money can be the subject of a conversion claim if the plaintiff has the right to

a specific identifiable fund of money."  Edwards v. Ocwen Loan Servicing, LLC, 24 F. Supp. 3d

21, 30 (D.D.C. 2014) (cleaned up).  "A conversion claim cannot stand where . . . plaintiff is

owed *at most* some unspecified, unidentified portion of a larger pool of funds."  Id. (citing Van

Dorn Retail Mgmt., Inc. v. Sovran Bank/DC Nat'l, Inc., No. 90-cv-2974, 1991 WL 222061, at *7

(D.D.C. Oct. 9, 1991)).

The students fail to allege that they have "the right to a specific identifiable fund of

money."  Id.  Through their conversion claim, the Georgetown students seek to recover "the pro-

rated portion of any Spring Semester 2020 tuition and fees for education services not provided or

_____

[9] The Georgetown students' Amended Complaint includes a claim for money had and
received.  However, this claim is wholly duplicative of the claim for unjust enrichment.  See
Del., Dep't of Health & Soc. Servs., Div. of Medicaid & Med. Assistance v. U.S. Dep't of
Health & Human Servs., 272 F. Supp. 3d 103, 114 (D.D.C. 2017) ("[T]he law of the District of
Columbia makes no distinction between actions for unjust enrichment and for money had and
received.").  Therefore, the claim for money had and received will be dismissed.

diminished in value since Georgetown shut down."  Georgetown Am. Compl. ¶ 71.  Similarly,

the American students do not appear to object to the university keeping *some* of their money;

they claim only that American's "continued possession of the *full payments* for the 2020 Spring

semester is adverse and in derogation of Plaintiffs' and the other Class members' entitlement to

such funds."  American Am. Compl. ¶ 192 (emphasis added); see also id. at 35–36 (seeking an

order "enjoining Defendant from retaining the *pro-rated, unused* monies paid for tuition and

fees") (emphasis added).  Neither Amended Complaint states a sum certain that the students

claim to be owed or spells out a formula or framework for prorating tuition.[10]  Nor do the

students allege that their tuition payments have been held in identifiable, segregated accounts,

rather than being comingled with other university funds.  The students therefore cannot recover

some yet-to-be-determined amount of tuition on a conversion theory.

### 4.  *D.C. Consumer Protection Procedures Act*

The final tuition-related claim to consider is the American students' claim under the D.C.

Consumer Protection Procedures Act ("CPPA").

The CPPA creates a cause of action against any person who "engage[s] in an unfair or

deceptive trade practice" and lists examples of such practices, including "misrepresent[ing] as to

a material fact which has a tendency to mislead."  D.C. Code § 28-3904.  "[A] claim of an unfair

trade practice [under the CPPA] is properly considered in terms of how the practice would be

viewed and understood by a reasonable consumer."  Pearson v. Chung, 961 A.2d 1067, 1075

---

[10] The Court could not simply order the universities to refund the amount of tuition proportional to the amount of time left in the spring 2020 semester when classes and activities moved online.  Prorating tuition in this way would provide an undue windfall to the students, who do not (and could not) claim that they received *zero* value from the online portion of the semester.

(D.C. 2008). The American students claim that the university committed an unfair and deceptive trade practice because its "provision of online education . . . contradicted representations made about [American's] educational services, including that Plaintiffs and the Class Members would receive in-person educational services, experiences, and opportunities." American Am. Compl. ¶ 202.

The students fail to allege that American made any false or misleading representation or omission about what it would provide in exchange for tuition. To be sure, the students plausibly allege that they expected their classes to meet on campus, based on American's advertising and other publications. By all indications, American had the same sincere expectation when it published those materials. Yet, as already discussed, American made no express or implied representation that it would provide uninterrupted in-person education regardless of the circumstances. On the contrary, a "reasonable consumer" of American's services, <u>Pearson</u>, 961 A.2d at 1075, would have understood from the outset that the university would adapt its program over time as reasonably necessary, even if that meant suspending all in-person education in response to a public health emergency. The students therefore may not recover any part of their tuition under the CPPA.[11]

B.  <u>Fee Claims</u>

   *1.  Breach of Contract*

Next, the universities seek dismissal of the students' contract claims as they relate to fees. Because Georgetown and American charged different fees, the Court will analyze the claims against the two universities separately.

---

[11] The Court does not reach American's alternative argument that the CPPA does not apply to its educational services.

The Georgetown students seek "disgorgement of the pro-rated portion of . . . fees, proportionate to the amount of time that remained in the Spring Semester 2020" when Georgetown allegedly stopped providing "campus services."  Georgetown Am. Compl. ¶ 18. Specifically, Georgetown allegedly charged undergraduates a mandatory $85.50 "Student Activities Fee" and represented that this fee "fund[s] various activities throughout the year, including concerts, lectures, performances, discussion groups, recreational opportunities, and other co-curricular programs."  Id. ¶ 21.  Graduate students were allegedly charged a "Graduate Student Activity Fee" of $17.50 per semester.  Id.  According to the Georgetown students, each of these fees "supports on-campus services that were not available to Plaintiffs after March 6, 2020."  Id.

These allegations fail to state a claim for breach of contract as to fees.  None of the quoted language from Georgetown's website specifies that the "activities" funded by students' fees would take place on campus, nor do the students allege that Georgetown failed to provide *any* activities (even online) after suspending in-person classes.  That Georgetown's fees have historically "support[ed] on-campus services," id., does not imply that Georgetown *promised* to provide activities on campus throughout the semester.  Similarly, the general allegation that Georgetown advertised its "in-person . . . experiences," id. ¶ 8, is not sufficient to demonstrate that Georgetown promised such "experiences" in exchange for students' payment of activity fees.

This analysis finds support in the emerging case law regarding universities' responses to COVID-19.  For example, in Chong v. Northeastern University, Northeastern represented that it charged a student activity fee to "provide[] support for student organizations, clubs and entertainment events throughout the school year."  No. 20-cv-10844-RGS, 2020 WL 7338499, at

*3 (D. Mass. Dec. 14, 2020).  The district court found that the student plaintiffs failed to state a claim for breach of contract as to that fee because the purpose of the fee was "to 'support' certain facilities during terms for which those students are enrolled in classes, and not to gain admission to any on-campus facility or access to a given resource (or even to support the operation of any specific service at an on-campus facility)."  Id. at *4.  The court specifically distinguished the student activity fee from Northeastern's campus recreation fee, which students paid in exchange for "the option to gain admission" to certain activities and facilities.  Id.  The Georgetown fees at issue here are akin to Northeastern's student activity fee, not its campus recreation fee.

The American students, for their part, seek partial refunds of four mandatory fees, relying on American's own description of each fee.  *First*, American charged an "Activity Fee," which it described as helping to fund "student-run organizations and programs" that "contribute significantly to the intellectual and social development of the student body, serve the university academic goals, encourage student participation and leadership, and enhance the general campus environment."  American Am. Compl. ¶ 160.  *Second*, American charged "all registered students" a "Sports Center Fee" to "help pay for building maintenance and service costs associated with the sports center complex."  Id. ¶ 161.  The university further noted that the Sports Center Fee "is not a membership fee for use [of] the fitness center" and that "[a]ny registered student can use the entire sports center complex facilities, including the fitness center."  Id.  *Third*, "all registered students" were required to pay a "Technology Fee," which was "assessed to help pay a small portion of the university's overall technology costs" for services available to all students, including those living "on-campus, off-campus, or abroad."  Id. ¶ 162.  *Fourth*, American required all "full time students enrolled in an on-campus program" to pay a "Metro University Pass (U-Pass) Fee" for a pass that would be "valid for unlimited

Metrorail and Metrobus transportation for the duration of the semester (Fall/Spring)."  Id. ¶ 163. The American students claim that the university breached its contract by failing to "provide student activities, on-campus printing facilities, access to recreational facilities, access to campus-based information technology resources, or access to metrobus transportation for a portion of the Spring 2020 semester."  Id. ¶ 165.

These claims against American fare no better than the fee-related contract claims against Georgetown.  To begin, American's Activity Fee is not meaningfully distinguishable from the activity fees Georgetown charged.  Like their Georgetown counterparts, the American students fail to allege a specific promise to provide *in-person* activities throughout the semester, and they do not contend that the online portion of the semester was completely devoid of virtual activities. See id. ¶ 167 (alleging only that American cancelled "*most* student activities" when the campus closed (emphasis added)).  As the students emphasize, American did describe its Activity Fee as supporting organizations and programs that, *inter alia*, "enhance the general campus environment."  Id. ¶ 160.  But this remark falls far short of promising uninterrupted access to on-campus extracurricular programming.  It makes perfect sense that the money American spends on student organizations—even during periods of temporary campus closure—would "enhance the general campus environment" in the long run by sustaining those organizations in existence until on-campus activities can resume.

The Court next considers American's Sports Center Fee.  Unlike Northeastern, which charged a campus recreation fee in exchange for "the option to gain admission" to activities and facilities, Chong, 2020 WL 7338499, at *4, American specified that its Sports Center Fee was "not a membership fee for use [of] the fitness center," American Am. Compl. ¶ 161.  Instead, American explained, the purpose of the Sports Center Fee was to "help pay for building

maintenance and service costs associated with the sports center complex," thus benefitting all registered students.  Id. ¶ 161.  Although the students allege that they lost "access to recreational facilities" amid the pandemic, id. ¶ 165, they do not claim that the shutdown somehow relieved American of the need to keep paying "building maintenance and service costs associated with the sports center complex" lest the facilities fall into disrepair, id. ¶ 161.  Nor does American's representation that "[a]ny registered student can use the entire sports center complex facilities," id., constitute a promise that students would *always* have access to those facilities.  In context, it is clear that American simply meant to express a policy of nondiscrimination among students: during the complex's operating hours, all students could use it, not just those who had paid a "membership fee."  Id.

The American students' contract claim regarding the Technology Fee is even weaker. The students claim they were denied "on-campus printing facilities" and "access to campus-based information technology resources," id. ¶ 165, but fail to make any allegation that American promised these specific services.  On the contrary, American stated that its Technology Fee supported services that are available to all students—even those who live abroad, far from American's physical campus.  Id. ¶ 162.  If anything, the fact that American moved its in-person classes to an online format suggests that it provided *more* in the way of technological services, not less.

Finally, the students allege that American failed to "provide . . . access to metrobus transportation" for part of the semester, despite charging the Metro U-Pass Fee.  Id. ¶ 165.  This is a non sequitur.  The only thing American allegedly agreed to "provide" in exchange for the Metro U-Pass Fee was an access pass for transit services provided by a third party, the

Washington Metropolitan Area Transit Authority ("WMATA").[12]  There is no allegation that American fully or partially revoked these passes when it transitioned to online learning.  That WMATA might have curtailed its services in response to COVID-19 does not create contractual liability for American.

The Court will therefore dismiss all of the Georgetown and American students' breach-of-contract claims insofar as they seek partial refunds of fees.

      2.   *Unjust Enrichment*

The students also claim that the universities were unjustly enriched by retaining the full student fees paid for the spring 2020 semester.  These claims must fail.

To reiterate, a plaintiff may state a claim for unjust enrichment as an alternative to breach of contract only if there is an "allegation that the contract is invalid or unenforceable."  He Depu, 306 F. Supp. 3d at 193.  Here, the students seek to recover part of their fees on a breach-of-contract theory, and they allege no facts to suggest that the claimed contract regarding fees was somehow invalid or unenforceable.  An alternative claim for unjust enrichment is not appropriate in this situation.

In any event, the students have not alleged sufficient facts to infer that it was unjust for the universities to retain their fees in full.  As already discussed, the Amended Complaints do not plausibly allege that the universities offered anything in exchange for the students' fees that they

---

[12] See Metrobus, Wash. Metro. Area Transit Auth., https://www.wmata.com/service/bus/ (last visited May 4, 2021).  Even at the pleading stage, the Court may take judicial notice of the fact that Metrobus is a WMATA service, which is "not subject to reasonable dispute" and is "generally known within the trial court's territorial jurisdiction."  Bradley v. Vox Media, Inc., 320 F. Supp. 3d 178, 181 (D.D.C. 2018) (quoting Fed. R. Evid. 201).

ultimately failed to deliver.  There can be no unjust enrichment where the universities upheld their end of a valid, consensual bargain.[13]

### 3.   Conversion

The Court explained above that the conversion claims as to tuition must be dismissed because the students do not claim entitlement to "a specific identifiable fund of money." Edwards, 24 F. Supp. 3d at 30.  The same reasoning applies to the conversion claims regarding student fees.  The students seek to have their fees prorated, but they do not plead a specific amount that allegedly should be returned or a formula for calculating the amount, nor do they allege the existence of a segregated account that they claim as their own.  These conversion claims cannot survive.

### 4.   D.C. Consumer Protection Procedures Act

Finally, the American students claim that they were deceived into paying fees, as well as tuition, in violation of the CPPA.  American Am. Compl. ¶ 208.  However, for the reasons already discussed, the students fail to allege that American made any false or misleading representations or omissions regarding its student fees.  A reasonable student would have understood that, even if American *expected* to offer campus-based programs and facilities throughout the semester, the university had not bound itself to an obligation to do so in all circumstances.  The CPPA claim thus fails as it relates to fees.

---

[13] Again, this conclusion on the unjust enrichment claims also disposes of the Georgetown students' claim for money had and received.  See supra note 9.

## IV.  Conclusion

For the foregoing reasons, the Court will grant both universities' motions to dismiss.

Separate Orders shall accompany this memorandum opinion.

 

 

 

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>May 7, 2021</u>