UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MAAZ QURESHI**, **MATTHEW RABINOWITZ**, and **DANISH ARIF**, individually and on behalf of others similarly situated,<br><br>       Plaintiffs,<br><br>       v.<br><br>**AMERICAN UNIVERSITY**,<br><br>       Defendant. | Case Nos. 20-cv-1141 (CRC),<br>       20-cv-1454 (CRC),<br>       20-cv-1555 (CRC) |

**MEMORANDUM OPINION AND ORDER**

  This lawsuit concerns a group of American University undergraduate students who sued their school for a partial refund of tuition and fees they paid for the spring 2020 semester, which was disrupted by the onset of the COVID-19 pandemic. Following the D.C. Circuit's partial reversal of this Court's prior dismissal of these claims, American now renews its motion to dismiss with respect to Plaintiffs' claim under the D.C. Consumer Protection Procedures Act. For the following reasons, and in light of the D.C. Circuit's opinion in this case, the Court will deny the renewed motion to dismiss.

**I. Background**

  Because the Court has already recounted the relevant factual background at length in its previous opinion in this case, it provides only a brief summary here. In the spring of 2020, Plaintiffs Maaz Qureshi, Matthew Rabinowitz, and Danish Arif (collectively, "Plaintiffs") were enrolled as undergraduate students at American University, a private university in Washington, D.C. Consolidated Amended Complaint ("Compl.") ¶¶ 6, 13. They paid tuition for the semester, id. ¶ 127, plus mandatory fees including an "activity fee," a "sports center fee," a "technology

fee," and a "Metro U-Pass fee," id. ¶¶ 33, 164.  Plaintiffs allege that American, through its website, marketing material, advertisements, course catalog, syllabi, and other documents, promised and sold them "on-campus instruction and the on-campus experience as key reasons that a student should choose to attend American."  Id. ¶¶ 24–26, 86, 115–16, 118–26.  In response to the COVID-19 pandemic, however, American shifted its instruction to a fully online format beginning in March 2020, continuing through the end of the spring 2020 semester, id. ¶¶ 46–47, but it refused to refund any portion of the tuition and fees Plaintiffs and other students paid at the outset of the semester, before the pandemic began, id. ¶¶ 3, 193.

In May and June 2020, Plaintiffs filed three separate class action complaints against American based on the switch to remote learning.  The Court consolidated the Plaintiffs' cases, see Minute Order (July 3, 2020),[1] and they filed an amended complaint alleging causes of action for breach of contract, unjust enrichment, conversion, and unlawful and deceptive trade practices in violation of the D.C. Consumer Protection Procedures Act ("CPPA").  See Compl. ¶¶ 76–211.  American moved to dismiss the complaint, and this Court granted the motion as to all of Plaintiffs' claims.  As relevant here, the Court concluded, with respect to the breach of contract claim, that American "impliedly promised, at most, to make a good-faith effort to provide on-campus education, while retaining the right to deviate from the traditional model if they reasonably deemed it necessary to do so."  Crawford v. Presidents & Dirs. of Georgetown Coll., 537 F. Supp. 3d 8, 22 (D.D.C. 2021).  Based on the conclusion that "American made no express or implied representation that it would provide uninterrupted in-person education regardless of the circumstances"—including a public health emergency arising from a once-in-a-century

---

[1] Plaintiffs' case was also consolidated with a similar case against Georgetown University, which has since been voluntarily dismissed.  See Stipulation of Dismissal, Crawford v. Presidents & Dirs. of Georgetown Coll., Case No. 21-7063 (D.C. Cir. Oct. 8, 2021).

2

global pandemic—the Court also dismissed Plaintiffs' CPPA claim for failing "to allege that American made any false or misleading representation or omission about what it would provide in exchange for tuition" or fees. Id. at 26, 29.

Plaintiffs appealed, and the D.C. Circuit affirmed in part and reversed in part. See Shaffer v. George Washington Univ., 27 F.4th 754 (D.C. Cir. 2022).[2] Specifically, the Circuit reversed this Court's dismissal of Plaintiffs' breach of contract claims relating to tuition and to two of American's student fees, reversed the dismissal of Plaintiffs' unjust enrichment claims, affirmed the dismissal of the conversion claim, and reversed the dismissal of the CPPA claim. See id. at 766–67, 770. With respect to the breach of contract claim, the court held that "Plaintiffs adequately allege the Universities breached an implied-in-fact contract to provide in-person education in exchange for tuition." Id. at 763. Assessing American's marketing and communications materials, combined with its "historic practice of providing on-campus instruction to students who pay the tuition associated with traditional on-campus—rather than online—education," the court held that "'a reasonable person would have assumed that the Universit[ies] intended to bind' themselves to providing in-person education in exchange for retaining Plaintiffs' entire tuition payments for traditional on-campus degree programs." Id. at 764 (alteration in original) (quoting Basch v. George Washington Univ., 370 A.2d 1364, 1367 (D.C. 1977)).

As for Plaintiffs' CPPA claim, the Circuit held that this Court's dismissal "rested on its conclusion that Plaintiffs failed to allege that the University was bound by any implied-in-fact agreements relating to any commitments made to provide campus-based programs and facilities

---

[2] For the appeal, this case was considered alongside another case against George Washington University, which is presently proceeding before a different judge in this district. See Shaffer v. George Washington Univ., Case No. 20-cv-1145.

throughout the semester," and so the Circuit accordingly reversed the dismissal of that claim and remanded for this Court "to reconsider American's motion to dismiss the CPPA claim in light of our analysis of Plaintiffs' breach-of-contract claims." Id. at 770. In particular, the Circuit noted that, on remand, this Court "may be required to consider American's alternative argument that the University is not subject to the CPPA" under an exception from CPPA liability for nonprofits "if the claim is 'based on membership services' or 'training or credentialing activities.'" Id. (quoting D.C. Code § 28-3905(k)(5)). The court "express[ed] no opinion" on these questions. Id.

After remand, American filed a renewed partial motion to dismiss focused on Plaintiffs' CPPA claim. That renewed motion is fully briefed and ripe for decision.

## II.  Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The Court treats the factual allegations of the complaint as true "and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)).

## III.  Analysis

The D.C. CPPA makes it unlawful "for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby." D.C. Code § 28-3904. The statute defines unfair or deceptive trade practices to include, among other things, representing that goods or services have characteristics that they do not have,

4

representing that goods or services are of a particular standard, quality, or style if in fact they are of another, and misrepresenting or failing to state a material fact which has a tendency to mislead.  Id. §§ 28-3904(a), (d), (e), (f).  "When used as an adjective" under the statute, the word "consumer" "describes anything, without exception, that" a "person does or would purchase, lease (as lessee), or receive and normally use for personal, household, or family purposes." Id. § 28-3901(a)(2)(B).  The statute likewise defines "goods and services" broadly to include "any and all parts of the economic output of society, at any stage or related or necessary point in the economic process, and includes consumer credit, franchises, business opportunities, real estate transactions, and consumer services of all types." Id. § 28-3901(a)(7).  Because the "purpose of the CPPA is to protect consumers from a broad spectrum of unscrupulous practices by merchants," the statute "should be read broadly to assure that the purposes are carried out." Mod. Mgmt. Co. v. Wilson, 997 A.2d 37, 62 (D.C. 2010).

In its renewed motion to dismiss Plaintiffs' CPPA claim, American reiterates two arguments first raised in its 2020 motion to dismiss.  First, American contends that the CPPA does not apply to claims raised against it because the statute includes a carve-out for actions brought "against a nonprofit organization" based on "membership in such organization, membership services, training or credentialing activities, . . . or any other transaction, interaction, or dispute not arising from the purchase or sale of consumer goods or services in the ordinary course of business."  D.C. Code § 28-3905(k)(5); Renewed Mot. to Dismiss ("Renewed MTD") at 2–5.  Second, American contends that, even if the CPPA applies to it, Plaintiffs have not alleged an unfair or deceptive practice because they have not alleged that the University's

representations about its offerings were "misleading or false at the time they were made." Renewed MTD at 5–6. The Court addresses each of these contentions in turn.[3]

### A. The Nonprofit Exception

First, American contends that, as a nonprofit organization, it falls within § 28-3905(k)(5)'s carve-out for nonprofits because Plaintiffs' claims, which concern the method and format of instruction provided to students during the COVID-19 pandemic, pertain to "training or credentialing activities." Renewed MTD at 2–3; MTD at 25–26. American's position, then, is that "training or credentialing activities" should be read to encompass undergraduate education. To be sure, the dictionary definition of "train" and "credential" could be read to include educational activities. See MTD at 25–26 (citing definition of "train" to include "to teach so as to make fit, qualified, or proficient" or "to form by instruction, discipline, or drill"); id. (citing definition of "credential" as "something that gives title to credit or confidence," such as "to credential adequate academic performance"). But for several reasons, the Court believes that, had the D.C. Council intended the CPPA's nonprofit carve-out to cover undergraduate educational activities of colleges and universities, it would have done so explicitly rather than through the terms "training" or "credentialing."

---

[3] Plaintiffs assert that American's renewed motion to dismiss is procedurally improper because, under Federal Rule of Civil Procedure 12(g), a party cannot raise "a defense or objection available to the party but omitted from its earlier motion." Opp. at 2–3. That argument is meritless. First, American did previously raise the arguments contained in its renewed motion; it is simply raising them again now, in light of the D.C. Circuit's opinion. See MTD at 25–28. Moreover, the court has the power to permit multiple motions despite Rule 12(g) if doing so would "significantly advance the progress of this litigation." He Depu v. Oath Holdings, Inc., 531 F. Supp. 3d 219, 236–37 (D.D.C. 2021) (quoting United States ex rel. Scott v. Pac. Architects & Eng'rs, Inc., No. 13-cv-1844, 2020 WL 224504, at *3 (D.D.C. Jan. 15, 2020)). Renewed motion to dismiss briefing in light of the D.C. Circuit's opinion in this case serves that purpose.

For one, although the terms "training" or "credentialing" can technically be read to have some scholastic connotation, the D.C. Council could easily have included the word "educational" in this list had it intended § 28-3905(k)(5) to cover educational activities of colleges and universities.  Generally, under the well-known canon of construction *expressio unius est exclusio alterius*, "mention of one thing implies exclusion of another thing."  Ethyl Corp. v. EPA, 51 F.3d 1053, 1061 (D.C. Cir. 1995) (quoting Am. Methyl Corp. v. EPA, 749 F.2d 826, 835–36 (D.C. Cir. 1984)); see NLRB v. SW Gen., Inc., 580 U.S. 288, 302 (2017) ("If a sign at the entrance to a zoo says 'come see the elephant, lion, hippo, and giraffe,' and a temporary sign is added saying 'the giraffe is sick,' you would reasonably assume that the others are in good health."). "Granted, the weight of the *expressio unius* canon is sensitive to statutory context," and is a "useful aid" only "where the context shows that the 'draftsmen's mention of one thing . . . does really necessarily, or at least reasonably, imply the preclusion of alternatives.'"  Nasdaq Stock Mkt. LLC v. SEC, 38 F.4th 1126, 1136–37 (D.C. Cir. 2022) (quoting Indep. Ins. Agents of Am., Inc. v. Hawke, 211 F.3d 638, 644 (D.C. Cir. 2000)).  Here, however, "it is fair to suppose that [the Council] considered the unnamed possibility" of excluding nonprofit educational activities from the CPPA's coverage "and meant to say no to it."  Marx v. Gen. Revenue Corp., 568 U.S. 371, 381 (2013) (quoting Barnhart v. Peabody Coal Co., 537 U.S. 149, 168 (2003)); see also Barnhart, 537 U.S. at 168 ("[T]he canon *expressio unius est exclusio alterius* does not apply to every statutory listing or grouping; it has force only when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." (quoting United States v. Vonn, 535 U.S. 55, 65 (2002))).

Here, the statutory context provides good reason to think the Council did not intend to include educational activities under the carve-out for "training and credentialing" activities.  As a

matter of common parlance, "training" and "credentialing" bear a business and professional connotation distinct from "educating." See, e.g., Steven Mintz, Educating Versus Training and Credentialing, Inside Higher Ed (Feb. 4, 2019), https://www.insidehighered.com/blogs/higher-ed-gamma/educating-versus-training-and-credentialing ("Credentials document and validate a person's knowledge and skills.  Higher education, in contrast, has traditionally had broader goals.").  For instance, a state bar association or medical board acts as a training or credentialing organization when it offers professional skills workshops or determines whether to grant someone a professional license, but those activities are distinct from the provision of an applicant's underlying education.

Moreover, when interpreting the CPPA's definition of "consumer," courts have explained that "the statute does not reach transactions intended primarily to promote business or professional interests." Shaw v. Marriott Int'l, Inc., 605 F.3d 1039, 1043 (D.C. Cir. 2010) (citing Ford v. ChartOne, Inc., 908 A.2d 72, 81, 83–84 & n.12 (D.C. 2003)).  In line with that overall statutory scheme, the other carve-outs in § 28-3905(k)(5) seem similarly geared toward excluding from CPPA coverage business and professional activities, such as the "sale of publications" of nonprofit organizations, "membership services," "medical or legal malpractice," and other conduct "not arising from the purchase or sale of consumer goods or services." See In re APA Assessment Fee Litig., 766 F.3d 39, 52–53 (D.C. Cir. 2014) (interpreting CPPA's "membership" exception in the context of professional medical association dues dispute); see also Yates v. United States, 574 U.S. 528, 543 (2015) ("[W]e rely on the principle of *noscitur a sociis*—a word is known by the company it keeps—to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress.'" (quoting Gustafson v. Alloyd Co., 513 U.S. 561, 575

(1995))).  In light of that context, it makes sense to read "training or credentialing activities" to encompass conduct like professional licensing, career training, apprenticeships, or accreditation activities, but not necessarily undergraduate education.

The history and context of the addition of § 28-3905(k)(5) further suggests that the omission of "educational activities" was intentional.  When it was first passed in 1976, the CPPA did not discuss nonprofits in particular.  See D.C. Consumer Protection Procedures Act of 1976, D.C. Law 1-76, 23 D.C. Reg. 1185 (July 22, 1976) (codified as amended at D.C. Code §§ 28-3901 et seq.).  A decade later, in 1986, the D.C. Court of Appeals interpreted the statute to exclude the conduct of nonprofit educational institutions.  See Save Immaculata/Dunblane, Inc. v. Immaculata Preparatory Sch., Inc., 514 A.2d 1152 (D.C. 1986), In Save Immaculata, a group of alumnae and parents associated with the Immaculata Preparatory School and Dunblane Academy filed a lawsuit after the schools announced that they would be closing and selling their buildings (coincidentally) to American University.  Id. at 1153–54.  Among other causes of action, the plaintiffs brought fraudulent misrepresentation and CPPA claims, alleging that "by withholding news of the impending closure of the schools and the sale of their properties to American," Immaculata and Dunblane had "intentionally deceived students and their parents into believing the students would get a four-year education," leading parents to enroll students who otherwise would have chosen other schools.  Id. at 1158–59.  The court dismissed both claims, holding that "a nonprofit educational institution is not a 'merchant' within the context of the" CPPA.  Id. at 1159.

In 2007, the Council "revised the statute 'to expose nonprofits otherwise acting as "merchants" to the same level of liability as for-profit corporations.'"  Shaffer, 27 F.4th at 770 (quoting In re APA Assessment Fee Litig., 766 F.3d at 53).  The 2007 legislation also included

9

the carve-out contained in § 28-3905(k)(5).  The Committee Report for the legislation observed that "[n]onprofits in the District include major universities."  See D.C. City Council, Comm. on Pub. Safety & the Judiciary, Comm. Rep. on B. No. 17-53, at 2 (Feb. 28, 2007) ("Comm. Rep."). The letter from then-Mayor Anthony Williams proposing the legislation called attention to the fact that the District's "nonprofits include major universities," observed that many "non-profit organizations, such as hospitals, *schools*, and counseling agencies, provide consumers with services for a fee," and cited Save Immaculata, a case against a nonprofit educational institution, as the origin of the then-existing nonprofit exception to the CPPA.  Id. at 13–14 (emphasis added); see also id. at 26, 32–33 n.6 (testimony before legislative committee by Chief of D.C. Attorney General's Consumer and Trade Protection Section, citing the Save Immaculata decision).  And the President of the Consortium of Universities of the Washington Metropolitan Area, John Childers, testified before the committee, noting that the proposed legislation could have an impact on institutions of higher education in the District.  See id. at 4, 44–45.

Given those events, the Council was well aware that modifying the CPPA to permit nonprofit liability might have an effect on educational institutions, yet § 28-3905(k)(5) made no explicit reference to colleges, universities, or "educational" activities when carving out other areas of conduct from the law's coverage.  Instead, the language the Council chose reflects an intent to exclude from CPPA's coverage the activities of trade associations, professional societies, and licensing organizations, all of which also lobbied the Council that enacted the 2007 legislation.  See Comm. Rep. at 36 (letter from firm representing "trade associations, professional societies and other types of tax-exempt organizations"); id. at 46 (letter from American Society of Association Executives representing "senior staff professionals of trade, professional, or philanthropic organizations").  Coupled with the text of the statute, the fact that

10

the Council was on notice that educational institutions also would fall within the amended CPPA, absent an exception, suggests that the omission of "educational activities" from § 28-3905(k)(5) was intentional. At the very least, using the words "training or credentialing activities," without more, would be a remarkably roundabout way to cover such a prominent constituency in the District as universities.

Alternatively, American contends that Plaintiffs claims relating to the fees charged for "access to campus facilities and participation in student events" qualify as claims related to "membership services" under § 28-3905(k)(5). Renewed MTD at 3. The Court finds this argument unconvincing for similar reasons. Even more so than "training or credentialing activities," "membership services" would be a cryptic way for the Council to describe facilities and extracurricular offerings available to university students. It is far more plausible that this provision is a reference to members of professional or trade organizations, as in In re APA Assessment Fee Litigation, which stated that a dues dispute between members of the American Psychological Association and the organization fell "directly within the nonprofit-membership exclusion" of the CPPA. 766 F.3d at 43–44, 52. The Court also notes that the D.C. Nonprofit Corporation Act defines "member" as a "person that has the right, in accordance with the articles of incorporation or bylaws, and not as a delegate, to select or vote for the election of directors or delegates or to vote on any type of fundamental transaction." D.C. Code § 29-401.02(24). Although the CPPA's definition of "nonprofit organization" is not limited to nonprofit corporations, see id. § 28-3901(a)(14), the Court finds the Nonprofit Corporation Act instructive insofar as it suggests that students paying tuition and fees for undergraduate education fall outside the intuitive definition of "membership services."

11

The Court is not persuaded by either of the two authorities on which American relies. First, American cites a D.C. Court of Appeals decision which reviewed a trial court opinion, which in turn held that obtaining a law degree "is a training and credentialing activity." Renewed MTD at 5; see Sanoian v. George Washington Univ., No. 18-CV-911, at 5 (D.C. Ct. App. Mar. 3, 2020) (slip op.).  But, Sanoian *declined* to address what it called the "difficult question[]" whether the "training or credentialing activities" exception applied in that case, instead affirming on a different basis.  Sanoian, No. 18-CV-911, at 5.  Further, whereas Plaintiffs in this case are undergraduates at American, Compl. ¶ 13, the plaintiffs in Sanoian were law school students to whom the possible professional connotations of the terms "training or credentialing activities" more plausibly could apply.[4]

The other source American cites is the public comments before the Council by John Childers, President of the Consortium of Universities of the Washington Metropolitan Area. Renewed MTD at 3–4.  After the proposed CPPA amendment was revised to add exceptions to nonprofit liability, Childers stated that the Consortium felt the language was "far better than the first version," which lacked such exceptions.  Comm. Rep. at 44.  But like "floor statements by individual lawmakers," this comment by a representative of collegiate interests is "among the least illuminating forms of legislative history."  Advoc. Health Care Network v. Stapleton, 581 U.S. 468, 481 (2017) (quoting SW Gen., 580 U.S. at 307).  At best, the comment represents a single person's understanding of the 2007 legislation, and at worst, it could be a self-serving attempt to influence the interpretation of the exception to include nonprofit university education. As explained above, the Court finds far more persuasive the fact that Childers spoke to the

---

[4] To the extent Plaintiffs' class action claims are not limited to undergraduate students, the Court reserves judgment on whether undergraduates and graduate students might be treated differently in this case.

Council about the impact of nonprofit CPPA liability on universities, and yet the Council chose not to cover educational activity explicitly in § 28-3905(k)(5).

Finally, American maintains that the instruction provided at the university is not a "consumer good or service" and thus falls outside the scope of the CPPA.  See D.C. Code § 28-3905(k)(5) (excluding from coverage lawsuits based on any "transaction, interaction, or dispute not arising from the purchase or sale of consumer goods or services in the ordinary course of business").  Specifically, American observes that the CPPA does not cover "transactions intended primarily to promote business or professional interests," Shaw, 605 F.3d at 1043, and posits that higher education falls squarely on the "business or professional" side of the line, Renewed MTD at 5.

American's position too narrowly construes the CPPA's definition of consumer goods or services.  When used as an adjective, the word "consumer" in the CPPA covers "*anything, without exception*, that" a person would "purchase, lease (as lessee), or receive and normally use for personal, household, or family purposes." D.C. Code § 28-3901(a)(2)(B) (emphasis added).  The statute, in turn, defines "goods and services" to include "*any and all* parts of the economic output of society, at any stage or related or necessary point in the economic process, and includes consumer credit, franchises, business opportunities, real estate transactions, and *consumer services of all types*."  Id. § 28-3901(a)(7) (emphasis added).  Because the CPPA "is a comprehensive statute designed to provide procedures and remedies for a broad spectrum of practices which injure consumers," Dist. Cablevision Ltd. P'ship v. Bassin, 828 A.2d 714, 722–23 (D.C. 2003) (quoting Atwater v. D.C. Dep't of Consumer & Regul. Affs., 566 A.2d 462, 465 (D.C. 1989)), the courts have stressed that "the statute should be read broadly to assure that th[ose] purposes are carried out," Mod. Mgmt. Co., 997 A.2d at 62.

Consistent with those definitions, "purpose is the touchstone of the CPPA's definition of 'consumer.'" Shaw, 605 F.3d at 1043. That is, so long as an individual's purpose in purchasing services is of a personal nature, then the transaction falls within the CPPA's scope, even if the individual also may have a pecuniary motive. For instance, in Ford v. Chartone, Inc., 908 A.2d 72 (D.C. 2006), a plaintiff filed a CPPA lawsuit against a medical records company for charging unconscionably high fees, id. at 77. The D.C. Court of Appeals explained that, although the plaintiff purchased his medical records to support a claim for financial recovery in a separate personal injury lawsuit, using "medical records to secure compensation for injuries in a lawsuit" was "no less 'personal'" than "using them to secure insurance coverage or, for that matter, a second medical opinion, employment, medical leave, and other personal benefits." Id. at 83. In short, a "motive may be pecuniary and still be personal," id., and just because a transaction may lead to a later monetary benefit does not take it outside the CPPA's coverage. "[I]t is not the use to which the purchaser ultimately puts the goods or services, but rather the nature of the purchaser that determines the nature of the transaction." Id. at 84 (alteration in original) (quoting Adam A. Weschler & Son, Inc. v. Klank, 561 A.2d 1003, 1005 (D.C. 1989)); see also Indep. Comm'cns Network, Inc. v. MCI Telecomms. Corp., 657 F. Supp. 785, 788 (D.D.C. 1987) (transactions between two merchants both on the "supply side" of the consumer-merchant divide fall outside CPPA).

In light of this case law, American's contention that Plaintiffs "pursued their degrees with an eye toward future employment" does not mean that American's provision of educational experiences falls outside of the CPPA. Renewed MTD at 5. And such a characterization of Plaintiffs' purposes for attending American is inconsistent with their complaint. Plaintiffs allege a host of interests in attending American that have everything to do with the personal

14

experiences and opportunities for enrichment of a college campus and nothing to do with business or professional intentions—for instance, the use of sports facilities and fitness centers, participation in on-campus student activities, "access to the energy, culture, and opportunities of our nation's capital," "campus amenities," "campus diversity," and an "experiential learning" setting. Compl. ¶¶ 13, 25–26, 40, 83, 87–88. To the extent American suggests, as a general rule, that all college students seek out higher education only for business or professional—rather than personal—purposes, that notion is contradicted by the University's own stated mission to "advance knowledge, foster intellectual curiosity, build community, and empower lives of purpose, service, and leadership." American University's Mission, Am. Univ., https://www.american.edu/about/mission.cfm (last visited Mar. 7, 2023).[5]

The Sixth Circuit's decision MacDonald v. Thomas M. Cooley Law School, 724 F.3d 654 (6th Cir. 2013), on which American relies, does not alter the Court's conclusion. There, the court interpreted a Michigan consumer protection statute to exclude claims brought by law students against their law school, reasoning that the plaintiffs "did not attend law school for personal purposes, nor for dilettantish reasons" but rather "bought their legal education for a business purpose, to make a living." Id. at 661–62. Unlike Plaintiffs here, however, the law students in MacDonald conceded in their complaint that they each "intended to use his or her law degree 'to prospectively better themselves and their personal circumstances *through the attainment of full-time employment in the legal sector*.'" Id. at 661. Moreover, the MacDonald plaintiffs were graduate students, not undergraduates like Plaintiffs here. The Sixth Circuit did

---

[5] Were American's theory correct, many college anthems would require revision as well. See, e.g., H.S. Durand, Bright College Years, https://collegearts.yale.edu/sites/default/files/attachments/bright_college_years.pdf (last visited Mar. 7, 2023) ("Bright College years, with ~~pleasure~~ [professional networking opportunities] rife, / The shortest, ~~gladdest~~ [most lucrative] years of life." (alterations added)).

not purport to hold that all students everywhere—undergraduate and professional alike—seek out higher education only for business purposes. Thus, even if the MacDonald law students "did not purchase a Cooley legal education so that they could leisurely read and understand Supreme Court Reports," id. at 661 (citation omitted), an American University undergraduate may well pay for an education to leisurely digest the philosophy of Plato,[6] the poetry of Maya Angelou,[7] or the films of Federico Fellini.[8]

The Court recognizes that the vision of American college campuses as liberal-arts idylls is becoming increasingly illusory. Over roughly the last decade, English and History majors across the country fell by a third, and humanities enrollment overall dropped by seventeen percent. Nathan Heller, The End of the English Major, The New Yorker, Mar. 6, 2023, at 28. The declines have been across the collegiate spectrum. SUNY Albany lost three-quarters of its humanities majors; Tufts and Notre Dame roughly a half. Id. And a survey last year found that only seven percent of Harvard undergraduates planned to major in humanities, compared to twenty percent in 2012 and around thirty percent in the 1970s. Id. at 31. Still, while the barbarians of professionalism may be at the gates of the quad, the academy has yet to be overrun. Colleges continue to attract students who wish to broaden their intellectual horizons, even while

---

[6] BA in Philosophy, Am. Univ., https://www.american.edu/cas/philrel/ba-phil.cfm (last visited Mar. 7, 2023) ("Ultimately, the philosophy BA program helps students acquire useful skills for many trades and professions (former students have gone on to careers in academia, business, government, journalism, law, non-profit, public administration, etc.); but above all, it nurtures powers of the mind and heart for future changemakers.").

[7] Literature (BA), Am. Univ., https://www.american.edu/cas/literature/ba-lit.cfm (last visited Mar. 7, 2023) ("LIT-247 Contemporary Poetry").

[8] Communication: Film and Media Arts (BA), Am. Univ., https://www.american.edu/soc/film/ba/ba-fmed-degree-course-requirements-cfm.cfm (last visited Mar. 7, 2023) ("COMM-201 Survey of International Cinema").

they might select majors with more pecuniary objectives in mind. And as American demonstrates, schools actively market the liberal arts to achieve well-rounded student bodies. So, for now at least, undergraduate education remains a personal consumer service under the CPPA's broad definition of the term.

The Court therefore concludes that Plaintiffs' claims do not fall within the limited nonprofit carve-out in § 28-3905(k)(5).

B.  Unfair or Deceptive Trade Practice

American also asks that the Court dismiss Plaintiffs' CPPA claim on the ground that they have not alleged an unfair or deceptive practice under the statute. Specifically, American contends that Plaintiffs "fail to allege any facts supporting the assertion that" its representations about the nature or quality of instruction provided to Plaintiffs "were misleading or false at the time they were made" because American could not foresee the global pandemic that necessitated a move to remote instruction. Renewed MTD at 5–6. American also maintains that because it made no express representations about in-person education and on-campus services, it could not have misrepresented any facts regarding those matters. Reply at 6.

The CPPA's provision defining unfair or deceptive trade practices offers a long, non-exhaustive list of qualifying practices, including representing "that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have," representing that goods or services "are of particular standard, quality, grade, style, or model, if in fact they are of another," "misrepresent[ing] as to a material fact which has a tendency to mislead," "fail[ing] to state a material fact if such failure tends to mislead," using "innuendo or ambiguity as to a material fact, which has a tendency to mislead," and making or enforcing "unconscionable terms or provisions

17

of sales or leases." See D.C. Code § 28-3904(a), (d), (e), (f), (f-1), (r); see Atwater, 566 A.2d at 466 (list of forbidden practices "was not designed to be exclusive"). Plaintiffs' complaint does not identify by code section which specific provisions American allegedly violated, but because their CPPA count contains language tracking the provisions just cited, the Court assumes that Plaintiffs allege claims arising under those subsections. See Compl. ¶ 202.

In any event, the Court need not opine on every possible one of Plaintiffs' theories to resolve this motion. In light of the D.C. Circuit's decision in this case, Plaintiffs have at least alleged that American represented that its educational services were of a particular standard, quality, or style "when in fact they were of another" or misrepresented "as to a material fact which has a tendency to mislead." In reviving Plaintiffs' breach of contract claims, Shaffer held that a reasonable person reviewing American's communications in the context of the historical practice of on-campus instruction would have assumed that American intended to bind itself "to providing in-person education in exchange for retaining Plaintiffs' entire tuition payments for traditional on-campus degree programs." Shaffer, 27 F.4th at 764. Formulated that way, the alleged misrepresentation for purposes of Plaintiffs' CPPA claim is not (as this Court views it) American's promise to provide in-person education, no matter the circumstances, but rather its representation that the full-tuition package students purchased at the outset of 2020—the payment for which American has retained—included all of the in-person, on-campus elements described in the complaint.[9] It may well be that American did not foresee a global pandemic

---

[9] American did not renew in this round of briefing the argument that Plaintiffs' CPPA claims are premised on a "statement of future expectation" that is "not actionable under the CPPA." See MTD at 27 (citing Cannon v. Wells Fargo Bank, N.A., 926 F. Supp. 2d 152, 174 (D.D.C. 2013)). That argument, therefore, is waived. Davila v. Mayorkas, No. 22-CV-357 (CRC), 2023 WL 2072455, at *3 (D.D.C. Feb. 17, 2023) (Cooper, J.). But, even had American raised this argument in its renewed motion to dismiss, Plaintiffs' CPPA claim is not premised on "[o]pinions or predictions of future events," Cannon, 926 F. Supp. 2d at 174 (citation omitted),

when it made those representations, but a "plaintiff does not have to establish intentional misrepresentation in order to make out a claim" under the CPPA's misrepresentation provisions. E.M. v. Shady Grove Reprod. Sci. Ctr. P.C., 496 F. Supp. 3d 338, 411 (D.D.C. 2020). Plaintiffs have therefore alleged material misrepresentations sufficient to support at CPPA claim, at least at the motion to dismiss stage.[10]

This is not to say that Plaintiffs will ultimately prevail on the merits. For instance, whether a fact is material is usually a question for the factfinder and depends on whether "a reasonable person 'would attach importance to its existence or nonexistence when determining his or her choice of action in the transaction'" or "the maker of the representation knows or has reason to know" that the recipient likely "regard[s] the matter as important in determining his or her choice of action." Frankeny v. Dist. Hosp. Partners, 225 A.3d 999, 1005 (D.C. 2020) (alteration in original) (quoting Saucier v. Countrywide Home Loans, 64 A.3d 428, 442 (D.C. 2013)). The burden of proof for CPPA claims, moreover, is clear and convincing evidence. Id. (citing Pearson v. Chung, 961 A.2d 1067, 1073 (D.C. 2008)). But at least at this stage of the case, Plaintiffs' complaint adequately alleges representations made by American that a

---

but rather (as the Circuit saw it) the representation that the full price tag of Spring 2020 tuition and fees purchased "in-person education" and "traditional on-campus degree programs," Shaffer, 27 F.4th at 764.

[10] Alongside their misrepresentation allegations, Plaintiffs' complaint also alleges that American imposed "unconscionable terms or provisions of a sale" by retaining full tuition and fees despite remote operations. Compl. ¶ 202(f). That allegation tracks the phrasing of another category of unfair or deceptive practice—§ 28-3904(r). Subsection (r), unlike the CPPA's misrepresentation provisions, "*does* require that the practice be intentional," E.M., 496 F. Supp. 3d at 413 (emphasis added), that is, that the allegedly unlawful acts "must be done with deceit or with knowledge of the probable adverse impact on the consumer," Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp., 944 A.2d 1055, 1073 (D.C. 2008). Plaintiffs' complaint contains no allegations suggesting that American intentionally mischaracterized its educational offerings, as required for an unconscionability claim, but because they have plausibly alleged a violation based on a misrepresentation theory, their CPPA claim may proceed.

reasonable person would have understood to bind it "to providing in-person education in exchange for retaining Plaintiffs' entire tuition payments for traditional on-campus degree programs." Shaffer, 27 F.4th at 764; Compl. ¶¶ 22–30, 202–211.

## IV. Conclusion

For these reasons, it is hereby

**ORDERED** that [Dkt. No. 57] Defendant's Renewed Motion to Dismiss is DENIED.

**SO ORDERED**.

CHRISTOPHER R. COOPER<br>
United States District Judge

Date: March 7, 2023